DEC 2 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Rodney K. Justin
c/o 620 Virginia Drive
Woodleaf, North Carolina [27054]
(704) 278-4359

Plaintiff, in *pro se*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Rodney K. Justin, A sentient human being,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES, a Federal corporation; DEPARTMENT OF THE TREASURY; the INTERNAL REVENUE SERVICE; the DEPARTMENT OF JUSTICE; Title 26 U.S.C. § 7201; Title 26 U.S.C. § 7203; Title 26 U.S.C. § 7851; LEANNA JARRELLS, in her official capacity; RON BROWN, in his official capacity; BOBBY MARTENS, in his official capacity; and DOES 1 through 5, inclusive;<br><br>Defendants. | Case No.<br><br><br>**VERIFIED COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED**<br><br>Case: 1:07-cv-02334<br>Assigned To : Kennedy, Henry H.<br>Assign. Date : 12/28/2007<br>Description: Pro se General Civil |



COMES NOW Rodney K. Justin, Plaintiff, proceeding on his own behalf, filing this Verified Complaint and invoking the Constitution pursuant to 28 U.S.C. § 1331, *et seq.*, to cede the jurisdiction of this Court, vesting it to act as an Article III Court under the Constitution for the United States of America to dispose of cases and controversy that fall within its constitutional ambit; since Article III *"serves to identify those disputes which are appropriately resolved through the judicial process." Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). It is well established that the *"Federal courts of limited jurisdiction are empowered to hear only those cases that the Constitution and Congress grant them authority to consider."* See *Finley v. United States*, 490 U.S. 545 (1989).



Plaintiff has standing by virtue of the fact that Defendants' acts, commissions, and omissions have caused Plaintiff to suffer an injury – an invasion of a legally-protected interest which is: (a) concrete and particularized (*Warth v. Seldin*, 422 U.S. 490, 508 (1975); *Sierra Club v. Morton*, 405 U.S. 727, 740-741, fn.16 (1972)) and (b) actual or imminent (Whitmore, supra, at 155 quoting *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)); secondly, there is a causal connection between the injury and the conduct complained of traceable to the challenged action of the Defendants (*Simon v. Eastern K. Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976)); and thirdly, it is likely that the injury will be redressed by a favorable decision, id. at 38, 43. **"In order to maintain a cause of action based on an allegation of constitution violations, a plaintiff must show that the actions complained of are 'fairly attributable' to the government."** (*Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982).

Plaintiff is, at all times mentioned herein, proceeding in the capacity and standing as a Living, Breathing, Conscious, Thinking, Flesh and Blood Sentient Human Being. Plaintiff is NOT appearing as a subclass statutory person, citizen, collective entity, creature of statute or otherwise, but of a superior class and authority not enjoyed by the Defendants – corporate entities void of conscience – given life and existence by their officials, officers, agents and employees (see *Brasswell v. United States*, 487, U.S. 99 (1988) quoting *United States v. White*, 322 U.S. 694 (1944).

The First, Fourth, Fifth, Seventh, Ninth, Tenth, Thirteenth, Fourteenth and Sixteenth Amendments to the Constitution secure Due Process for the American people in the course of the Common Law, which necessarily includes the right to trial by jury. See *Wayman v. Southard*, 23 U.S. 1; 6 L. Ed. 253; 10 Wheat 1(1825). The United States Supreme Court established: **"The Constitution is to be interpreted according to the Common Law Rules."** *Schick v. United States*,

195 U.S. 65; 24 S. Ct. 826; 49 L. Ed.99. The Supreme Court stated further: "*It [U.S. Constitution] must be interpreted in the light of Common Law, the principles and history of which are familiarly known to the framers of the Constitution. The language of the Constitution could not be understood without reference to the Common Law.*" <u>United States v. Wong Kim Ark</u>, 169 US 649; 18 S.Ct. 456. Therefore, this Court is hereby provided with notice that, as a precaution, Plaintiff is invoking the saving to suitors clause at 28 U.S.C. § 1333(1) in order to secure and proceed in the course of the Common Law in the event of controversy within special maritime and territorial jurisdiction of the United States – which exists in this instant case.

## Jurisdiction And Venue

This Court has Article III jurisdiction over this matter statutorily invoked pursuant to 28 U.S.C. §§ 1331 to engage the common-law protections afforded the Plaintiff under the First, Fourth, Fifth, Seventh, Ninth, Tenth, Thirteenth, Fourteenth and Sixteenth Amendments and Article I, Section 7, Clauses 1 and 2 of the Constitution for the United States of America as Amended; the United States Code of Judicial Procedure; and the Administrative Procedures Act at 5 U.S.C. §§ 701-706. Further, this Court has statutory jurisdiction under the *prima facie* internal revenue laws at 26 U.S.C. §§ 6301 through 6303, 6212, 6213 and 7429.

Venue is proper in this District pursuant to the United States Code of Judicial Procedure, 28 U.S.C. § 1391. The United States is a Federal corporation created by an Act of Congress pursuant to 28 U.S.C § 3002(15)(A) and a *citizen* as defined at 28 U.S.C § 1332(c)(1) and (d). The DEPARTMENT OF THE TREASURY is an agency within the meaning of 5 U.S.C § 101, creating the Defendant INTERNAL REVENUE SERVICE as the internal affairs division within the Department.

A duly authorized officer of the UNITED STATES will answer on behalf of the acts committed by its officials, officers and agents from said district. *"The United States government is a foreign corporation with respect to a state."* *In the Matter of Merriam*, 36 N.E. 505, 141 N.Y. 479, affirmed 16 S. Ct. 1073, 163 U.S. 625, 41 L.Ed 28720 CJS, Section 1785; also see *Penhallow v. Doane's Administrator's*, 3 Dall. 54; *Clearfield Trust Company v. United States*, 318 U.S. 363, 371, (1943). Said corporations are prohibited from certain acts and limited to certain enumerated powers by said contract (the Constitution for the United States), which are alleged herein.

The Defendants, the UNITED STATES, the INTERNAL REVENUE SERVICE, the DEPARTMENT OF THE TREASURY and the DEPARTMENT OF JUSTICE, individually and collectively participated in causing damage and harm to Plaintiff Rodney K. Justin 's person and property, and Plaintiff hereby enjoins all Defendants, pursuant to Fed.R.Civ.P. – Rule 18, *in pari materia* with 28 U.S.C. § 1367 – engaging this Court's supplemental jurisdiction.

### All Statutory Reference Made To Title 26 Of The United States Code, AKA The Prima Facie Internal Revenue Code, Is Limited To "In The Nature Of" Only

The Plaintiff, having documentary evidence sufficient to establish and conclude that the Internal Revenue Code was <u>not</u> enacted by the United States Congress as commanded under Article I, Section 7, Clauses 1 and 2 of the Constitution for the United States of America, which makes a limited reference to the Code as "in the nature of" only, giving rise to understand the substance of the Plaintiff's complaint – and no other inference should be drawn. Plaintiff's reference to any statutes cited from the Code should not be construed or interpreted in any manner to validate that the Code was constitutionally enacted. To that end, the Plaintiff cites Title 26 of the United States Code aka the Internal Revenue Code, as amended herein and throughout.

## Defendants

i.    At all times relevant hereto, the corporate citizen Defendant the UNITED STATES aka the UNITED STATES OF AMERICA'S corporate headquarters is located at 500 N. Capitol Street NW, Washington, D.C. 20221.

ii.    At all times relevant hereto, the corporate citizen Defendant the DEPARTMENT OF THE TREASURY'S main office is located at 1500 Pennsylvania Avenue NW, Washington, D.C. 20220.

iii.    At all times relevant hereto, the corporate citizen Defendant the INTERNAL REVENUE SERVICE'S main office is located at 1111 Constitution Avenue NW, Washington. D.C. 20224, with a pilot office location at office located at 4405 Bland Road, Raleigh, NC, 27609.

iv.    At all times relevant hereto, the corporate citizen Defendant the DEPARTMENT OF JUSTICE'S main office is located at 950 Pennsylvania Avenue NW, Washington, DC 20530-0001.

v.    At all times relevant hereto, the corporate citizen Defendant Title 26 U.S.C. § 7201's main office is located at c/o United States, 500 N. Capitol Street NW, Washington, D.C. 20221.

vi.    At all times relevant hereto, the corporate citizen Defendant Title 26 U.S.C. § 7203's main office is located at c/o United States, 500 N. Capitol Street NW, Washington, D.C. 20221.

vii.    At all times relevant hereto, the corporate citizen Defendant Title 26 U.S.C. § 7851's main office is located at c/o United States, 500 N. Capitol Street NW, Washington, D.C. 20221.

viii.  LEANNA JARRELLS is a Revenue Officer with an office located at Internal Revenue Service, SB/SE, 4405 Bland Road, Raleigh, NC 27609.

ix.    RON BROWN is a Revenue Officer with an office located at Internal Revenue Service, SB/SE, 4405 Bland Road, Raleigh, NC 27609.

x.    BOBBY MARTENS is a Special Agent of the Criminal Investigation Division with an office located at Internal Revenue Service, CID, 6635 Executive Circle Drive, Suite 180, Charlotte, NC 28212.

xi.    The true names and identities of DOES 1 through 5 are unknown to Plaintiff at the time of filing this action; however, when the true names and identities of Does 1 through 5 are discovered, Plaintiff shall amend his complaint to reflect the true names and identities of Does 1 through 5.

### Demand for Trial by Jury

Plaintiff, Rodney K. Justin, demands that the Federal Rules of Civil Procedure, Rule 1, Scope and Purpose of Rules shall govern this action, and Plaintiff shall preserve, inviolate, his right of trial by jury under Rules 38 and 57, and right of discovery disclosures without request prescribed under Rule 26, concurrent with Defendants' answer pursuant to Rule 7(a) and Rule 8(b), with no other pleadings allowed except upon Order of the Court as provided by law.  The **JURY** shall decide all issues including immunity, and shall decide all claims in this suit.

THEREFORE, demand is hereby made by Plaintiff for a trial by jury to determine all facts and issues before the Court.

### The United States Supreme Court Established The Doctrine Of Substance Over Form Regarding The Filing Of A Complaint

The United States Supreme Court stated in *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978) 98 S.Ct. 1291, *"In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed.* ***"The Court has never regarded 'the simple expedient of drawing up papers,'"***

*Commissioner* v. *Tower*, 327 U.S. 280, 291 (1946), *"as controlling for tax purposes when the objective economic realities are to the contrary. In the field of taxation, administrators of the laws, and the courts, are concerned with substance and realities, and formal written documents are not rigidly binding."* *Helvering v. F. & R.Lazarus & Co.*, 308 U.S. 525, at 255. See also *Commissioner v. P. G. Lake, Inc.*, 356 U.S. 260, 266-267 (1958); *Commissioner* v. *Court Holding Co.*, 324 U.S. 331, 334 (1945). *"Nor is the parties' desire to achieve a particular tax result necessarily relevant."* *Commissioner v. Duberstein*, 363 U.S. 278, 286 (1960).

### No Plain, Adequate And Complete Remedy, Statutory Or Otherwise, Exists For Plaintiff To Challenge The Constitutionality Of A Federal Statute

Plaintiff has invoked the tenable jurisdiction of the Administrative Procedure Act (APA). In this instant case, the Plaintiff has no access to judicial review to challenge the constitutionality regarding the statutory language, construction or ambiguity of 26 U.S.C. § 7201, 7203 and 7851 as *". . . the Act was not intended to bar an action where . . . Congress has not provided the plaintiff with an alternative legal way to challenge the validity of a tax."* See *South Carolina v. Regan*, 465 U.S. 367, 373, 104 S.Ct. 1107, 79 L.Ed.2d 372 (1984). **The relief sought by the Plaintiff under the APA is non-monetary, amongst other things, to obtain relief regarding the _procedural validity_ of the agency action.**

The Administrative Procedure Act ("APA"), however, waives the United States' sovereign immunity for actions brought by [p]ersons *suffering a legal wrong* at the hands of an agency when those [p]ersons seek relief other than monetary damages, pursuant to 5 U.S.C. § 702(a). *"Another waiver of sovereign immunity may be found in a statute that creates a federal agency, corporation or other artificial entity, and gives to that entity, the power to sue and be sued."* See *FDIC v. Meyer*, 510 U.S. 471, 473, 114 S. Ct. 996, 127 L. Ed. 2d 308 (1994).

In *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989),

the court cited the intent of Congress in passing the APA in so stating: ". . . *on its face, the 1976 amendment to § 702 waives sovereign immunity in all actions seeking relief from official misconduct except for money damages.*" The court went on to state: ". . . nothing in the legislative history of the 1976 amendment of § 702 suggests that Congress intended to limit the waiver of sovereign immunity to the specific forms of "agency action" enumerated in § 551(13). On the contrary, *Congress stated that "the time [has] now come to eliminate the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer acting in an official capacity.*" H.Rep. No. 1656, 94th Cong., 2d Sess. 9, *reprinted in* 1976 U.S. Code Cong. & Admin. News 6121, 6129 (emphasis supplied). *"Congress singled out types of government conduct similar to the alleged INS conduct in this case — "tax investigations" and "control of subversive activities" — as appropriate for judicial review under the amended version of § 702."*

In this instant case the UNITED STATES and named Defendants cannot and have not pointed to a plain, adequate and complete remedy – statutory or otherwise – that would prove to have afforded the Plaintiff a remedy to challenge the constitutionality, validity or vagueness of an internal revenue statute – rendering the jurisdiction of the APA unquestionable.

### Factual Background And Summary Of Events

1. Plaintiff restates and incorporates by reference all of the allegations contained in all of the preceding paragraphs and further alleges.

2. On or about October 12, 2004, Plaintiff received a boilerplate Letter 3175(SC) signed by Revenue Officer LEANNA JARRELLS in reference to tax years 1997, 1998, 1999 and 2000 and a Notice of Federal Tax Lien in the amount of $201,255.32 for tax years 1997, 1998, 1999

and 2000 signed by C SHERWOOD *aka* Cheryl Sherwood for LEANNA JARRELLS, effectively slandering title to the name and real property rights of Plaintiff Rodney K. Justin.

3. Between December 4, 2004 and February 22, 2005, Revenue Officer RON BROWN issued a third-party Form 668-A (ICS) - Notice of Levy in the amount of $217,186.97 to CALLAWAY ASSOCIATES, attempting an administrative seizure of Plaintiff Rodney K. Justin's personal property in CALLAWAY'S possession; a Notice of Federal Tax Lien for tax years 1997, 1998, 1999 and 2000 in the amount of $201,261.32, effectively slandering title to the name and real property rights of Plaintiff Rodney K. Justin; and two IRS Letters 3177 titled "Notice of Federal Tax Lien Filing – Nominee or Alter-Ego" addressed to INS Enterprises and HFP Enterprises with attached Form 668 (Y) – Notice of Federal Tax Lien for tax years 1997 through 2000.

4. The Notices of Levy and Notices of Federal Tax Lien all purport the underlying tax liability to be "1040" – as cited in column (a) "Kind of Tax" on the instruments.

5. On or about April 13, 2005 or soon thereafter, Revenue Officer RON BROWN caused Plaintiff Rodney K. Justin's compensation in the amount of $54,583.00 for labor property to be seized via an alleged Form 668-A (ICS) - Notice of Levy from Plaintiff's then contracted employer, CALLAWAY ASSOCIATES, LLP – causing economic hardship and devastation to said Plaintiff' ability to provide a living for his family – resulting not only in the termination of said Plaintiff, but causing a fifty percent (50%) loss in labor compensation property.

6. On or about August 31, 2005, Plaintiff Rodney K. Justin filed four (4) Forms 843 - Claim for Refund and Request for Abatement for the following tax years: 1997 in the amount of $42,595.65; 1998 in the amount of $132,188.36; 1999 in the amount of $17,251.54; and 2000 in the amount of $9,219.77; and Form 12661 - Disputed Issue Verification and Form 12277 -

Application for Withdrawal of Filed Form 668 (Y) - Notice of Federal Tax Lien with an affidavit and exhibits attached, demanding the release of the Notices of Federal Tax Liens filed for tax years 1997, 1998, 1999 and 2000, which resulted in <u>no response</u> from the area director or any other fiduciaries petitioned for such release.

7.  On about October 18, 2005, Plaintiff received a Letter 3176C, responding to the Plaintiff's submitted Forms 843 for Tax Periods 1997 through 2000, signed by Operations Manager DENNIS L. PARIZEK, stating the information Plaintiff Rodney K. Justin sent was frivolous and giving him 30 days to correct his position.

8.  Plaintiff petitioned the United States Congress for assistance and received responses from Elizabeth Dole dated September 28, 2005, October 12, 2005 and October 27, 2005, resulting in the Taxpayer Advocate Jackie Bracey – practicing law without a license – responding to issues completely <u>unrelated</u> to concerns of the Plaintiff in this instant case.

9. Between November 2, 2005 and November 18, 2005, Plaintiff filed and served Defendants a "Notice To Abate Erroneous Civil Penalties" and included IRS Form 12261-Disputed Issue Verification, IRS Form 843 - Claim for Refund and Request for Abatement and mailed said Notice to the District Director, Chief Special Procedures and the Technical Service Group Manager; and a "Constructive Notice and Affidavit of Intent, Demand for Proof of Claim and Notice of Disputed Claim of Frivolous Filing in Response to IRS Boilerplate Letter 3176C" to the Area Director and to the Chief of Regulations and Special Procedures in Washington, DC – all via Certified Mail.

10. On or about December 3, 2005 and December 15, 2005, alleged Special Agent BOBBY MARTENS issued 2039 Summonses bearing the term "Criminal Investigation," seeking to obtain books, records and other confidential financial information from WACHOVIA BANK,

WORLD'S FOREMOST BANK, FIRST CITIZENS BANK, NORTHWEST MUTUAL LIFE INSURANCE COMPANY, SMITH BARNEY INC., and MELLON INVESTOR SERVICES. (See **Exhibit A** attached hereto and incorporated herein by reference.)

11. Between November 18, 2005 and December 18, 2005, Plaintiff filed and served an "Affidavit of Intent - Demand for Proof of Claim and Notice of Disputed Claim of Frivolous Filing in Response to IRS Boilerplate Letter 3176C" via certified mail to Department of the Treasury, Internal Revenue Service, Area Director; and a "Notice To Abate Alleged Federal Tax Liability For Failure To Make An Assessment" for tax years 1999 and 2000, including three (3) IRS Forms 843 - Claim for Refund and Request for Abatement and an IRS Form 12661 – Disputed Issue Verification to the Area 4 Area Director, and IRS Technical Service Group Manager and Chief of Special Procedures at Atlanta, GA.

12. Plaintiff received IRS Letters 105C dated February 21, 2006, denying all claims for abatement of the alleged assessments for tax years 1997, 1998, 1999 and 2000, which failed to disclose the basis for such denials.

13. On or about March 8, 2006, Plaintiff filed and served Defendants a "Verified Affidavit of Protest to Contest Notice Disallowing Claim for Abatement and Request for Appeal of Decision," including IRS Form 9423 – Collection Appeal Request.

14. On or about April 30, 2006, Plaintiff Rodney K. Justin filed and served 1040 U.S. Individual Income Tax Returns for the tax years, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004 and 2005 to IRS Atlanta, Georgia and copies to Area 3, Area Director, Ron Brown and others via certified mail. Plaintiff signed and caused to be filed Forms 1040 U.S. Individual Income Tax Return to the best of Plaintiff's knowledge, understanding and belief as to the accuracy of the prepared returns for tax years 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004

and 2005; and Plaintiff believed these were the returns required to be filed, but were prepared, signed and filed under duress.

15. That the Defendants never issued any notice, letter or memorandum indicating that the filed returns were insufficient or failed to meet the requirements of a valid return, leaving the Plaintiff to believe that he had satisfied all the filing requirements of reporting a return of income under the existing internal revenue laws.

16. Between May 16, 2006 and July 19, 2006, Plaintiff Rodney K. Justin filed and served a Notice and Demand for Certificate of Release of Lien for the years 1997 to 2000, and mailed a copy to the Department of the Treasury, Internal Revenue Service, District Director, Attn: Chief, Special Procedures with IRS Form 12277 - Application for Withdrawal of Filed Form 668(Y), IRS Form 12661 - Disputed Issue Verification, IRS Form 843 - Claim for Refund and Request for Abatement, and a "Notice of Appeals For Denial of Request For Abatement, Not Refund." and Appeals Form 9423.

17. On or about August 11, 2006, Plaintiff received an appeals response letter from Appeals Officer JENNIFER R SAWYER and on or about August 21, 2006, Plaintiff filed and served a response to the appeals, specifically stating his claim with authority and mailed a copy by Certified Mail to Area 4, Area Director, Compliance Technical Support Manager.

18. On or about September 5, 2006, Plaintiff received an appeals response letter from alleged Appeals Team Manager JENNIFER R. SAWYER stating, "*I have completed my review of your denied claim. I find there is no basis to allow it,*" referencing tax years ending December 31, 1997 through 2000.

19. On or about November 6, 2006, Plaintiff received two Notices CP 71C from unknown Service employees at the Shawnee Mission, KS location stating, "You have past due tax balance

for . . ." and referencing alleged assessments of penalties and interest totaling $173,723.28 for tax years ending December 31, 1998 and 1999.

20. Between November 30, 2006 and December 22, 2006, Plaintiff Rodney K. Justin filed and served a "Verified Notice to Abate Alleged Federal Tax Valid Claim of Zero Liability Not in Dispute", and a "Verified Notice to Abate Alleged Federal Tax Liability for Failure to Make an Assessment" in response to the above referenced two CP 71C Notices, including IRS Forms 843 - Request for Abatement and IRS Forms 12661 - Disputed Issue Verification for tax years 1997 to 2000 by certified mail to Area 4, Area Director, Compliance Technical Support Manager.

21. On or about January 15, 2007, Plaintiff filed and served a Freedom of Information Act Request requesting copies of 26 U.S.C. § 6212 Notice of Deficiency for the tax years 1996 through 2005; and to date the Internal Revenue Service never has responded.

22. That on or about April 6, 2007, Plaintiff filed and served a Form 9423 - Collection Appeal Request and a Form 12277 - Application for Withdrawal of Filed Form 668(Y) - Notice of Federal Tax Lien, with a verified Notice of Administrative Claim and Demand to Release Notice of Federal Tax Lien and Return of Property Seized, stating in detail the claim and injuries and dollar amounts thereof; and sent via certified mail to the Department of the Treasury, IRS, Area 4, Area Director, Compliance Technical Support Manager, and sent copies to the following: Department of the Treasury, IRS, Attn: Ron Brown, C. Sherwood, Leanna Jarrells, and the Treasury Inspector General for Tax Administration, Alberto R. Gonzales, Chief Counsel Donald L. Korb in Washington, DC; and CCP Lien Unit in Cincinnati, Ohio. (See **Exhibit B** attached hereto and incorporated herein by reference.)

23. On or about July 10, 2007, Plaintiff received a letter dated July 10, 2007 from Charles E. Hunter, Special Agent in Charge, of the Department of the Treasury, Internal Revenue Service Criminal Investigation, stating: "This office has under consideration a recommendation that criminal proceedings be instituted against your for evasion of assessment of taxes for tax years 2001, 2002, 2003, and 2004 in violation of I.R.C. § 7201," with an offer of a conference regarding this matter scheduled for July 25, 2007 at 10:00 a.m. (See **Exhibit C** attached hereto and incorporated herein by reference.)

24. On or about July 18, 2007, Plaintiff timely responded to the above letter, which Plaintiff mailed to Charles E. Hunter, Special Agent in Charge explaining that he has filed all tax returns for tax years 2001 through 2004 and has in no way attempted to evade or defeat any tax (See **Exhibit C** attached hereto and incorporated herein by reference.)

25. On or about September 12, 2007, Plaintiff received a letter from the Charles E. Hunter, Special Agent In Charge, Criminal Investigation, Charlotte Field Office, stating that: *"A Report recommending you be prosecuted for attempting to evade the assessment of income taxes for the years 2001 through 2004 and in violation of Title 26, United States Code, Section 7201, was forwarded to Department of Justice, Tax Division on this date."* (See **Exhibit C** attached hereto and incorporated herein by reference.)

26. There has never been a notice of deficiency or any other notice submitted by Defendants that would give Plaintiff the opportunity to dispute, file an administrative claim or any other administrative remedy prior to being referred to the Department of [Justice] for alleged violation of the internal revenue laws.

27. Although the Plaintiffs are of the conviction that the facts and law speaks unambiguously to the matters present herein and throughout, having experienced first hand the

Citizen acting as a *pro se* litigant proceeding before a prejudice and biased judiciary acting with impunity and favoritism on behalf of the UNITED STATES and its employees regarding these serious life and liberty issues, having no confidence in the judiciary due to the fear of reprisal and the potential for abuse of process as previously experienced, the Plaintiff has submitted a copy of this First Amended Verified Complaint to the appropriate fiduciary Congressional authorities to effect the record for oversight and review purposes (see **Exhibit P** attached hereto and incorporated herein by reference).

**COUNT I.**
**Defendant BOBBY MARTENS Caused Administrative Summonses**
**To Issue Without Signature Of An Approving Officer**

28. Plaintiff realleges all allegations stated above, and further states as follows:

29. On or about December 3, 2005, alleged Special Agent BOBBY MARTENS issued 2039 Summonses bearing the term "Criminal Investigation," seeking to obtain books, records and other confidential financial information from WACHOVIA BANK, WORLD'S FOREMOST BANK, FIRST CITIZENS BANK, NORTHWEST MUTUAL LIFE INSURANCE COMPANY, SMITH BARNEY INC., and MELLON INVESTOR SERVICES. (See **Exhibit B** attached hereto and incorporated herein by reference.)

30. The individual identifying himself as Special Agent BOBBY MARTENS is a criminal investigator, as signified by the title, "Special Agent." This status is confirmed by the fact that the third party Summonses at issue specifically identify Special Agent BOBBY MARTENS as an employee of the Department of the Treasury – Internal Revenue Service, Criminal Investigation Division.

31. The third party Summonses issued by Special Agent BOBBY MARTENS, pursuant to a Criminal Investigation into the activities of the Plaintiff Rodney K. Justin, were not supported by any affidavits or declarations.

32. The third party Summonses issued by Defendant BOBBY MARTENS bear his signature as the "issuing officer", and no other signature appears on the instruments. As indicated on the Summonses, Defendant MARTENS signed as the "issuing officer" and did not obtain the "approving officer's" signature, as MARTENS is not authorized by the Secretary or the Secretary's delegate to sign as the approving officer (See **Exhibit B** attached hereto and incorporated herein by reference.)

33. The authority and chain of command for issuing administrative Summonses is found at Delegation Order No. 4 of the Handbook of Delegation Orders and at www.irs.gov. In review, Delegation Order No. 4 (revision 23) is no longer annotated, and does not fully disclose with particularity in what manner the authority to issue a summons is delegated. Thus, a read of the annotated version of Delegation Order No. 4 (Rev. 21) provides complete disclosure and guidance as to who is authorized to issue such summons. Delegation Order No. 4 (Rev. 21) at § 1(d) states in pertinent part: ***"The authority to issue summonses . . . is delegated to the following officers and employees except that in the instance of a summons to a third party witness, the issuing officer's case manager, group manager, or any supervisory official above that level, has in advance personally authorized issuance of the summons. Such authorization shall be manifest by the signature of the authorizing officer on the face of the original and all copies of the summons or by a statement on the original and all copies of the summons, signed by the issuing officer, that he/she had prior authorization to issue said summons and***

*stating the name and title of the official and the date of authorization"* (See **Exhibit D** attached hereto and incorporated herein by reference.)

34. Delegation Order No. 4 has not been redelegated to Special Agents. Defendant MARTENS was required to state or identify the name and title of the official and the date of authorization by the approving officer as required pursuant to 26 CFR § 301.7602-1(b) – as cited in Delegation Order No. 4. However, MARTENS admits he personally caused the procedurally invalid Summonses to issue without obtaining the required signature approval from a supervisory official stating the name and title of the official and the date of authorization prior to their issuance.

35. A literal read of 26 CFR § 301.7602-1(b)(2) states in pertinent part: *"officer or employee of the IRS means all officers and employees of the United States who are engaged in the administration and enforcement of the internal revenue laws or any other laws administered by the IRS, and who are appointed by, or subject to the direction, instructions, or orders of the Secretary of the Treasury or the Secretary's delegate."* Defendant BOBBY MARTENS is subject to the direction, instructions, or orders of the Secretary of the Treasury or the Secretary's delegate and has not been authorized to act alone and without consent (See **Exhibit D** attached hereto and incorporated herein by reference.)

36. The Plaintiff has been damaged and suffered a loss sustained of life, liberty and property and was forced to spend time and money defending against the procedurally unenforceable actions brought by the Defendants.

37. The Plaintiff has been damaged as a direct and proximate result of the Defendants' failure to obtain approval from the Secretary or the Secretary's delegate, presumed to be the approving officer, in writing, as commanded by 26 CFR § 301.7602-1(b)(2), giving rise to an

action cognizable under the Administrative Procedure Act; and the Plaintiff is entitled to a review of the assessment procedures pursuant to 26 U.S.C. § 7429 *et seq.* in light of their collusive acts.

**COUNT II.**

**Defendants Are Seeking Prosecution In Violation Of 26 USC 6213(a), The Due Process Clause Of The Fifth Amendment, And The Administrative Procedures Act**

38. Plaintiff realleges all allegations stated above, and further alleges:

39. On or about December 3, 2005, or soon thereafter, employees of the UNITED STATES, a Federal Corporation, the DEPARTMENT OF THE TREASURY, the INTERNAL REVENUE SERVICE, the DEPARTMENT OF JUSTICE, BOBBY MARTENS and DOES 1 through 5, inclusively, conspired with intent to deprive Plaintiff of his constitutionally-protected Rights and acting in their official capacity and under color of legal authority did in bad faith intentionally and recklessly, with willful disregard for the internal revenue laws, begin seeking prosecution prior to issuance of a Notice of Deficiency (90-day letter) for tax years 2001 through 2004 as required by 26 U.S.C. § 6212(a) and 6213(a) and (b) and applicable Treasury Regulations. (See **Exhibit E** attached hereto and incorporated herein by reference.)

40. Pursuant to 26 U.S.C. § 6213(a), Restrictions applicable to deficiencies; petition to Tax Court, "*. . . no . . . proceeding in court . . . shall be . . . prosecuted until such notice has been mailed to the taxpayer . . .*" and the Plaintiff is not in receipt of any such notice.

41. Defendant BOBBY MARTENS and DOES 1 through 5, inclusively, acting in their official capacity and under color of legal authority, are seeking prosecution in direct violation of 26 U.S.C. § 6213(a), seeking information against Plaintiff for possible charges of tax evasion and willful failure to file.

42. Defendant BOBBY MARTENS and DOES 1 through 5, inclusively well knew that no notices of deficiency were issued and proceeded in violation of 26 U.S.C. § 6213(a), which prohibits prosecution in court until such notices have been mailed; and said Defendants and their Criminal Investigation Division Manager and the Criminal Investigation Division Supervisor were all personally responsible for compliance.

43. The Defendants never assessed any tax or caused a notice and demand to pay any tax imposed to issue, as commanded by 26 U.S.C. § 6301, prior to empanelling the Grand Jury investigation and seeking prosecution as prohibited by 26 U.S.C. § 6213(a) – clearly violating the Fifth Amendment Due Process Clause and the rights of the Plaintiff.

44. As a direct and proximate result of the Defendants' failure to fully comply with 26 U.S.C. §§ 6212 and 6213(a) and their illegal conduct, the Plaintiff is entitled to a review of the assessment procedures pursuant to 26 U.S.C. § 7429 *et seq.*, and the Defendants should be ordered to cease and desist seeking prosecution of the Plaintiff as herein prohibited by Congress.

## COUNT III.
## 26 U.S.C. § 7201 Is Void For Vagueness And Is Constitutionally Defective

45. Plaintiff restates and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

46. On or about September 12, 2007 or soon thereafter, Plaintiff Rodney K. Justin received a letter from Charles E. Hunter, Special Agent in Charge, Criminal Investigation, Charlotte Field Office, stating that: "*A Report recommending you be prosecuted for attempting to evade the assessment of income taxes for the years 2001 through 2004 and violation of Title 26, United States Code, Section 7201, was forwarded to Department of Justice, Tax Division on this date.*" (See **Exhibit C** attached hereto and incorporated herein by reference.)

47. The statutory construction and plain language of 26 U.S.C. § 7201, the statute which the Plaintiff is presumed to have violated, states in pertinent part: "Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title ... shall ... be guilty of a felony..." (See **Exhibit F** attached hereto and incorporated herein by reference.)

48. Plaintiff is with evidence sufficient to conclude that the statutory language of 26 U.S.C. § 7201 is <u>not</u> a standalone, "self-executing" enforcement statute; it is overly broad and void for vagueness on its face, as it fails in its present statutory construction to disclose which tax is imposed by Title 26 that would give notice – as commanded by the Sixth Amendment to the Constitution for the United States of America – and inform Plaintiff of the nature and cause of the accusation, thereby extending the common-law right and opportunity to properly defend against any potential action that might be brought against the Plaintiff.

49. Title 26 of the United States Code, also known as the Internal Revenue Code, is a compilation of thousands of different classifications of income taxes imposed; however, the language of 26 U.S.C. § 7201 stands moot, as it fails to disclose which tax is imposed by the title applicable to the Plaintiff's alleged activities.

50. To the degree that the statute may be determined to have passed Constitutional muster under Article I, Section 7, Clause 1 and 2, Congress has effectively placed the burden of proof on the Defendants, particularly the UNITED STATES at large, to identify the tax imposed in order to determine the liability of the TAXPAYER. However, 26 U.S.C. § 7201 – an enforcement statute – does not establish or create an income tax liability under the internal revenue laws; it functions to punish for the alleged evasion and nonpayment of some a statutory tax imposed under the Code.

51. The statutory language and construction of 26 U.S.C. § 7491(a)(1) states as follows: Burden shifts where taxpayer produces credible evidence. "If, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the TAXPAYER for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue," thus shifting the burden of proof on the Defendants to identify and establish which statutory tax has been imposed under Title 26 of the United States Code.

52. As the Code ambiguously references "any tax imposed," the Defendants have not identified which statutory tax has been imposed, or will be imposed by the Title that the Plaintiff is presumed to have attempted to evade or defeat. Without question one can assert that the phrase ". . . tax imposed by this title . . ." is overly broad, vague, ambiguous, constitutionally deficient and creates an impossibility for a man or woman of average intelligence to know which income tax law or internal revenue laws the Plaintiff is presumed to have attempted to evade or defeat.

53. Can the Plaintiff establish that the vagueness of this statute appears on its face to violate the fundamental principles of the Common Law under the Sixth Amendment and does not provide full disclosure to inform a man or woman of average intelligence of the nature and cause of the accusation? We must answer in the affirmative. Let us consider a like scenario using a man or woman of average intelligence. In this example, on Saturday, December 23, 2006, TAXPAYER A crosses the path of TAXPAYER B at a large shopping mall during the Christmas Season in a parking lot of more than 5,000 vehicles.

54. While in the presence of TAXPAYER B, TAXPAYER A begins to have a heart attack, becoming short of breath and clenching his chest. Before loosing consciousness, in a swallowed

breath TAXPAYER A communicates to TAXPAYER B that his vehicle is parked in the mall parking lot and his heart medicine is located in the glove compartment of the vehicle – pleading before his last breath that he go retrieve it – at which point TAXPAYER A loses consciousness.

55. TAXPAYER B goes into a full panic because TAXPAYER A passed out prior giving TAXPAYER B a description and location that would enable TAXPAYER B to locate TAXPAYER A's vehicle, retrieve the heart medication and save his life. Thus, in this scenario, TAXPAYER B was unable to save the life of TAXPAYER A because he was not given the information necessary to determine which one of the more than 5,000 vehicles in the mall parking lot belonged to TAXPAYER A.

56. The above scenario is relative to the number of different alleged taxes imposed under the internal revenue laws and the income tax laws. The statutory construction and language of 26 U.S.C. § 7201 fails to disclose the particular "tax imposed," leaving the Plaintiff without knowledge of which tax he is presumed to have attempted to evade or defeat – surely a life and death situation considering the seriousness of the possible indictment. How can a [p]erson (sentient flesh and blood being) be punished to suffer the possible loss of life and liberty to become property of the Federal Government via incarceration pursuant to an ambiguous statute that is an enforcement statute, is not self-executing and is unsupported by an underlying statute identifiable within the Code?

57. **The question of law that must be answered is:**

(a) Because 26 U.S.C. § 7201 is an enforcement statute and is <u>not</u> self-executing, which statute identifiable under Title 26 of the United States Code (IRC) imposes a statutory tax liability that the Plaintiff is presumed to have violated that would give rise to Plaintiff being indicted for the alleged crime of tax evasion?

(b) On its face, the statutory construction and language of 26 U.S.C. § 7201 is not a self-executing standalone enforcement statute and must be supported by an enhancement statute that discloses the statutory "tax imposed" by Title 26 that would inform the Plaintiff of the nature and cause of the accusation, as required under the Common Law pursuant to the Sixth Amendment to the Constitution for the United States of America.

(c) Does the statutory construction and/or ambiguous language of 26 U.S.C. § 7201 – in its present form as a self-executing standalone enforcement statute – violate the due process clause of the Fifth and Fourteenth Amendments, wherein it fails to inform the Plaintiff of which *"tax imposed"* by the title (under the internal revenue laws) that the Plaintiff is presumed to have violated? Plaintiff must answer in the affirmative.

58. The statutory construction and plain language of 26 U.S.C. § 7201, charged as a self-executing standalone enforcement statute, must be challenged as unconstitutional on its face in direct violation of both the due process clause of the Fifth Amendment and the equal protection clause of the Fourteenth Amendment of the United States Constitution, because it fails to inform the Plaintiff (or any man or woman of average intelligence) which tax is the *". . . tax imposed by this title . . .*", be it an income or an internal revenue tax he is presumed to have violated.

59. How can the Plaintiff, a man of average intelligence, defend against an undisclosed and invisible tax imposed under the internal revenue laws that the Defendants have refused to identify? The placement of the burden on the Plaintiff in this conundrum is wholly unconstitutional.

60. The statutory construction and language of 26 U.S.C. § 7201 violates the Common Law and Constitutional due process as it: (1) is not in harmony with the Common Law, (2) cannot be

imposed upon citizens/subjects/statutory slaves referred to as TAXPAYERS equally, (3) is a Pandora's Box for selective prosecution, (4) is unreasonable, (5) does not have a real or substantial objective to be obtained, save fear and collusion, (6) violates the constitutional due process of law at Amendments Five, Six, Nine, Ten and Fourteen for failure to give notice and opportunity to be heard, and to disclose the nature and cause of the accusation, (7) the objective is not a reasonable and proper one for the legislature to seek, as neither the ends are legitimate, nor the means acceptable for meeting that end,  and (8) it violates substantive and constitutional due process of law for failure to give notice and opportunity to be heard, fails to disclose the nature and cause of the accusation, and violates equal protection of the law.

61. The statutory construction of 26 U.S.C. § 7201, presumed to be a self-executing standalone enforcement statute, is herein challenged by the Plaintiff as void for vagueness and therefore unconstitutional because the crux of the statute is incompetent, and thus benign, wherein it does not disclose in its own words a statutory liability for which "*. . . any tax imposed by this title . . .*" the Plaintiff is presumed to have attempted to evade or defeat – the very lynchpin for being indicted by the statute.

62. Unfortunately, in this quagmire of "Congressional Activism" trolling hand-in-hand with "Judicial Activism," the United States Congress and United States Supreme Court make it no secret and have openly admitted that Congress intentionally enacts legislation to be ambiguous, so as to allow judicial activism, political interpretation and abuse of discretion that results in the *"selective prosecution"* of issues before the Court – in essence making every act of Congress *void ab initio.*

63. This practice in and of itself is in bad faith and unconstitutional, because ambiguous legislation fails to comply with the common-law jurisdiction established under the Constitution

for the United States of America, based on principles of the Common Law, to effectively instruct Citizens of average intelligence the intent of the law and what the law commands or forbids.

64. The Plaintiff has been damaged as a direct and proximate result of the Defendants' *failure to identify the tax imposed under the internal revenue laws* pursuant to 26 U.S.C. § 7201 that would give rise to an assessment under 26 U.S.C. § 6301. The Plaintiff is entitled to a review of the assessment procedures pursuant to 26 U.S.C. § 7429 *et seq.*

WHEREFORE, Plaintiff Rodney K. Justin prays the Court set forth a determination of the following:

a. Set forth a written judicial determination under the Common Law of the Constitution that 26 U.S.C. § 7201 is a statute void for vagueness because it is not in harmony with the Common Law of the Constitution and violates the due process clause of the Fifth Amendment, and the nature and cause of the accusation of the Sixth Amendment.

b. Set forth a written judicial determination under the Common Law of the Constitution that 26 U.S.C. § 7201 is void for vagueness and is therefore unconstitutional and cannot operate as a standalone enforcement statute, because it implies but fails to identify any tax imposed under the internal revenue laws that gives rise to being charged by the statute itself.

c. Issue an Order under the Common Law of the Constitution prohibiting the Defendants from causing the Plaintiff to be charged for possible violation of 26 U.S.C. § 7201 until such time a determination has been made to establish the constitutionality of the statute in its present ambiguous construction.

## COUNT IV.
### 26 U.S.C. § 7203 Is Void For Vagueness And Constitutionally Defective

65. Plaintiff restates and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

66. On or about July 25, 2007 or soon thereafter, Plaintiff Rodney K. Justin was informed that he is under Criminal Investigation by officers and employees of the Department of Treasury, Internal Revenue Service, Criminal Investigation, pending possible statutory charges for alleged violations of 26 U.S.C. § 7203 – Willful failure to file return, supply information or pay tax. (See **Exhibit C** attached hereto and incorporated herein by reference.)

67. The language of 26 U.S.C. § 7203, the statute with which the Plaintiff may be charged, is as follows: "Any *person required under this title to pay any estimated tax or tax*, or *required by this title* or by regulations made under authority thereof *to make a return, keep any records, or supply any information*, who willfully fails to pay such estimated tax or tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor..." (See **Exhibit G** attached hereto and incorporated herein by reference.)

68. In addition, the statutory language of 26 U.S.C. § 7203, Congress enacted 26 U.S.C. § 6001 as an enforcement statute for an alleged violation of failing to act, the section of the Code that the Secretary must give notice commanding Plaintiff to act, which states in pertinent part: "*Every person liable for any tax imposed by this title*, or for the collection thereof, *shall keep such records, render such statements, make such returns*, and comply with such rules and regulations as the Secretary may from time to time prescribe. Whenever in the judgment of *the Secretary* it is necessary, he *may require any person, by notice served upon such person or by*

*regulations, **to make such returns, render such statements, or keep such records**,* as the Secretary deems sufficient to show whether or not such person is liable for tax under this title."

69. Here the statutory language of section 6001 works *in pari materia* with, and is just as ambiguous as 7201 and 7203, employing phrases such as: (1) every person liable, (2) any tax imposed, (3) that the Secretary *may* require *any person* by *notice served upon him*, (4) to keep books and records – a statutory maze of internal revenue riddles. The language of 26 U.S.C. § 6001 appears to command an act of commission by the Secretary, in that he may require *any person* by notice served upon him to keep books and records. (See **Exhibit H** attached hereto and incorporated herein by reference.)

70. It is reasonable to presume that if the Secretary did not serve notice and the regulations do not serve notice (and there is no requirement for any person to serve notice upon himself), then Plaintiff cannot be presumed to have violated 26 U.S.C. § 7203 – the statutory enforcement statute for failing to act pursuant to notice not given by the Secretary or by regulations under 26 U.S.C. § 6001 – which would indeed be an act or alleged crime of omission.

71. Plaintiff is with evidence sufficient to conclude that the statutory language and construction of 26 U.S.C. § 7203 is problematic in that it is overly broad and void for vagueness on its face; it fails to disclose who *any* person required is, under the title, to keep *any* records or supply *any* information, that would give Plaintiff notice and opportunity to pay any estimated tax required by statute and regulation.

72. Title 26 of the United States Code is a compilation of thousands of <u>different classifications of income taxes imposed</u>; however, the language of 26 U.S.C. § 7203 appears to stand <u>moot</u> as it fails to disclose who the any person is that is required to keep books and records and, therefore, burdens the Secretary to give notice to such person at 26 U.S.C. § 6001.

73. Congress effectively placed the burden on the Government to serve notice on *any person* required to keep books and records, supply information and identify the tax imposed to determine the liability of the TAXPAYER; however, 26 U.S.C. § 7203 is a enforcement statute that does not establish or create a liability.

74. The statutory language of 26 U.S.C. § 7491(a)(1) Burden shifts where TAXPAYER produces credible evidence. States as follows: "If, *in any court proceeding*, a taxpayer introduces credible *evidence with respect to any factual issue relevant to ascertaining the liability* of the TAXPAYER *for any tax imposed* by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue." (See **Exhibit I** attached hereto and incorporated herein by reference.)

75. As the Code constantly references "any tax imposed," the Defendants have failed to identify what tax has been, or will be imposed by the title that the Plaintiff is presumed to be required to pay.

76. Without question one can assert that the phrase ". . . *Any person required . . .*" is overly broad, vague, constitutionally deficient and creates an impossibility for a man or woman of average intelligence to know who *any person required* is, as such is the responsibility of the Secretary to inform the Plaintiff of his duty to keep books and records – and if the Secretary fails to inform the Plaintiff, it is his nonfeasance or failure to act that caused the Plaintiff not to act.

77. Plaintiff has never received notice from the Secretary, and, by regulations, Plaintiff was not required to keep books and records or render statements without notice from the Secretary prior thereto.

78. Can the Plaintiff establish that the vagueness of this statute appears on its face to violate the fundamental principles of full disclosure and, therefore, due process? We must answer in the affirmative.

79. Let's consider a like scenario using everyday life for the average Human being/non-statutory Citizen or subject. In this example, TAXPAYER X, after securing a major contract with United States Oil Company (USOC), receives Letter 978 from the Secretary on January 15, 2004, explaining that because he sells oil products throughout the United States of America, he is required to keep books and records to assess his tax liability and pay the tax on the oil products – and with such notice he proceeds accordingly.

80. But TAXPAYER Z, after graduating from high school, became a self-sufficient carpenter who worked with his hands and contracted to build single and multiple family dwellings with various construction vendors in his local State of Honesty beginning in 1994 and never filed a federal income tax return, because he never received notice from the Secretary like TAXPAYER X had, instructing him to do so – therein never filing a return, never keeping books or records and never keeping information.

81. Because TAXPAYER Z never received a notice from the Secretary or area director, he had no reason to believe that he was legally required to file a federal income tax return or pay a tax.

82. The above scenario is relative to the number of different unknown taxes imposed by the income tax laws. The statutory construction and language of 26 U.S.C. § 7203 fails to disclose the particular "*person required*," leaving the Plaintiff without knowledge of which tax he is presumed to have willfully failed to file.

83. **The question of law that must be answered is:**

(a)    Can a person be penalized and punished to suffer the possible loss of life and liberty, to become United States' property based on a statutory enactment that commands the Secretary to perform an act that does not create a known legal duty that the Plaintiff can effectively violate? The statutory obligation to notice the Plaintiff is that of the Secretary – not of the Plaintiff.

(b)    On its face, the statutory construction and language of 26 U.S.C. § 7203 acts as a standalone enforcement statute – unsupported by an enhancement statute – and is not self-executing for prosecutorial purposes.

(c)    Does the statutory construction and/or language of 26 U.S.C. § 7203 – in its present form as a standalone enforcement statute that is not self-executing – violate the due process clause of the Fifth and Fourteenth Amendments wherein it fails to inform the Plaintiff of the statutory *"person required"* by the *Secretary* to perform the Act? Plaintiff must answer in the positive.

82.    The statutory construction of 26 U.S.C. § 7203, charged as a standalone enforcement statute that is not self-executing, appears to be <u>unconstitutional</u> on its face in direct violation of the due process clause of the Fifth Amendment and the equal protection clause of the Fourteenth Amendment of the United States Constitution, because it fails to inform the Plaintiff (or any man or woman of average intelligence) <u>which of</u> the 1000 plus taxes is the *". . . tax imposed by this title . . ."* that he is presumed to have violated.

83.    The statutory language and construction of 26 U.S.C. § 7203 violates the substantive elements of constitutional due process as it: (1) is not in harmony with the Common Law, (2) cannot be imposed upon Citizens (TAXPAYERS) equally, (3) is a Pandora's Box for selective prosecution, (4) is unreasonable, (5) does not have a real or substantial objective to be obtained, (6) the objective is not a reasonable and proper one for the legislature to seek, (7) the ends are

not legitimate nor the means acceptable for meeting that end, and (8) it violates substantive and constitutional due process of law for failure to give notice and opportunity to be heard, fails to disclose the nature and cause of the accusation, and violates equal protection of the law.

84.    The statutory language and construction of 26 U.S.C. § 7203 – presumed to be a standalone enforcement statute that is not self-executing – is herein challenged by the Plaintiff as unconstitutional and void for vagueness because the statute clearly commands that the main element of the statute encompasses the undisclosed liability for "*. . . any tax imposed by this title . . .*" which is the lynchpin for being charged by this statute.

85.    The Plaintiff has been damaged as a direct and proximate result of the Defendants' *failure to identify the tax imposed under the internal revenue laws* pursuant to 26 U.S.C. § 7203, that would give rise to an assessment under 26 U.S.C. §§ 6301, 6302 and 6303. The Plaintiff is entitled to a review of the assessment procedures pursuant to 26 U.S.C. § 7429, *et seq.* (See **Exhibit J** attached hereto and incorporated herein by reference.)

**WHEREFORE**, Plaintiff Rodney K. Justin prays the Court set forth a determination of the following:

a.    Set forth a written judicial determination under the Common Law of the Constitution that 26 U.S.C. § 7203 is a statute void for vagueness because it is not in harmony with the Common Law of the Constitution and violates the due process clause of the Fifth Amendment and the nature and cause of the accusation of the Sixth Amendment.

b.    Set forth a written judicial determination under the Common Law of the Constitution that 26 U.S.C. § 7203 is void for vagueness and is therefore unconstitutional and cannot operate as a standalone enforcement statute, because it implies but fails to identify any tax imposed under the internal revenue laws that give rise to being charged by the statute itself.

c. Issue an Order under the Common Law of the Constitution prohibiting the Defendants from causing the Plaintiff to be charged for possible violation of 26 U.S.C. § 7203 until such time a determination has been made to establish the constitutionality of the statute in its present ambiguous construction.

## COUNT V.
### Statutes Of The United States Not Legislatively Enacted by Congress As Required Under The Constitution Have No Force Or Effect Of Law

86.    Plaintiff restates and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

87.    Documentary intrinsic evidence is sufficient to establish that ALL statutes under Subtitle F of the Internal Revenue Code have not yet been enacted by an Act of Congress in violation of Article I § 7 Clauses 1 and 2 of the Constitution, including but not limited to 26 U.S.C. §§ 6531, 7201, 7203, 7802, 7431, 7433, 6103 and 7602. (See **Exhibit K** attached hereto and incorporated herein by reference.)

88.    The Internal Revenue Service was pen stroked into being through the Department of the Treasury at 26 U.S.C. § 7802(a) as an Oversight Board (not an Act of Congress under the Constitution) for which the original intent was for (internal affairs) governing federal employees.

89.    This is further established in the United States Government Manual 2006 on page 341 as listed under the Department of the Treasury. This is supported at Title 26 U.S.C. § 6103(b)(9) – Federal agency "means an agency of section 551(1) of title 5, United States Code."

90.    The Constitution for the United States of America does not authorize an agency of the Government, including the Department of the Treasury, to pass legislative enactments – thus, limiting the jurisdictional reach of its internal affairs division, the [I]nternal Revenue Service.

91.    The term "Act of Congress" means a law enacted in one of the ways prescribed by Article I § 7 Clauses 1 and 2 of the Constitution. Acts of Congress are published in the United States Statutes At Large, which constitutes *legal evidence*" of what the law provides. Article I § 7 Clauses 1 and 2 of the Constitution states in pertinent part:

> Section 7 Clause 1: "*All Bills for raising revenue shall originate in the House of Representatives . . .*" and;

> Section 7 Clause 2*: "Every Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States . . .*" (See Exhibit K attached hereto and incorporated herein by reference.)

92.    This section of the statute comes under Subtitle F of the Internal Revenue Code (IRC) of 1954 and 1986 as amended to date.

93.    Subchapter B of Title 26 of the United States Code discloses the effective dates of enactment as codified at 26 U.S.C. § 7851 - Applicability of revenue laws:

(1)    Subtitle A. "(A) *Chapters 1, 2, 4, and 6 of this title shall apply only with respect to taxable years beginning after December 31, 1953, and ending after the date of enactment of this title.*"

(2)    (2) Subtitle B. "(A) *Chapter 11 of this title shall apply with respect to estates of decedents dying after the date of enactment of this title*, and with respect to such estates chapter 3 of the Internal Revenue Code of 1939 is hereby repealed."

(3)    Subtitle C. "*Subtitle C of this title shall apply only with respect to remuneration paid after December 31, 1954*, except that chapter 22 of such subtitle shall apply only with respect to remuneration paid after December 31, 1954, which is for services performed after such a date."

(4)    Subtitle D. "*Subtitle D of this title shall take effect on January 1, 1955.*"

(5)    Subtitle E. "*Subtitle E* shall take effect on January 1, 1955,"

(6)    Subtitle F. "(A) General rule. *The provisions of subtitle F shall take effect on the day after the date of enactment of this title* and shall be applicable with respect to any tax imposed by this title."

(See **Exhibit L** attached hereto and incorporated herein by reference.)

94.    In accordance with the Internal Revenue Code, United States Code Service and United States Code Annotated, Title 26 U.S.C. § 7802 is provisioned under Subtitle F – Procedures and

Administration, Chapter 75. Crimes and Other Offenses – an Act that Congress failed to legislatively enact under the Constitution at Article I, § 7, Clauses 1 and 2, giving rise to a Constitutional controversy. Accordingly, Subtitle A Income taxes, a Chapter 2 tax on self-employment as referenced at 26 U.S.C. § 7851(a)(1), comes under this enforcement provision.

95.   A literal read of 26 U.S.C. § 7851(a)(1) states in pertinent part: *"**Chapters . . . 2 . . .of this title shall apply. . . to taxable years beginning after December 31, 1953; and ending after the date of enactment of this title,**"* (See **Exhibit L** attached hereto and incorporated herein by reference.)

96.   The construction of the statute reads: Subtitle F "(a) General rule. *__The provisions of subtitle F shall take effect on the day after the date of enactment of this title__*," and there is no date of enactment for Subtitle F, no Public Law reference to the enactment of Subtitle F, no Enacting Clause for Subtitle F, or any other information to conclude that Subtitle F has ever been enacted under Congressional Mandate and legislative authorization.  (See **Exhibit L** attached hereto and incorporated herein by reference.)

97.   To further establish that Subtitle F has not yet been enacted by Congress, the following language is provisioned at 26 U.S.C. § 7851(c) – Crimes and forfeitures, which openly violates constitutional mandate and circumvents the required Acts of Congress in so stating:

> (c) **Crimes and forfeitures. "***All offenses committed***, and all penalties or forfeitures incurred, *__under any provision of law hereby repealed, may be prosecuted and punished in the same manner__* and with the same effect *__as if this title had not been enacted__*."**

98.   This statute unambiguously establishes that even if Congress has failed to comply with the constitutional requirements prescribed by Article I § 7 of the Constitution, Plaintiff can be prosecuted and punished without such an enactment.

99.   If Plaintiff is to rely on the clear language of the statute, a man or woman of average intelligence would conclude that Subtitle F, which covers Chapters 61 through 80, has not yet been enacted – and upon enactment, Chapter 2 of Subtitle A is ended. Plaintiff seeks declaratory relief to determine the validity of an enforcement statute that has never been enacted by Congress, and upon its enactment – the Chapter to which the statute applies shall have ended.

110.   **The questions of law are as follows:**

(a) Can the Department of the Treasury cause statutes to be published in the Internal Revenue Code as if they are legislative enactments by Congress under the Constitution – even though they have never been enacted as prescribed by Article I § 7 Clause 1 and 2 of the Constitution?

(b) Can Plaintiff be persecuted and then prosecuted and punished by an Act of Congress related to any internal revenue law that has not been enacted by Congress as prescribed by Article I § 7 Clause 1 and 2 of the Constitution?

(c) Does Congress have the power to circumvent the prescribed mechanisms established by Article I § 7 Clause 1 and 2 of the Constitution as it relates to the internal revenue laws?

(d) Can Congress draft and publish an Act which has never been enacted that effectively usurps and circumvents Article I § 7 Clause 1 and 2 of the Constitution that may cause Plaintiff to suffer punishment and prosecution in the same manner and with the same effect as if this title had not been enacted?

(e) When Congress fails or refuses to comply with Article I § 7 Clause 1 and 2 of the Constitution, does this not cause any Act *not* passed or enacted by Congress according to its terms to be null and void, having no force and effect in law?

111. The Plaintiff has been damaged as a direct and proximate result of the Defendants' *failure to establish where* under Constitution for the United States of America Congress is authorized to ignore and not comply with Article I § 7 Clause 1 and 2, regarding the enactment of laws generating revenue, a/k/a, internal revenue laws.

**WHEREFORE**, Plaintiff Rodney K. Justin prays the Court set forth a determination of the following:

a. Set forth a written judicial determination under the Common Law of the Constitution that 26 U.S.C. § 7851, *et seq.*, is a statute under the internal revenue laws that must be enacted pursuant to Article I, § 7, Clause 1 and 2 of the Constitution for the United States of America, which commands an Act of Congress.

b. Set forth a written judicial determination under the Common Law of the Constitution that 26 U.S.C. § 7851, *et seq.*, has not been enacted pursuant to Article I, § 7, Clause 1 and 2 of the Constitution for the United States of America pursuant to an Act of Congress, and the statute is void – having no force or effect of law.

c. Set forth a written judicial determination under the Common Law of the Constitution injunctive relief prohibiting the Defendants from causing the prosecution of the Plaintiff under the enforcement statues of the internal revenue laws pursuant to Title 26 U.S.C. § 7851(6) Subtitle F that have never been enacted at Article I, § 7, Clause 1 and 2 of the Constitution for the United States of America and generally.

d. Issue an Order under the Common Law of the Constitution prohibiting the Defendants from causing the Plaintiff to be prosecuted under the enforcement statues at Title 26 U.S.C. § 7851(6) Subtitle F of the internal revenue laws that have never been enacted by any Act of Congress.

## COUNT VII.
### The Internal Revenue Service Is NOT Authorized Under The Constitution For The United States Of America Through Any Act Of Congress To Administer The Internal Revenue Laws

111. Plaintiff restates and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

112. On or about December 3, 2005, alleged Special Agent BOBBY MARTENS issued 2039 Summonses bearing the term "Criminal Investigation," seeking to obtain books, records and other confidential financial information from WACHOVIA BANK, WORLD'S FOREMOST BANK, FIRST CITIZENS BANK, NORTHWEST MUTUAL LIFE INSURANCE COMPANY, SMITH BARNEY INC., and MELLON INVESTOR SERVICES. (See **Exhibit B** attached hereto and incorporated herein by reference.)

113. The Form 2039 Summonses clearly identify the Department of the Treasury and Internal Revenue Service to include the logo of their seal that appears to be a Vulture or Buzzard as their signature and mark representing their corporations. (See **Exhibit B** attached hereto and incorporated herein by reference).

114. In 1862, during the Civil War, President Lincoln and Congress created the Office of Commissioner of Internal Revenue and enacted an income tax to pay war expenses (see Revenue Act of 1862). The position of Commissioner exists today as the head of the Internal Revenue Service (see **Exhibit I** attached hereto and incorporated herein by reference).

115. The organization created that enforced the collection of those taxes without authority was named the Bureau of Internal Revenue, in contrast to U.S. government institutions that collected external revenue through duties and tariffs.

116. This organization is further established in the United States Government Manual 2006 on page 341 as the Internal Revenue Service listed under the Department of the Treasury. The

Office of the Commissioner of Internal Revenue, cited as the "Internal Revenue Service Oversight Board" at 26 U.S.C. § 7802(a), was originally intended to oversee internal affairs and governance of federal employees. However, the INTERNAL REVENUE SERVICE, as it exists today, was never created by an Act of Congress under the Constitution.

117. As early as the year 1929, the Bureau of Internal Revenue began using the name "Internal Revenue Service" on at least one tax form. In 1953 the name change to the "Internal Revenue Service" was formalized in Treasury Decision 6038 (see **Exhibit M** attached hereto and incorporated herein by reference).

118. To further establish the non-agency status of the INTERNAL REVENUE SERVICE, pursuant to Title 26 U.S.C. § 6103(b)(9) - Federal agency, *"means an agency of section 551(1) of title 5, United States Code,"* where any established entity of the United States Government deemed an "agency" is defined; and IRS is not defined as such within that meaning. (See **Exhibit N** attached hereto and incorporated herein by reference.)

119. Further affirmed and established by United States Attorney Richard A. Ward on November 18, 1993 in the case of *Diversified Metal Products, Inc., v. Internal Revenue Service, et al.*, Civil No. 93-405-E-EJL, on page 2 at ¶ 4 of Counsel's answer, he affirms that the Internal Revenue Service is not an agency of the United States in so stating in pertinent part: *"Denies that the Internal Revenue Service is an agency of the United States Government . . ."* (See **Exhibit N** attached hereto and incorporated herein by reference.)

120. In a recently declassified document released by the National Archives and Records Administration (NARA) dated August 25, 1945 to Secretary Vinson from Messrs. Luxford and Brenner regarding the Administrative History of the Bureau of Internal Revenue (existing now as the defendant INTERNAL REVENUE SERVICE), Luxford states on page 27 at § VIII ¶ 1:

*"There has never been any statutory creation of the Bureau of Internal Revenue, although the Bureau is mentioned in several statutes . . ."* affirming the alleged existence of the *nul tiel* entity, not created by any act of Congress – Constitutionally or otherwise – and, therefore, rendering the INTERNAL REVENUE SERVICE'S enforcement authority a nullity. (See **Exhibit O** attached hereto and incorporated herein by reference.)

121. The Constitution for the United States of America does not authorize any agency of the Government, including the Department of the Treasury, to pass legislative enactments – thus, limiting the jurisdictional scope and reach of the INTERNAL REVENUE SERVICE and its *qui tam* officers, agents and employees proceeding on behalf of the UNITED STATES Federal Corporation.

122. **The questions of law are as follows**:

(a)   What part of the Constitution for the United States of America authorized the INTERNAL REVENUE SERVICE to act on behalf of the UNITED STATES or the DEPARTMENT OF THE TREASURY created by any act of Congress to collect revenues within the meaning of Article I § 7 Clauses 1 and 2 of the Constitution?

(b)   What part of the Constitution for the United States of America authorized the DEPARTMENT OF THE TREASURY to create and employ the INTERNAL REVENUE SERVICE to act on behalf of the UNITED STATES to collect revenues from American Citizens pursuant to an act of Congress within the meaning of Article I § 8 Clause 1 of the Constitution?

(c)   What act of Congress created the INTERNAL REVENUE SERVICE under the Constitution for the United States of America that authorized its officers, agents and

employees to collect revenues within the meaning of Article I § 8 Clause 1 of the Constitution?

(d)   Because the INTERNAL REVENUE SERVICE was not created by an act of Congress and is not an agency of the United States Government, without proceeding under abuse of power, color of law and color of authority, under what jurisdictional authority is the IRS authorized under the Constitution for the United States of America to act as a police power to enforce the collection of internal revenues allegedly owed by Plaintiff within the meaning of Article I § 8 Clause 1 of the Constitution?

(e)   The Plaintiff has been damaged as a direct and proximate result of the Defendants' *failure to establish where* under Constitution for the United States of America an act of Congress created the INTERNAL REVENUE SERVICE that would authorize its officers, agents or employees to act on behalf of the UNITED STATES Federal Corporation for the collection of internal revenue – or external revenue for that matter.

**WHEREFORE**, Plaintiff Rodney K. Justin pray the Court set forth a determination of the following:

a.   Set forth a written judicial determination that the INTERNAL REVENUE SERVICE was not created under the Constitution for the United States of America pursuant to an act of Congress.

b.   Set forth a written judicial determination that the INTERNAL REVENUE SERVICE is not an agency of the United States Government.

c.   Set forth a written judicial determination that the INTERNAL REVENUE SERVICE is not an agency of the United States Government and its officers, agents and employees acted beyond their jurisdictional scope to issue administrative process and to petition the

DEPARTMENT OF JUSTICE to empanel a Grand Jury to prosecute the Plaintiff criminally for an alleged violation of the internal revenue laws.

## Conclusion And Other Remedy Sought

100. At all times this summary and each and every cause of action and/or count as stated herein is incorporated by reference.

101. The acts of the Defendants, the UNITED STATES, the INTERNAL REVENUE SERVICE, the DEPARTMENT OF THE TREASURY and the DEPARTMENT OF JUSTICE, Title 26 U.S.C. § 7201; Title 26 U.S.C. § 7203; Title 26 U.S.C. § 7851; LEANNA JARRELLS, RON BROWN, BOBBY MARTENS, and DOES 1 through 5 inclusive, are clear violations of the Constitution for the United States of America, Acts of Congress and the United States Supreme Court, committing pernicious acts under color of legal authority.

102. The reprehensible and vexatious conduct of and the illegal disclosure made by Criminal Investigation Division Special Agent BOBBY MARTENS et al., and the other agents involved herein caused Plaintiff substantial professional and personal embarrassment, loss of goodwill, and unnecessary attorney fees and accountant fees, resulting in actual damages, the extent of which at this time cannot be completely and accurately ascertained, but which will be more fully known after the completion of discovery.

**WHEREFORE,** Plaintiff Rodney K. Justin has been damaged by officials, officers, agents and employees of the Defendants and their agencies herein named, due to their individual and collective intentional, willful and reckless acts and Plaintiff prays for other declaratory and injunctive relief as follows:

a. The Court permit Plaintiff to amend this complaint when the true name and identities of the DOE Defendants become known and/or where additional causes of action are discovered;

b. Set forth a written judicial determination under the Common Law of the Constitution that the Defendants proceeded in violation of 26 U.S.C. § 7602(d)(1), *et seq.*, which prohibits the issuance of administrative summonses when a Justice Department referral is in effect pursuant to a criminal investigation, rendering all evidence obtained by the Defendants in this manner null and void;

c. Set forth a written judicial determination under the Common Law of the Constitution that the Defendants are statutorily prohibited from seeking prosecution of Plaintiff pursuant to 26 U.S.C. § 6212(a) and 6213(a) *et seq.*, which prohibit the Plaintiff from being prosecuted for an alleged violation of the internal revenue laws until such time a notice of deficiency or determination letter has been issued.

d. Award Plaintiff other relief, as necessary;

e. Award Plaintiff declaratory and injunctive relief under the APA, as necessary;

f. Award Plaintiff relief pursuant to the Equal Access to Justice Act, including but not limited to, an award of reasonable attorneys fees and costs; and

g. Any other remedy under Common Law of the Constitution, at law and in equity this Court deems just and proper.

## JURY TRIAL DEMANDED

Respectfully Submitted.

## VERIFICATION

I, <u>Rodney K. Justin</u>, declare under penalty of perjury pursuant to 28 U.S.C. § 1746(1), that I believe the above to be true and correct to the best of my knowledge, understanding and belief. All Rights retained without recourse.

On this **22** day December, 2007

Rodney K. Justin, Plaintiff

### NOTARY ACKNOWLEDGMENT

State of North Carolina    )
                           ) subscribed and sworn
County of *Rowan*          )

On this **22** day, of *December*, 2007, Rodney K. Justin personally appeared, is personally known to me, or proved to me on the basis of satisfactory evidence to be the one whose name is subscribed to within this instrument and took an Oath.

Witness my hand and official seal.

Nena Y. Morris
Signature of Notary

My Commission Expires: *December 13, 2008*

## ATTACHMENTS:

**Exhibit A:**  Plaintiff's "Notice of Administrative Claim and Demand to Release Notice of Federal Tax Lien and Return of Property Seized" filed and served April 6, 2007 with Form 9423 - Collection Appeal Request and Form 12277 - Application for Withdrawal of Filed Form 668(Y) - Notice of Federal Tax Lien (13 pages)

**Exhibit B:**  IRS 2039 Summonses dated December 3, 2005 and December 15, 2005 issued to WACHOVIA BANK, WORLD'S FOREMOST BANK, FIRST CITIZENS BANK, NORTHWEST MUTUAL LIFE INSURANCE COMPANY, SMITH BARNEY INC., and MELLON INVESTOR SERVICES (14 pages)

**Exhibit C:**  Letter from Charles E. Hunter, Special Agent in Charge dated July 10, 2007, Plaintiff's response dated July 18, 2007 and letter from the Charles E. Hunter, Special Agent In Charge, Criminal Investigation, Charlotte Field Office dated September 12, 2007, recommending criminal prosecution (5 pages)

**Exhibit D:**  IR Manual Delegation Order No. 4 (Rev. 21) and Treasury Regulations at 26 CFR § 301.7602-1(b)(2) and Title 26 § 7602 – Examination of books and witnesses (11 pages)

**Exhibit E:**  Title 26 U.S.C. §§ 6212 and 6213- Notice of Deficiency and Restrictions, Treasury Regulations 26 CFR §§ 301.6212 and 301.6212 (9 pages)

**Exhibit F:**  Title 26 U.S.C. § 7201- Attempt to evade or defeat tax (1 page)

**Exhibit G:**  Title 26 U.S.C. § 7203 – Willful failure to file return, supply information, or pay tax (2 pages)

**Exhibit H:**  Title 26 U.S.C. § 6001 – Notice or regulations requiring records, statements, and special returns, and IR Manual Delegation Order No. 24 (2 pages)

**Exhibit I:**  Title 26 U.S.C. § 7491 –Burden of Proof (1 page)

**Exhibit J:**  Title 26 U.S.C. §§ 6301, 6302 and 6303 and 7429 (9 pages)

**Exhibit K:**  Article I § 7 Clauses 1 and 2 of the Constitution for the United States of America (6 pages)

**Exhibit L:**  Title 26 U.S.C. § 7851 – 26 U.S.C. § 7851 - Applicability of revenue laws (4 pages)

**Exhibit M:**  United States Government Manual 2005/2006 – Commissioner of Internal Revenue, Title 26 U.S.C. §§ 7801 and 7802 – Internal Revenue Service Oversight Board (11 pages)

**Exhibit N:**  Diversified Metal Products, Inc., v. T-Bow Company Trust, Internal Revenue Service, etc – IRS Is Not An Agency Of the United States Government; and Title 26 U.S.C. § 6103(b)(9) - Federal agency (9 pages)

**Exhibit O:**  NARA Declassified Document Dated August 25, 1945 Confirming That the Internal Revenue Service (Bureau of Internal Revenue) Has Never Been Created By Any Act Of Congress (38 pages)

**Exhibit P:**  Letters to Chief Counsels William Smith and Preet Bharara of the U.S. Committee on the Judiciary, and to Senator Richard Burr and Senator Elizabeth Doyle (6 pages)

/ / /

/ / /

/ / /

F 07-2334 HHK

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

Rodney K. Justin                                  88888

## DEFENDANTS

UNITED STATES; DEPARTMENT OF THE TREASURY; the INTERNAL REVENUE SERVICE; the DEPARTMENT OF JUSTICE; Title 26 U.S.C. § 7201; Title 26 U.S.C. §7203; Title 26 U.S.C. § 7851; LEANNA JARRELLS; RON BROWN; BOBBY MARTENS; and DOES 1 through 5

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**
**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Rodney K. Justin
c/o 620 Virginia Drive
Woodleaf, North Carolina [27054]
(704) 278.4359

ATTORNEYS (IF KNOWN)

Case: 1:07-cv-02334
Assigned To : Kennedy, Henry H.
Assign. Date : 12/28/2007
Description: Pro se General Civil

JURY ACTION

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

O 1 U.S. Government
    Plaintiff

(X) 2 U.S. Government
    Defendant

O 3 Federal Question
    (U.S. Government Not a Party)

O 4 Diversity
    (Indicate Citizenship of
    Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|                          | PTF | DFT |                                                      | PTF | DFT |
|--------------------------|-----|-----|------------------------------------------------------|-----|-----|
| Citizen of this State    | O 1 | (x) 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | (x) 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

O **A. Antitrust**

☐ 410 Antitrust

O **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

O **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

O **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

O **E. General Civil (Other)**          OR          (O) **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant)
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☒ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

(8)

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General <br> ☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) <br><br> *(If pro se, select this deck)* | ☐ 895 Freedom of Information Act <br> ☐ 890 Other Statutory Actions (if Privacy Act) <br><br> *(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act <br> ☐ 720 Labor/Mgmt. Relations <br> ☐ 730 Labor/Mgmt. Reporting & Disclosure Act <br> ☐ 740 Labor Railway Act <br> ☐ 790 Other Labor Litigation <br> ☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act) <br> ☐ 443 Housing/Accommodations <br> ☐ 444 Welfare <br> ☐ 440 Other Civil Rights <br> ☐ 445 American w/Disabilities-Employment <br> ☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance <br> ☐ 120 Marine <br> ☐ 130 Miller Act <br> ☐ 140 Negotiable Instrument <br> ☐ 150 Recovery of Overpayment & Enforcement of Judgment <br> ☐ 153 Recovery of Overpayment of Veteran's Benefits <br> ☐ 160 Stockholder's Suits <br> ☐ 190 Other Contracts <br> ☐ 195 Contract Product Liability <br> ☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Court from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Violations of APA at 5 U.S.C. §§ 701-706; 26 U.S.C. §7601, 7602(d)(1), 7603, 7851; I, IV, V, IX, X XIII, XIV and XVI Constitutional Amendments

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** zero <br> **JURY DEMAND:** | Check YES only if demanded in complaint <br> YES ☒   NO ☐ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☐   If yes, please complete related case form.

DATE 12/24/07 *(28)*   SIGNATURE OF ATTORNEY OF RECORD   *Rodney R. ...*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

**EXHIBIT A**:
Plaintiff's "Notice of Administrative Claim and Demand to Release Notice of Federal
Tax Lien and Return of Property Seized" filed and served April 6, 2007 with Form 9423
- Collection Appeal Request and Form 12277 - Application for Withdrawal of Filed
Form 668(Y) - Notice of Federal Tax Lien
(13 pages)

# Collection Appeal Request

| | |
|---|---|
| 1. Taxpayer's Name<br><br>Rodney K Justin | 2. Representative: (Form 2848, Power of Attorney Attached)<br>N/A |

| 3. SSN/EIN<br><br>exempt (b)(6) | 4. Taxpayer's Business Phone<br><br>N/A | 5. Taxpayer's Home Phone<br><br>N/A | 6. Representative's Phone<br><br>N/A |
|---|---|---|---|

**7. Taxpayer's Street Address**

c/o 620 Virginia Drive

| 8. City<br><br>Woodleaf | 9. State<br><br>North Carolina | 10. Zip Code<br><br>[27054] |
|---|---|---|

| 11. Type of Tax (Tax Form)<br><br>Unknown | 12. Tax Periods Being Appealed<br><br>12/31/1997 through 2000 | 13. Tax Due<br><br>Unknown |
|---|---|---|

## Collection Action(s) Appealed

**14. Please Check the Collection Action(s) You're Appealing:**

- [✓] Federal Tax Lien
- [✓] Levy or Notice of Levy
- [✓] Seizure

- [ ] Denial of Installment Agreement
- [ ] Termination of Installment Agreement

## Explanation

**15.** Please explain why you disagree with the collection action(s) you checked above and explain how you would resolve your tax problem. Attach additional pages if needed. Attach copies of any documents that you think will support your position.

**See attached: VERIFIED NOTICE OF ADMINISTRATIVE CLAIM AND DEMAND TO RELEASE NOTICE OF FEDERAL TAX LIEN AND RETURN PROPERTY SEIZED**

07 2334
FILED
DEC 2 8 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Under penalties of perjury, I declare that I have examined this request and the attached documents, and to the best of my knowledge and belief, they are true, correct and complete. A submission by a representative, other than the taxpayer, is based on all information of which preparer has any knowledge.

| 16. Taxpayer's or Authorized Representative's Signature<br><br>*Rodney K Justin MD* | 17. Date<br><br>4-6-07 |
|---|---|
| 18. Collection Manager's Signature | 19. Date Received |

Form **9423** (Rev. 01-1999)     Catalog Number 14169I     **(Over)**     Department of the Treasury – Internal Revenue Service

Form **12277**
(Rev. June 2004)

Department of the Treasury - Internal Revenue Service

# Application for Withdrawal of Filed
## Form 668(Y), Notice of Federal Tax Lien
### (as based on Internal Revenue Code Section 6323(j))

## General Instructions

1. Attach a copy of the Form 668(Y), "*Notice of Federal Tax Lien* ", affecting the property, if available. You may also provide other documentation that you feel substantiates your request. If the information you supply is not complete, it may be necessary for the Technical Services Group Manager to obtain additional information before issuing the notice of withdrawal.

2. Please mail your request to the IRS, ATTN: Technical Services Group Manager, in the area where you live. Use Publication 4235, "*Technical Services Group Addresses* ", to determine where to mail your application.

3. If a determination is made to withdraw the filed Form 668(Y), we'll send you a Form 10916(c), "*Withdrawal of Filed Notice of Federal Tax Lien* ", and we'll notify your creditors if you provide the names and addresses of the credit reporting agencies or financial institutions.

4. If, at a later date, additional copies of the Form 10916(c) are needed, you must provide a written request to the Technical Services Group Manager. The request must provide the following information:

    a. the name, current address and taxpayer identification number of the person requesting that the credit reporting agency, financial institution or creditor be notified of the withdrawal of the Notice of Federal Tax Lien;

    b. a copy of the notice of withdrawal, if available; and

    c. a list of the names and addresses of any credit reporting agencies, financial institutions, or creditors that you want notified of the withdrawal of the filed Form 668(Y).

    **NOTE:** This document also serves as our authority to release the notice of withdrawal information to the agencies or financial institutions you have identified.

---

1. Name *(First, Middle Initial, Last)*

Rodney K Justin

2. SSN or EIN

exempt (b)(6)

3. Address *(Number, Street, P.O. Box)*

c/o 620 Virginia Drive

4. City

Woodleaf

5. State

North Carolina

6. ZIP code

[27054]

7. Reason for requesting withdrawal of the filed Notice of Federal Tax Lien *("x" appropriate box and, on a separate sheet, explain the events that occurred.)*

[X] a. The notice was filed prematurely, or not in accordance with IRS procedures.

[ ] b. The taxpayer entered into an installment agreement to satisfy the liability on the lien *(unless the agreement provides otherwise).*

[ ] c. The withdrawal will facilitate collection of the tax, **or**

[ ] d. The withdrawal would be in the best interest of both the taxpayer *(as determined by the Taxpayer Advocate)* and the government.

**Affirmation**

Under penalties of perjury, I declare that I have examined this application *(including any accompanying schedules, exhibits, affidavits, and statements)* and, to the best of my knowledge and belief, it is true, correct and complete.

Signature *(Taxpayer or Representative)*

Date
4-6-07

---

Part 1— IRS Copy        Catalog No. 27939C        www.irs.gov        Form **12277** (Rev. 6-2004)

Certified Mail: 7005 1160 0000 1985 5907

Rodney K Justin
c/o 620 Virginia Drive
Woodleaf, North Carolina [27054]

April 9, 2007

**Department of the Treasury**
Internal Revenue Service
Area 4, Area Director
Compliance Technical Support Manager
31 Hopkins Plaza
Baltimore, MD 21202

Re: Notice of Federal Tax Lien
Assigned Treasury Account:
                exempt (b)(6)

## VERIFIED NOTICE OF ADMINISTRATIVE CLAIM AND DEMAND TO RELEASE NOTICE OF FEDERAL TAX LIEN AND RETURN PROPERTY SEIZED

I, Rodney K Justin, hereinafter referred to as "Belligerent Claimant," or "Claimant," (see _United States v. Johnson_, 76 F.Supp. 538 (1947)), am in receipt of the Department of the Treasury, Internal Revenue Service Form 668(Y)(c) and two Forms 668(Y) both titled "NOTICE OF FEDERAL TAX LIEN", hereinafter referred to as "NFTL", dated August 19, 2004 and February 18, 2005 referencing alleged and erroneously assessed tax liabilities in excess of $201,000.00 for tax years ending December 31, 1997 through 2000 (see **Exhibit A**). Notice, is hereby given of this administrative claim for monetary actual economic damages sustained by Claimant to dispute, contest and challenge due process violations committed by named unknown employees of the Internal Revenue Service. Service employees have collectively and individually caused procedurally invalid Notices of Federal Tax Lien to issue resulting in Claimant's economic harm and injury. As cited in _Bivens v. Six Unknown Fed. Narcotics Agents_, 392, 403 U.S. 388 (1971) _"**An agent acting — albeit unconstitutionally — in the name of the United States possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own.**"_ Cf. _Amos v. United States_, 255 U.S. 313, 317 (1921); _United States v. Classic_, 313 U.S. 299, 326 (1941).

This Verified Notice constitutes a complete and final exhaustion of Claimant's administrative remedies pursuant to 26 CFR § 301.7433(a)(1), (b)(1) and (e). Therefore, this final exhaustion gives Claimant jurisdiction to pursue this action in a district court of the United States in the event this claim is denied, ignored or not responded to in any manner as relative to the facts and evidence presented herein.

# I.
## Facts and Occurrence of Events

1. That between February 18, and February 22, 2005, alleged Revenue Officer RON BROWN issued two Forms 668(Y) – Notice of Federal Tax Lien attached to Letters 3177 titled "Notice of Federal Tax Lien – Nominee or Alter-Ego" referencing tax years 1997, 1998, 1999 and 2000, effectively slandering title to the name and real property rights of Claimant Rodney K. Justin (see **Exhibit A**).

2. On or about August 19, 2004, alleged Revenue Officer LEANNA JARRELLS issued a "Notice of Federal Tax Lien" in the amount of $201,255.32 for tax years 1997, 1998, 1999 and 2000 signed by C SHERWOOD *aka* CHERYL SHERWOOD, effectively slandering title to the name and real property rights of Claimant Rodney K. Justin (see **Exhibit A**).

3. On or about December 4, 2004, CALLAWAY ASSOCIATES was served Form 668-A(ICS) a third-party "Notice of Levy" by Revenue Officer RON BROWN in the amount of $217,186.97 attempting an administrative seizure and taking of Claimant Rodney K. Justin's personal property in their possession (see **Exhibit B**).

4. That on or about April 13, 2005 or soon thereafter, Revenue Officer RON BROWN caused Claimant Rodney K. Justin's compensation for labor property to be seized and taking via an alleged "Notice of Levy" in the amount of $54,583.00 from Claimant's then contracted employer: CALLAWAY ASSOCIATES, LLP (corporate office is located at 4221 Tuckaseegee Road, Charlotte, North Carolina 28208) causing economic hardship and devastation to Claimant's ability to provide a living for his family – resulting not only in the termination of Claimant, but causing a fifty percent (50%) loss sustained in labor compensation property (see **Exhibit C**).

5. That on or about August 31, 2005, Claimant Rodney K. Justin filed four (4) Forms 843 – Claim for Abatement of erroneous liability and alleged assessment for tax years 1997 in the amount of $42,595.65; 1998 in the amount of $132,188.36; 1999 in the amount of $17,251.54; and 2000 in the amount of $9,219.77; and in response Claimant received Letters 105C dated February 21, 2006 disallowing all claims without explanation (see **Exhibit D**).

6. That in response to Letters 105C Claimant caused an appeals to be filed soon thereafter; and Appeals Team Manager, JENNIFER R. SAWYER issued a final determination letter dated September 5, 2006 disallowing the claims without disclosing the basis for such denials and stating that Claimant has two years from the date of the claim to file suit (see **Exhibit E**).

7. That on or about August 31, 2005, Claimant Rodney K. Justin filed Forms 12661 – "Disputed Issue Verification" and Form 12277 – "Application for Withdrawal of Filed Notice of Federal Tax Lien" with an affidavit and exhibits attached demanding the release of the Notices of Federal Tax Liens filed for tax years 1997, 1998, 1999 and 2000, which resulted in no response from the area director or any other fiduciaries petitioned for such release (see **Exhibit F**).

8. That on or about April 30, 2006 or soon thereafter Claimant, caused returns to be prepared, signed and filed for tax years 1997 through 2005, fully disclosing and reconstructing return information to the best of Claimant's ability, taking all allowable exemptions, deductions and exclusions, resulting in no response from the IRS as of the date of this Verified Claim.

9. That on or about November 29, 2006, Claimant's household suffered and sustained loss of personal property through a third party seizure and taking in the amount of $11,449.68 pursuant to the closing of a Real Estate sale due to alleged Revenue Officer RON BROWN'S filing of a procedurally invalid Notice of Federal Tax lien (see **Exhibit G**).

10. That alleged Service employees RON BROWN, BOBBY MARTENS, SHAWNEE MISSION, DENNIS L PARIZEK, LEANNA JARRELLS, C SHERWOOD, JENNIFER R SAWYER, the Secretary and his delegates have continued to ignore and refuse to answer Claimant's issues and concerns relevant to alleged liabilities in direct violation of 26 CFR § 601.201(a)(1), stating in pertinent part, *"It is the practice of the Internal Revenue Service to answer inquiries of individuals and organizations, as to their status for tax purposes, and as to the tax effects of their acts or transaction,"*

11. That alleged Service employees named herein have caused exactions to be effectuated against Claimant in direct violation of 26 CFR § 601.106 Rule I., stating in pertinent part: *"An exaction by the U.S. Government, which is not based upon law, statutory or otherwise, is taking of property without due process of law, in violation of the Fifth Amendment to the U.S. Constitution,"* establishing a claim of right wherein relief must be granted.

12. That alleged Service employees named herein have failed or refused to address Claimant's issues and concerns contrary to statutes, regulations and policy and the filing of the wrongful and illegal Notice of Federal Tax Lien to encumber Claimant's real property rights and seize personal property constitute violations of due process and warrant withdrawal and/or release accordingly.

## II.
### Claimants Were Never Issued A Notice Of Deficiency To Dispute The Alleged Liability

**FACTS, LAW AND PROCEDURE:** Contrary to 26 U.S.C. § 6212(a) *et seq.*, Claimant was never given an opportunity to petition tax court and dispute the alleged federal tax liability as prescribed therein. Congress enacted Section 6212(a) giving [taxpayers] an opportunity to petition tax court, stating in pertinent part:

26 U.S.C. § 6212. **Notice of deficiency (a)** In general *"If the Secretary determines that there is a deficiency in respect of any tax imposed* by subtitles A or B or chapter 41, 42, 43, or 44 *he is authorized to send notice of such deficiency to the taxpayer by certified mail or registered mail.*

Furthermore, because Claimant was never given and opportunity to petition the tax court, the Notice of Federal Tax Lien for tax years ending December 31, 1997 through 2000 were issued in violation of 26 U.S.C. § 6213(a) which prohibits an assessment until such time a deficiency has been issued. This statute states in pertinent part:

26 U.S.C. § 6213. **Restrictions applicable to deficiencies; petition to Tax Court (a)** "*Except as otherwise provided* in section 6851, 6852, or 6861 <u>*no assessment of a deficiency in respect of any tax imposed*</u> by subtitle A, or B, chapter 41, 42, 43, or 44 <u>*and no levy or proceeding in court for its collection shall be made, begun, or prosecuted until such notice has been mailed to the taxpayer, nor until the expiration of such 90-day or 150-day period*</u>, as the case may be, nor, if a petition has been filed with the Tax Court, until the decision of the Tax Court has become final."

a.  Claimant references the Internal Revenue Service Automated Data Processing (ADP) Manual at 3(27)(68)(12) regarding the application of Transaction Codes (TC). The Notice of Deficiency Transaction Code 494 indicates that a 90-day notice (Statutory Notice of Deficiency) was issued (see **Exhibit H**).

b.  With verification and confirmation provided by IRS Disclosure Officer R.L. COMMERSON that no Notice of Deficiency for tax years ending December 31, 1997 through 2000 was ever issued, Claimant refers to the computer-generated Individual Master File Complete. These transcripts make reference to numerous three-digit transaction codes identifying the type of financial transactions entered, similar to a banking statement, yet the Statutory Notice of Deficiency TC 494 Code does not appear anywhere on the transcripts (see **Exhibit I**).

c.  This evidence is factually sufficient to establish and conclude that Claimant has never been issued a 90–day Notice of Deficiency for tax years ending December 31, 1997 through 2000 by employees of the Internal Revenue Service giving Claimant an opportunity to petition tax court – a direct violation of the Due Process Clause of the Fifth Amendment to the Constitution. The Courts have ruled: "*A Notice of Deficiency must be mailed before an assessment and/or any subsequent levy or lien on property may be made. 26 U.S.C. § 6213(a). Simply put, the Notice serves as a prerequisite to a valid assessment by the IRS.*" <u>Robinson v. United States,</u> 920 F.2d 1157, 1158 (3d Cir. 1990).

d.  The court also stated: "*An assessment is illegal and void if no required (valid) deficiency notice is sent to the taxpayer.*" See <u>United States v. Williams</u>, (1958 DC NY) 161 F. Supp 158. 58-1 USTC 9213. (20 Fed Proc., L Ed 48:440) "*This deprivation of the opportunity to litigate a tax liability before paying the tax can cause substantial hardship to the taxpayer.*" <u>Granquist v. Hackleman</u>, 264 F.2d 9, 14 (9th Cir. 1959). Such a deprivation is also "*out of keeping with the thrust of the Code.*" <u>Laing</u>, 423 U.S. at 176, 96 S.Ct. at 482.

### III.
### <u>Unknown Service Employees Failed To Establish A Procedurally Valid Tax Liability Pursuant To IRC § 6020(b) – Substitute For Return</u>

## <u>FACTS AND EVIDENCE REGARDING SFR:</u>

1.  On or about May 16, 2005 Claimant received a response to a Freedom of Information Act (FOIA) request from Disclosure Officer R.L. COMMERSON producing a copy of the Individual Master File Complete for tax years ending December 31, 1997 through 2000, which indicates TC 150 - Substitute for Return transaction codes pursuant to IRC 6020(b) that were established in the IMF on November 20, 2000 and July 29, 2002 (see **Exhibit I**).

2. That on or about February 12, 2005, Claimant submitted a Freedom of Information Act (FOIA) Requests asking for signed Substitute for Returns (SRF) and Forms 13496 – IRS Section 6020B Certifications as indicated in the IMF Complete for tax years ending December 31, 1995 through 2004 (see **Exhibit J**). As of the date of this complaint Claimant has received no response or reply, indicating that no such documents or evidence exists.

## LAW AND PROCEDURE:

3. Internal Revenue Service Form 13496 – Section 6020(b) Certification and other like forms must be signed by the Service employee authorized to file a Substitute for Return applicable to nonfilers, additional assessment of penalties and/or filers presumed to have understated their liability. This section states in pertinent part:

> 26 U.S.C. § 6020(b). Returns prepared for or executed by Secretary (a) Preparation of return by Secretary – *"If any person shall fail to make a return required by this title or by regulations prescribed thereunder, but shall consent to disclose all information necessary for the preparation thereof, then, and in that case, the Secretary may prepare such return, which, being signed by such person*, may be received by the Secretary as the return of such person."

4. That a Notice signed by Associate Chief Counsel Deborah A. Butler of the Department of the Treasury - Internal Revenue Service from the Officer of Chief Counsel dated February 4, 2007 further affirms that records must exist and the return must be signed by the Secretary or and authorized officer for the Substitute for Return to be valid (see **Exhibit K**)

5. As indicated in Claimant's investigation and discovery Claimant has not seen or been presented with any verified evidence that employees of the IRS complied with 26 U.S.C § 6020(b) and issued Substitute for Return(s) for tax years ending December 31, 1997 through 2000 that: (1) identified Claimant as the [t]axpayer by name and identification number, (2) contains sufficient information from which to compute a tax liability, and (3) was signed by an authorized officer identifying the return, nor does Claimant believe any such evidence exists and therefore requests production of the same (see *Millsap v. Commissioner*, 91 T.C. 926 (1988).

### IV.
### Unknown Service Employees Failed To Establish
### A Valid Or Verifiable Statutory Assessment

## FACTS AND EVIDENCE REGARDING THE ASSESSMENT:

1. Claimant submitted a Freedom of Information Act (FOIA) Request dated February 11, 2005 requesting production of the signed Summary Record of Assessment pursuant to 26 U.S.C. § 6203 and 26 CFR § 301.6203-1 for tax years ending December 31, 1995 through 2004, which provides evidence that valid assessments exist; and in response Claimant received a response dated July 6, 2005 from Disclosure Specialist D. HIGLEY stating, ". . . *the information you seek does not exist* . . ." (see **Exhibit L**).

## LAW AND PROCEDURE:

2. Although unknown Service employees claim that assessments were made as indicated on the Notice of Federal Tax Lien for tax years 1997 through 2000 and in other Notices asserting tax liabilities, Claimant's own investigation established that no such assessments exist. An assessment if made must comply with the provisions of 26 U.S.C. § 6203 and 26 CFR § 301.6203-1.

26 U.S.C. § 6203. Method of assessment – "The assessment shall be made by recording the liability of the taxpayer in the office of the Secretary in accordance with rules or regulations prescribed by the Secretary. *Upon request of the taxpayer, the Secretary shall furnish the taxpayer a copy of the record of the assessment.*"

26 CFR § 301.6203-1 Method of assessment – "*The assessment shall be made by and assessment officer signing the summary record of assessment.* The summary record, through supporting records, shall provide identification of the taxpayer, character of liability assessed, the taxable period, if applicable, and the amount of the assessment . . . *The date of the assessment is the date the summary record is signed by the assessment officer.*" (See *Stallard v. United States*, 806 F. Supp. 152 (W.D. Tex. 1992), aff'd 12. F.3d 499 (5th Cir. 1994).

26 U.S.C. § 6751.(b) Approval of assessment. "No penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate."

3. Claimant's issued and <u>unsigned</u> Individual Master Files Complete Transcripts for tax years ending December 31, 1997 through 2000 are **NOT** and **do not** come into purview of the valid signed assessment authorized by the Secretary – rendering all claims of a valid assessment by Service employees void. The courts have ruled: ". . . *when an assessment was invalid due to the lack of a signature on the 23C Form. This defect, however, was a significant violation of regulations . . .*" *Brafman v. United States*, 384 F.2d 863 (5th Cir. 1967), "*Certificates of Assessments and Payments are `routinely used to prove that tax assessment has in fact been made.' They are presumptive proof of a valid assessment.*" *Guthrie v. Sawyer*, 970 F.2d 733, 737 (10th Cir. 1992) (quoting *Geiselman v. United States*, supra at 6).

### V.

### Demand For Release of the Procedurally Invalid Notice of Federal Tax Lien(s) For Exhaustion of the Administrative Remedies at 26 CFR § 301.7433(a)(1), (b)(1) and (e)

Claimant herein requests assistance pursuant to 26 CFR § 601.201(a)(1), stating in pertinent part, "*It is the practice of the Internal Revenue Service to answer inquiries of individuals and organizations, as to their status for tax purposes, and as to the tax effects of their acts or transaction.*"

The verified evidence above referencing all Notices of Federal Tax Lien which appear to be signed by RON BROWN and C SHERWOOD for LEANNA JARRELLS dated August 19, 2004 and February 18,

2005 for tax years ending December 31, 1997 through 2000 are in support of Claimant qualifying for release pursuant to 26 U.S.C. § 6325(a)(1), or withdrawal pursuant to 26 U.S.C. § 6323(j)(1)(A). These statutory provisions provide in pertinent part:

**§ 6325. Release of lien or discharge of property.**

**(a) Release of lien.**

"Subject to such regulations as the Secretary may prescribe, *the Secretary shall issue a certificate of release of any lien imposed with respect to any internal revenue tax not later than 30 days after* the day on which—

**(1) Liability satisfied or unenforceable.**

The Secretary finds that *the liability for the amount assessed, together with all interest* in respect thereof, has been fully satisfied or *has become legally unenforceable*"

**26 U.S.C. § 6323(j)(1)(A) Withdrawal of notice in certain circumstances.**

(1) **In general.** "The Secretary may withdraw a notice of a lien filed under this section and this chapter shall be applied as if the withdrawn notice had not been filed, if the Secretary determines that— (A) *the filing of such notice was premature or otherwise not in accordance with administrative procedures of the Secretary*,"

All Notices of Federal Tax Lien signed by RON BROWN and C SHERWOOD for LEANNA JARRELLS, dated August 19, 2004 and February 18, 2005 for tax years ending December 31, 1997 through 2000 were not filed in accordance with the administrative procedures of the Secretary and, therefore, are legally unenforceable. Further, the NFTL is facially misleading and fraudulent in violation of 26 U.S.C. § 7214(a)(7), as Service employees have intentionally mischaracterized the alleged tax liabilities imposed or "Kind of Tax" as a Form 1040– willfully implying that Congress enacted "Form 1040" as the type of statutory tax liability imposed – when everybody knows that "Form 1040" is not a Kind of Tax, but a self-assessment information return.

In review, Claimant has verified evidence sufficient to conclude that alleged Service employees RON BROWN, C SHERWOOD and LEANNA JARRELLS failed to comply with the following administrative procedures prior to issuing the procedurally invalid Notice of Federal Tax Lien, warranting withdrawal and/or release in light of the documented violations as follows:

1.1 In willful disregard for the internal revenue laws, unknown Service employees failed to comply with 26 U.S.C. §§ 6212(a) and 6213(a) by failing to issue a Notice of Deficiency – allowing Claimant 90 days to petition the tax court to challenge the validity of liability for tax years as stated above;

1.2 In willful disregard for the internal revenue laws, unknown Service employees failed to comply with 26 U.S.C. § 6330, by failing to allow Claimant a Collections Due Process Hearing – regarding tax years as stated above – noticing Claimant regarding his rights of a due process hearing;

1.3 In willful disregard for the internal revenue laws, unknown Service employees failed to comply with 26 U.S.C. § 6751, by failing to obtain approval from the Secretary in writing prior to or after issuing the jeopardy assessment and before issuing the NFTL for tax years as stated above;

1.4 In willful disregard for the internal revenue laws, unknown Service employees failed to comply with 26 U.S.C. § 6020(b) by failing to obtain approval from the Secretary in writing prior to creating the alleged liability and before issuing the Notices of Federal Tax Lien for tax years as stated above;

No evidence exists on the record that alleged Service employees RON BROWN, C SHERWOOD, LEANNA JARRELLS, the Secretary and his delegates or unknown Service employees complied with 1.1 through 1.4 above prior to issuing the illegal and procedurally invalid Notice of Federal Tax Lien against the real property rights of Claimant. Therefore, this shall be considered an exhaustion of Claimant's administrative remedy in accordance to Regulations 26 CFR § 301.7433(a)(1), (b)(1) and (e), seeking monetary damages and demanding release and/or withdrawal of the Notices of Federal Tax Lien against Claimant's real property.

## VI.
### Exhaustion of Administrative Remedies And Damages Sought For Unauthorized Collection Actions If Denied

Notice is hereby given that alleged Service employees RON BROWN, C SHERWOOD, LEANNA JARRELLS, the Area Director, Compliance Technical Support Manager for Area 4 and any other fiduciary Service employee(s) in receipt of this notice that this shall be considered Claimant's exhaustion of the administrative remedies and any failure to release, withdraw, abate, discharge or respond in any manner as herein demanded will result in an action cognizable under 26 U.S.C. §§ 7214, 7431, 7432 and 7433, seeking actual and direct economic damages for violations that shall be effectively enumerated in a properly executed cause of action. Claimant suggests that before Service employees summarily deny all claims alleged herein, you fully investigate the facts and issues alleged herein.

**Claimant herein further demands the relief as follows:**

(a) Claimant demands alleged Service employees RON BROWN, C SHERWOOD, LEANNA JARRELLS and the Area Director, Compliance Technical Support Manager for Area 4, issue a release and/or withdraw the procedurally invalid Forms 668(Y)/(Y)(c) Notice of Federal Tax Lien dated August 19, 2004 and February 18, 2005 as commanded by 26 U.S.C. § 6325 et seq., for tax years ending December 31, 1997 through 2000 presently encumbering and slandering title to Claimant's real property rights as stated above.

(b) Pursuant to 26 U.S.C. § 7433(d)(1) and 26 CFR § 301.7433-1(a), (d), and (e)(2), Claimant demands payment in the amount $66,032.68 for direct actual damages sustained due to the negligent acts of alleged Service employees RON BROWN, C SHERWOOD, LEANNA JARRELLS and other Service employees proceeding in willful disregard of the internal revenue laws as evidenced on the record.

(c) Pursuant to 26 U.S.C. § 7433(d)(1) and 26 CFR § 301.7433-1(a), d), and (e)(2), Claimant demands payment in the amount $100,000.00 for direct economic damages sustained due to the negligent acts of alleged Service employees RON BROWN, C SHERWOOD, LEANNA JARRELLS and other Service employees proceeding in willful disregarded of the internal revenue laws as evidenced on the record.

The Area Director (District Director) at Area 4, acting in capacity as the Compliance Technical Support Manager, the Secretary of the Treasury, alleged Service employees RON BROWN, C SHERWOOD, LEANNA JARRELLS and other Internal Revenue Service fiduciary employees named here must respond within 10 days from receipt of this notice as required pursuant to 5 U.S.C. § 552a(d)(2)(A) of the Administrative Procedures Act. Claimant is demanding that the parties named herein review IRS records to correctly reflect Claimant's status as required by 5 U.S.C. § 552a(d)(2)(B)(i). Thank you for your kind indulgence and assistance in this matter as Claimant looks forward to your response within 30 days from the date of receipt of this notice.

I, Rodney K Justin, declare under penalty of perjury and under the laws of the United States of (North) America and 28 U.S.C. § 1746(1), that I believe the above to be true and correct to the best of my knowledge and understanding. All rights retained without recourse.

/s/ _Rodney K Justin_
Rodney K Justin, Claimant

State of North Carolina    )
                           ) ss:
County of  Rowan    )

On this 6 day of April_____ 2007, Rodney K Justin personally appeared known to me, or proved to me on the basis of satisfactory evidence to be the ones whose names are subscribed to within this instrument.

Witness my hand and official seal: _Nona Y Morris_
                                    Signature of Notary

My Commission Expires: _Dec 8, 2008_

**INCLUSIONS:**

Form 9423 – Collection Appeal Request.
Form 12277 - Application for Withdrawal of Notice of Federal Tax Lien.

**ATTACHMENTS:** Due to the large volume of exhibits referenced herein, please find enclosed first and last pages only. Complete exhibits will be furnished upon request.

**EXHIBIT A:** Forms 668(Y)(c) and 668(Y) - Notice of Federal Tax Lien.

**EXHIBIT B:** Form 668-A(ICS) - Notice of Levy addressed to CALLAWAY ASSOCIATES.

**EXHIBIT C:** $54,583.00 of Illegally Seized Property Paid to the US Treasury Dated April 11, 2005.

**EXHIBIT D:** Claimant filed Forms 843 and IRS response Letters 105C.

**EXHIBIT E:** Appeals Team Manager JENNIFER R. SAWYER'S denial letter.

**EXHIBIT F:** Claimant's filed Forms 12277 and 12661 with attached affidavit.

**EXHIBIT G:** $11,449.68 Seizure And Taking of Personal Property.

**EXHIBIT H:** IRS ADP Manual Referencing TC 494 – Statutory Notice Of Deficiency Issuance.

**EXHIBIT I:** IMF Complete Transcripts for tax years ending December 31, 1997 through 2001.

**EXHIBIT J:** FOIA request for production of Substitute for Return (SFR) dated May 3, 2006.

**EXHIBIT K:** Associate Chief Counsel DEBORAH A. BUTLER'S Notice dated February 4, 2007.

**EXHIBIT L:** Disclosure Specialist D. HIGLEY response dated July 6, 2005.

**Mail to:**

**Department of the Treasury**
Internal Revenue Service
Attn: RON BROWN
31 Hopkins Plaza
Baltimore, MD 21202
Certified Mail: 7005 1160 0000 1985 5853

**Department of the Treasury**
Internal Revenue Service
Attn: C SHERWOOD
31 Hopkins Plaza
Baltimore, MD 21202
Certified Mail: 7005 1160 0000 1985 5884

**Department of the Treasury**
Internal Revenue Service
Attn: LEANNA JARRELLS
31 Hopkins Plaza
Baltimore, MD 21202
Certified Mail: 7005 1160 0000 1985 5891

**Treasury Inspector General for Tax Administration**
ATTN: Complaint Management Division
P.O. Box 589
Washington, DC 20044
Certified Mail: 7005 1160 0000 1985 5860

**Attorney General of the United States**
Alberto R. Gonzales
United States Department of Justice
950 Pennsylvania Avenue Northwest
Washington, DC 20530-00001
Certified Mail: 7005 1160 0000 1985 5877

**Department of the Treasury**
Internal Revenue Service
Donald L. Korb, Chief Counsel
1111 Constitution Ave., NW CM#4
Washington, DC, 20224
Certified Mail: 7005 1160 0000 1985 5839

**Department of The Treasury**
Internal Revenue Service
CCP – Lien Unit
P.O. Box 145595, Stop 8420G –Team (201)
Cincinnati, Ohio 45250-5595
Certified Mail: 7005 1160 0000 1985 5846


///


///


///

**EXHIBIT B**:
2039 Summonses dated December 3, 2005 and December 15, 2005 issued to
WACHOVIA BANK, WORLD'S FOREMOST BANK, FIRST CITIZENS BANK,
NORTHWEST MUTUAL LIFE INSURANCE COMPANY, SMITH BARNEY INC.,
and MELLON INVESTOR SERVICES
(14 pages)



# Summons

In the matter of  RODNEY K JUSTIN

Internal Revenue Service (Division):  CRIMINAL INVESTIGATION

Industry/Area (name or number):  CHARLOTTE, NC

Periods: FOR THE TAX YEARS 2001, 2002, 2003, AND 2004

## The Commissioner of Internal Revenue

To: FIRST CITIZENS BANK

At: 100 EAST TRYON RD, RALEIGH, NC 27603, ATTN: LEGAL DEPARTMENT

You are hereby summoned and required to appear before  SPECIAL AGENT BOBBY MARTENS
an officer of the Internal Revenue Service, to give testimony and to bring with you and to produce for examination the following books, records, papers, and other data relating to the tax liability or the collection of the tax liability or for the purpose of inquiring into any offense connected with the administration or enforcement of the internal revenue laws concerning the person identified above for the periods shown.

SEE ATTACHED

---

**Do not write in this space**

07 2334

# FILED

DEC 2 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**Business address and telephone number of IRS officer before whom you are to appear:**

6635 Executive CR DR, Suite 180, Charlotte, NC 28212    (704) 566-5274

**Place and time for appearance at** 6635 Executive CR DR, Suite 180, Charlotte, NC 28212

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|

on the _____3RD_____ day of _____DECEMBER_____ 2005 at _____5:00_____ o'clock __p__ m.
(year)

Issued under authority of the Internal Revenue Code this __4th__ day of __November__ , __2005__ .
(year)

**IRS**

Department of the Treasury
Internal Revenue Service

www.irs.gov

Form 2039 (Rev. 12-2001)
Catalog Number 21405J

_Bobby Martens_                    SPECIAL AGENT
Signature of issuing officer                    Title

_____                    _____
Signature of approving officer *(if applicable)*                    Title

**Part C —** to be given to noticee

ATTACHMENT TO SUMMONS ISSUED TO:  FIRST CITIZENS BANK

ALL OPEN AND CLOSED ACCOUNTS

For the years: 2001 - 2004

All records pertaining to the following individuals and business entities whether held jointly or severally or as trustee or fiduciary as well as custodian, executor or guardian as well as any other entity in which these individuals or entities may have a financial interest:  RODNEY K JUSTIN, LYNN SHERRILL JUSTIN

To include all accounts in which these individuals had signatory authority and/or the right of withdrawal.

These records should include but are not limited to:

SAVINGS ACCOUNT RECORDS:  Including signature cards, ledger cards or records reflecting dates and amounts of deposits, withdrawals, interest, debit and credit memos, deposit slips, checks deposited, withdrawal slips, and checks issued for withdrawals, Forms 1099 issued.

CHECKING ACCOUNT RECORDS:  Including signature cards, bank statements, deposit slips, checks deposited, checks drawn on the account, records pertaining to all debit and credit memos, Forms 1099 issued.

LOAN RECORDS:  Including applications, financial statements, loan collateral, credit and background investigations, loan agreements, notes or mortgages, settlement sheets, contracts, checks issued for loans, repayment records, including records revealing the date, amount and method of repayment (cash or check), checks used to repay loans and a record disclosing the total amount of discount or interest paid annually, records of any liens, loan correspondence files, and internal bank memoranda.

SAFE DEPOSIT BOX RECORDS:  Including contracts, access records, and records of rental fees paid disclosing the date, amount, and method of payment (cash or check).

CERTIFICATES OF DEPOSIT AND MONEY MARKET CERTIFICATES: Including applications, actual instruments(s), records of purchases and redemption's, checks issued on redemption, checks used to purchase certificate, any correspondence and any Forms 1099 issued, records revealing the annual interest paid or accumulated, the dates of payment or date interest is earned, checks issued for interest payments.

U.S. TREASURY NOTES AND BILLS:  All records of the purchase of U.S. Treasury Bills and Notes and/or subsequent sale of such bills or notes, including interest paid, checks used for the purchase or sale of the notes and bills, Forms 1099 issued, checks

issued for interest payments, records of interest paid or accumulated revealing the dates and amount of interest paid or accumulated.

CREDIT CARD RECORDS:  Including customer's application, signature card, credit or background investigations conducted, correspondence, monthly billing statements, individual charge invoices, repayment records disclosing the dates, amounts and method (cash or check) of repayment, checks used to make repayments (front and back).

PURCHASES OF BANK CHECKS:  Purchases of bank checks, cashier, teller, travelers' check records, or money order records including the check register, file copies of the checks or money orders, records revealing the date and source of payment for said checks or money orders.

OTHER RECORDS:  Records of certified checks, wire transfers, or collections, letters of credit, bonds and securities purchased through your bank, savings bond transactions and investment accounts.  Such records that disclose the date and amount of the transaction, method (cash or check) and source of payment, instruments and statements of transactions.

All correspondence with the above persons/entities and/or with third parties regarding the above persons/entities.  All memoranda, notes, files, or records relating to meetings or conversations concerning the above persons/entities.



# Summons

In the matter of  RODNEY K JUSTIN

Internal Revenue Service (Division):  CRIMINAL INVESTIGATION

Industry/Area (name or number):  CHARLOTTE, NC

Periods: TAX YEARS 2001, 2002, 2003, AND 2004

## The Commissioner of Internal Revenue

To:  MELLON INVESTOR SERVICES

At:  SHAREHOLDER RELATIONS DEPT., 480 WASHINGTON BLVD, JERSEY CITY, NJ 07310

You are hereby summoned and required to appear before  SPECIAL AGENT BOBBY MARTENS

an officer of the Internal Revenue Service, to give testimony and to bring with you and to produce for examination the following books, records, papers, and other data relating to the tax liability or the collection of the tax liability or for the purpose of inquiring into any offense connected with the administration or enforcement of the internal revenue laws concerning the person identified above for the periods shown.

SEE ATTACHED

---

**Do not write in this space**

---

Business address and telephone number of IRS officer before whom you are to appear:

6635 Executive CR DR, Suite 180, Charlotte, NC 28212    (704) 566-5274

Place and time for appearance at  6635 Executive CR DR, Suite 180, Charlotte, NC 28212

| | |
|---|---|
| **IRS** | on the ____3RD____ day of ____DECEMBER____ 2005 at ___5___ o'clock __P__ m. *(year)* |
| Department of the Treasury Internal Revenue Service | Issued under authority of the Internal Revenue Code this __4th__ day of _November_ , _2005_ *(year)* |
| **www.irs.gov** | _signature_ Signature of issuing officer          SPECIAL AGENT  Title |
| Form 2039 (Rev. 12-2001) Catalog Number 21405J | Signature of approving officer *(if applicable)*          Title |

Part C — to be given to noticee

ATTACHMENT TO SUMMONS ISSUED TO: MELLON INVESTOR SERVICES INC.

FOR THE YEARS: 2001 - 2004

All records relative to financial transactions with or on behalf of RODNEY K JUSTIN.

All records of accounts open or closed whether held jointly or severally, as a trustee or fiduciary as well as custodian, executor, guardian or nominee.

Such records to include but not limited to:
ACCOUNT NUMBER  exempt (b)(6)

All account records of security transactions including all agreements, contracts, applications for account, signature cards, all records relative to treasury notes or certificates of deposit purchased, cash accounts, ready asset accounts, mutual fund accounts, commodity accounts, margin accounts, or other accounts. Such records including cash receipts, confirmation slips, securities delivered receipts, statements of account, notifications of purchase or sale, representative's stock record, account executive worksheets, correspondence, ledger sheets, cash in slips, buy and sell slips, or other records of these transaction.

Other records revealing a description of the securities transacted, quantity bought or sold, date of transactions, purchase or sales price and commissions paid.

Records revealing the dates, amounts, and purpose of all payments by the above to you.

Records of the disposition of the proceeds from each sale including checks (front and back) issued to the above as a result of these sales.

Records of cash and stock dividends and interest paid including checks (front and back) issued and forms 1099.

Broker's account records maintained including but not limited to all notes, memoranda (informal or formal), correspondence, financial statements, background or credit investigations, records disclosing the stock transfer agent and dividend disbursing agent.

Records of any other payments to the above such records revealing the date, amount, and purpose of the payment including the checks (front and back) for such payments.

# Summons

In the matter of  RODNEY K JUSTIN

Internal Revenue Service (Division):  CRIMINAL INVESTIGATION

Industry/Area (name or number):  CHARLOTTE, NC

Periods: FOR THE TAX YEARS 2001. 2002, 2003, AND 2004

## The Commissioner of Internal Revenue

To: NORTHWEST MUTUAL LIFE INSURANCE CO

At: LUANNE JOHNSON, 720 EAST WISCONSIN AVE., ROOM S4030, MILWAUKEE, WISCONSIN

You are hereby summoned and required to appear before  SPECIAL AGENT BOBBY MARTENS
an officer of the Internal Revenue Service, to give testimony and to bring with you and to produce for examination the following books, records, papers, and other data relating to the tax liability or the collection of the tax liability or for the purpose of inquiring into any offense connected with the administration or enforcement of the internal revenue laws concerning the person identified above for the periods shown.

SEE ATTACHED

**Do not write in this space**

**Business address and telephone number of IRS officer before whom you are to appear:**

6635 Executive CR DR, Suite 180, Charlotte, NC 28212    (704) 566-5274

**Place and time for appearance at** 6635 Executive CR DR, Suite 180, Charlotte, NC 28212

![IRS logo] **IRS**

Department of the Treasury
**Internal Revenue Service**

**www.irs.gov**

Form 2039 (Rev. 12-2001)
Catalog Number 21405J

on the _____ 3RD _____ day of _____ DECEMBER _____, _____ 2005 _____ at _____ 5:00 _____ o'clock _____ p _____ m.
(year)

Issued under authority of the Internal Revenue Code this 4th day of November , 2005 .
(year)

Signature of issuing officer

SPECIAL AGENT
Title

Signature of approving officer *(if applicable)*

Title

**Part C —** to be given to noticee



# Summons

In the matter of RODNEY K JUSTIN

Internal Revenue Service (Division): CRIMINAL INVESTIGATION

Industry/Area (name or number): CHARLOTTE, NC

Periods: FOR THE TAX YEARS 2001. 2002, 2003, AND 2004

## The Commissioner of Internal Revenue

**To:** SMITH BARNEY INC

**At:** RETAIL SALES LEGAL, ATTN: KELLY FIGUEROA, 250 WEST STREET, 10TH FLOOR, NY, NY 10013

You are hereby summoned and required to appear before SPECIAL AGENT BOBBY MARTENS
an officer of the Internal Revenue Service, to give testimony and to bring with you and to produce for examination the following books, records, papers, and other data relating to the tax liability or the collection of the tax liability or for the purpose of inquiring into any offense connected with the administration or enforcement of the internal revenue laws concerning the person identified above for the periods shown.

SEE ATTACHED

Do not write in this space

**Business address and telephone number of IRS officer before whom you are to appear:**

6635 Executive CR DR, Suite 180, Charlotte, NC 28212    (704) 566-5274

**Place and time for appearance at** 6635 Executive CR DR, Suite 180, Charlotte, NC 28212

| | |
|---|---|
| **IRS** | on the ___3RD___ day of __DECEMBER__, 2005 at __5:00__ o'clock _p_ m. |
| | _(year)_ |
| | Issued under authority of the Internal Revenue Code this _4th_ day of _November_, _2005_ |
| Department of the Treasury Internal Revenue Service | _(year)_ |
| **www.irs.gov** | _Bobby Martens_ _____ SPECIAL AGENT _____ |
| | Signature of issuing officer    Title |
| Form 2039 (Rev. 12-2001) Catalog Number 21405J | _____ _____ |
| | Signature of approving officer _(if applicable)_    Title |

**Part C — to be given to noticee**

ATTACHMENT TO SUMMONS ISSUED TO: SMITH BARNEY INC

FOR THE YEARS: 2001 - 2004

All records relative to financial transactions with or on behalf of RODNEY K JUSTIN.

All records of accounts open or closed whether held jointly or severally, as a trustee or fiduciary as well as custodian, executor, guardian or nominee.

Such records to include but not limited to:
ACCOUNT NUMBER  exempt (b)(6) ND ACCOUNT NUMBER : exempt (b)(6)

All account records of security transactions including all agreements, contracts, applications for account, signature cards, all records relative to treasury notes or certificates of deposit purchased, cash accounts, ready asset accounts, mutual fund accounts, commodity accounts, margin accounts, or other accounts. Such records including cash receipts, confirmation slips, securities delivered receipts, statements of account, notifications of purchase or sale, representative's stock record, account executive worksheets, correspondence, ledger sheets, cash in slips, buy and sell slips, or other records of these transaction.

Other records revealing a description of the securities transacted, quantity bought or sold, date of transactions, purchase or sales price and commissions paid.

Records revealing the dates, amounts, and purpose of all payments by the above to you.

Records of the disposition of the proceeds from each sale including checks (front and back) issued to the above as a result of these sales.

Records of cash and stock dividends and interest paid including checks (front and back) issued and forms 1099.

Broker's account records maintained including but not limited to all notes, memoranda (informal or formal), correspondence, financial statements, background or credit investigations, records disclosing the stock transfer agent and dividend disbursing agent.

Records of any other payments to the above such records revealing the date, amount, and purpose of the payment including the checks (front and back) for such payments.

# Summons

In the matter of RODNEY K JUSTIN

Internal Revenue Service (Division): CRIMINAL INVESTIGATION

Industry/Area (name or number): CHARLOTTE, NC

Periods: FOR THE TAX YEARS 2001. 2002, 2003, AND 2004

## The Commissioner of Internal Revenue

To: WORLDS FOREMOST BANK

At: ATTN: LEGAL DEPARTMENT, 4800 NW 1ST STREET, LINCOLN, NC 68521

You are hereby summoned and required to appear before SPECIAL AGENT BOBBY MARTENS
an officer of the Internal Revenue Service, to give testimony and to bring with you and to produce for examination the following books, records, papers, and other data relating to the tax liability or the collection of the tax liability or for the purpose of inquiring into any offense connected with the administration or enforcement of the internal revenue laws concerning the person identified above for the periods shown.

SEE ATTACHED

**Do not write in this space**

**Business address and telephone number of IRS officer before whom you are to appear:**

6635 Executive CR DR, Suite 180, Charlotte, NC 28212    (704) 566-5274

**Place and time for appearance at** 6635 Executive CR DR, Suite 180, Charlotte, NC 28212

# IRS

on the ___15TH___ day of __DECEMBER__ __2005__ at __5:00__ o'clock __p__ m.
(year)

Issued under authority of the Internal Revenue Code this 14th day of NOVEMBER , 2005
(year)

Department of the Treasury
Internal Revenue Service

_____    _____
Signature of issuing officer          Special Agent
                                      Title

**www.irs.gov**

Form 2039 (Rev. 12-2001)          _____    _____
Catalog Number 21405J             Signature of approving officer (if applicable)    Title

**Part C — to be given to noticee**

ATTACHMENT TO SUMMONS ISSUED TO:  WORLD'S FOREMOST BANK

ALL OPEN AND CLOSED ACCOUNTS

For the years: 2001 - 2004

All records pertaining to the following individuals and business entities whether held jointly or severally or as trustee or fiduciary as well as custodian, executor or guardian as well as any other entity in which these individuals or entities may have a financial interest:  RODNEY K JUSTIN, LYNN SHERRILL JUSTIN

To include all accounts in which these individuals had signatory authority and/or the right of withdrawal.

These records should include but are not limited to:

SAVINGS ACCOUNT RECORDS:  Including signature cards, ledger cards or records reflecting dates and amounts of deposits, withdrawals, interest, debit and credit memos, deposit slips, checks deposited, withdrawal slips, and checks issued for withdrawals, Forms 1099 issued.

CHECKING ACCOUNT RECORDS:  Including signature cards, bank statements, deposit slips, checks deposited, checks drawn on the account, records pertaining to all debit and credit memos, Forms 1099 issued.

LOAN RECORDS:  Including applications, financial statements, loan collateral, credit and background investigations, loan agreements, notes or mortgages, settlement sheets, contracts, checks issued for loans, repayment records, including records revealing the date, amount and method of repayment (cash or check), checks used to repay loans and a record disclosing the total amount of discount or interest paid annually, records of any liens, loan correspondence files, and internal bank memoranda.

SAFE DEPOSIT BOX RECORDS:  Including contracts, access records, and records of rental fees paid disclosing the date, amount, and method of payment (cash or check).

CERTIFICATES OF DEPOSIT AND MONEY MARKET CERTIFICATES: Including applications, actual instruments(s), records of purchases and redemption's, checks issued on redemption, checks used to purchase certificate, any correspondence and any Forms 1099 issued, records revealing the annual interest paid or accumulated, the dates of payment or date interest is earned, checks issued for interest payments.

U.S. TREASURY NOTES AND BILLS:  All records of the purchase of U.S. Treasury Bills and Notes and/or subsequent sale of such bills or notes, including interest paid, checks used for the purchase or sale of the notes and bills, Forms 1099 issued, checks

issued for interest payments, records of interest paid or accumulated revealing the dates and amount of interest paid or accumulated.

CREDIT CARD RECORDS:  Including customer's application, signature card, credit or background investigations conducted, correspondence, monthly billing statements, individual charge invoices, repayment records disclosing the dates, amounts and method of repayment, checks used to make repayments (front and back).

PURCHASES OF BANK CHECKS:  Purchases of bank checks, cashier, teller, travelers' check records, or money order records including the check register, file copies of the checks or money orders, records revealing the date and source of payment for said checks or money orders.

OTHER RECORDS:  Records of certified checks, wire transfers, or collections, letters of credit, bonds and securities purchased through your bank, savings bond transactions and investment accounts.  Such records that disclose the date and amount of the transaction, method (cash or check) and source of payment, instruments and statements of transactions.

All correspondence with the above persons/entities and/or with third parties regarding the above persons/entities.  All memoranda, notes, files, or records relating to meetings or conversations concerning the above persons/entities.

# Summons

In the matter of RODNEY K JUSTIN

Internal Revenue Service (Division): CRIMINAL INVESTIGATION

Industry/Area (name or number): CHARLOTTE, NC

Periods: FOR THE TAX YEARS 2001. 2002, 2003, AND 2004

## The Commissioner of Internal Revenue

To: WACHOVIA BANK

At: JUDICIAL PROCESSING, PO BOX 7618, 401 MARKET STREET, MAIL CODE PA-4292, PHILADELPHIA, PA 19106

You are hereby summoned and required to appear before SPECIAL AGENT BOBBY MARTENS
an officer of the Internal Revenue Service, to give testimony and to bring with you and to produce for examination the following books, records, papers, and other data relating to the tax liability or the collection of the tax liability or for the purpose of inquiring into any offense connected with the administration or enforcement of the internal revenue laws concerning the person identified above for the periods shown.

SEE ATTACHED

PLEASE CONTACT SPECIAL AGENT BOBBY MARTENS AT 704-566-5274 PRIOR TO COMPLIANCE WITH THE SUMMONS TO DISCUSS COMPLIANCE COSTS.  THIS SUMMONS INCLUDES ANY AND ALL RECORDS FOR SOUTHTRUST BANK.



## Do not write in this space

**Business address and telephone number of IRS officer before whom you are to appear:**

6635 Executive CR DR, Suite 180, Charlotte, NC 28212     (704) 566-5274

**Place and time for appearance at** 6635 Executive CR DR, Suite 180, Charlotte, NC 28212

**IRS**

Department of the Treasury
Internal Revenue Service

**www.irs.gov**

Form 2039 (Rev. 12-2001)
Catalog Number 21405J

on the _____15TH_____ day of __DECEMBER__ __2005__ at __5:00__ o'clock __p__ m.
_(year)_
Issued under authority of the Internal Revenue Code this __14TH__ day of __NOVEMBER__ , __2005__
_(year)_

Signature of issuing officer          Title   SPECIAL AGENT

Signature of approving officer _(if applicable)_          Title

**Part C — to be given to noticee**

ATTACHMENT TO SUMMONS ISSUED TO:  WACHOVIA BANK

<u>ALL OPEN AND CLOSED ACCOUNTS</u>

For the years: 2001 - 2004

All records pertaining to the following individuals and business entities whether held jointly or severally or as trustee or fiduciary as well as custodian, executor or guardian as well as any other entity in which these individuals or entities may have a financial interest:  RODNEY K JUSTIN, LYNN SHERRILL JUSTIN, and RKJ ENTERPRISES

To include all accounts in which these individuals had signatory authority and/or the right of withdrawal.

These records should include but are not limited to:

<u>SAVINGS ACCOUNT RECORDS:</u>  Including signature cards, ledger cards or records reflecting dates and amounts of deposits, withdrawals, interest, debit and credit memos, deposit slips, checks deposited, withdrawal slips, and checks issued for withdrawals, Forms 1099 issued.

<u>CHECKING ACCOUNT RECORDS:</u>  Including signature cards, bank statements, deposit slips, checks deposited, checks drawn on the account, records pertaining to all debit and credit memos, Forms 1099 issued.

<u>LOAN RECORDS:</u>  Including applications, financial statements, loan collateral, credit and background investigations, loan agreements, notes or mortgages, settlement sheets, contracts, checks issued for loans, repayment records, including records revealing the date, amount and method of repayment (cash or check), checks used to repay loans and a record disclosing the total amount of discount or interest paid annually, records of any liens, loan correspondence files, and internal bank memoranda.

<u>SAFE DEPOSIT BOX RECORDS:</u>  Including contracts, access records, and records of rental fees paid disclosing the date, amount, and method of payment (cash or check).

<u>CERTIFICATES OF DEPOSIT AND MONEY MARKET CERTIFICATES:</u> Including applications, actual instruments(s), records of purchases and redemption's, checks issued on redemption, checks used to purchase certificate, any correspondence and any Forms 1099 issued, records revealing the annual interest paid or accumulated, the dates of payment or date interest is earned, checks issued for interest payments.

<u>U.S. TREASURY NOTES AND BILLS:</u>  All records of the purchase of U.S. Treasury Bills and Notes and/or subsequent sale of such bills or notes, including interest paid, checks used for the purchase or sale of the notes and bills, Forms 1099 issued, checks

issued for interest payments, records of interest paid or accumulated revealing the dates and amount of interest paid or accumulated.

CREDIT CARD RECORDS:  Including customer's application, signature card, credit or background investigations conducted, correspondence, monthly billing statements, individual charge invoices, repayment records disclosing the dates, amounts and method (cash or check) of repayment, checks used to make repayments (front and back).

PURCHASES OF BANK CHECKS:  Purchases of bank checks, cashier, teller, travelers' check records, or money order records including the check register, file copies of the checks or money orders, records revealing the date and source of payment for said checks or money orders.

OTHER RECORDS:  Records of certified checks, wire transfers, or collections, letters of credit, bonds and securities purchased through your bank, savings bond transactions and investment accounts.  Such records that disclose the date and amount of the transaction, method (cash or check) and source of payment, instruments and statements of transactions.

All correspondence with the above persons/entities and/or with third parties regarding the above persons/entities.  All memoranda, notes, files, or records relating to meetings or conversations concerning the above persons/entities.

**EXHIBIT C:**
Letter from Charles E. Hunter, Special Agent in Charge dated July 10, 2007, Plaintiff's response dated July 18, 2007 and letter from the Charles E. Hunter, Special Agent In Charge, Criminal Investigation, Charlotte Field Office dated September 12, 2007, recommending criminal prosecution
(5 pages)



**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

Criminal Investigation

July 10, 2007

Rodney K. Justin
620 Virginia Drive
Woodleaf, NC  27054

Dear Mr. Justin:

This office has under consideration a recommendation that criminal proceedings be instituted against you for evasion of assessment of taxes for tax years 2001, 2002, 2003, and 2004 in violation of I.R.C. § 7201.

If you desire a conference in this matter, it will be held on July 25, 2007, at 10:00 a.m., in my office which is located at 6635 Executive Circle Dr., Suite 180, Charlotte, NC 28212.  Please contact me on or before July 19, 2007, and indicate whether you do or do not intend to attend this scheduled conference.  If I do not hear from you, I will cancel the scheduled conference and will not be available.  I may be contacted telephonically at (704) 566-5167 or in writing at the 6635 Executive Circle, Suite 180, Charlotte, NC  28212.  If you do not wish a conference at this time, you may submit in writing, any defenses which you want to be considered.

You have the right to have an attorney represent you at this conference or any subsequent legal proceedings.  You may appear at the conference with an attorney, an attorney may appear without you or you may appear by yourself.  If you have attorney represent you, the attached Form 2848 must be completed by you and your attorney and presented at the conference.  A statement concerning the attorney's qualifications to practice must also be presented at the conference.

Please be advised that plea bargaining, civil settlement, negotiations and/or compromise of the tax liabilities involved will not be considered or discussed at this conference.

Sincerely,

07 2334

Charles E. Hunter
Special Agent in Charge

Enclosure

**FILED**

DEC 2 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Certified Mail: 7002 0510 0001 9996 1761

Rodney K. Justin
620 Virginia Drive
Woodleaf, North Carolina [27054]

July 18, 2007

Department of the Treasury
Internal Revenue Service
Charles E. Hunter, Special Agent in Charge
CI: SAC Office-TV
6635 Executive Circle, Suite 180
Charlotte, NC 28212

Re: Scheduled Conference

Charles E. Hunter:

This response is in reply to your letter dated July 10, 2007, stating in pertinent part *"This office has under consideration a recommendation that criminal proceedings be instituted against you for evasion of assessment of taxes for tax years 2001, 2002, 2003, and 2004 in violation of I.R.C. 7201."* (See Exhibit A). Having filed all returns required to be filed and fully disclosing all compensation and income, including profits, gains and losses, I am at a complete loss of understanding regarding your erroneous assertion that I have evaded an assessment of taxes. Please understand, I have no intention of coming into violation of the nation's tax laws and will do everything in my power to insure that I remain in compliance with the same. With your kind assistance, I seek to correct any oversight on my part presumed to exist.

Due to my complex and demanding schedule, I am presently unable to attend the meeting you scheduled for July 25, 2007 at 10:00 a.m. to discuss this matter. Therefore, if you would be so kind as to put the questions you may have for me in writing, I will be more than happy to answer any issues and concerns you may have regarding this matter. Furthermore, if you could answer these limited questions I have, it would aid in my understanding of whatever issues you wish to address with me in the rescheduled meeting. Therefore, in the event there is any technical oversight on my part and I am in need of refiling the returns for tax years 2001, 2002, 2003 and 2004, I would be very inclined to do so with your assistance.

## Questions for Clarification Prior to Rescheduled Meeting:

Mr. Hunter, as you are probably aware, the United States Supreme Court ruled in *Mitchell* that "Sections 1 and 3 of the 1954 Code, 26 USC 1 and 3, as have all their predecessors since *the Revenue Act of 1917, what that phrase includes. The statutes however, have not specified impose a tax on the taxable income, "of every individual." The statutes however, have not specified what constitutes an individuals income.*" See *United States v. Mitchell*, 403 U.S. 190 (1971) at 194 and 195 (Emphasis Added) – as this adds to a great part of my confusion. Hence, if the United States Supreme Court could not readily determine what "**constitutes an individuals income,**" how can an IRS employee such as yourself make such a determination? Thus, in good faith, I prepared and filed my returns to the

Rodney Justin
Notary on page 3

best of my ability based on unclear and ambiguous internal revenue laws, as I would like to think that such an act cannot be considered a crime.

## Hence, the questions for clarification are as follows:

1. Because I believe have correctly filed all returns required to be filed for the years 2001, 2002, 2003 and 2004 and fully disclosed my compensation and any income that I have earned, can you briefly explain why you believe that I have evaded the assessment of a tax?

2. Did I file the proper forms for purposes of self-assessment or are there other forms you believe I am required to file? If so, can you include these forms with your response?

3. Was I wrong to exclude the Fair Market Value of my labor from gross income as allowed under Internal Revenue Code (IRC) Sections 83, 165, 212 and 1012 et al., of the Code? And if so, can you explain why these sections do not apply to my compensation or income?

4. Was I incorrect to rely on sections of the IRC that would result in me having a Zero federal tax liability? If so, can you explain what sections of the Code prohibit me from relying on these statutes?

5. Am I prohibited from relying on certain statutes, rules and regulations cited in the IRC? If so, can you identify those sections so I don't make that mistake again?

6. If I was incorrect in seeking these particular answers, will you direct me to the part of the IRC that I must research to assess the tax? Your assistance in this matter would be greatly appreciated.

Finally Mr. Hunter, it is my contention that you are bound by 26 CFR § 601.201(a)(1), stating in pertinent part, *"It is practice of the Internal Revenue Service to answer inquiries of individuals and organizations, as to their status for tax purposes, and as to the tax effects of their acts or transaction."* Accordingly, I respectfully request that you respond to and answer the Six (6) "Questions for Clarification" I have presented for your review regarding the internal revenue laws that you believe I have misinterpreted, misunderstood, misapplied and possibly violated. For expedience, I have included a prepaid self-addressed envelop in anticipation of your response and answer to my questions. **Thank you for your kind and professional assistance and cooperation regarding all matters stated herein.**

I, Rodney Justin, declare under penalty of perjury pursuant to 28 U.S.C. § 1746(1), that this document was prepared by me and I believe the above to be true and correct to the best of my knowledge and understanding.

Rodney Justin

Rodney Justin

Rodney Justin
Notary on page 3

State of North Carolina )

                     ) Subscribed and Sworn:

County of _Rowan_ )

On this _20_ day, of _July_____, 2007 Rodney Justin personally appeared, personally known to me, or proved to me on the basis of satisfactory evidence to be the one whose name is subscribed to within this instrument.

                      Witness my hand and official seal.

                                          _Nona Y Morris_

                                          Signature of Notary

                    Expiration Date: _December 13, 2008_



**Inclusion:**
Self-Addressed Prepaid First Class Envelope

**Attachment:**
Exhibit A: CI Letter dated July 10, 2007

**Copies Mailed To:**

Department of the Treasury
Internal Revenue Service
Area 4, Area Director
Compliance Technical Support Manager
31 Hopkins Plaza
Baltimore, MD 21202
Certified Mail: _7002 0510 0001 9996 1785_

Attorney General of the United States
Alberto R. Gonzales
United States Department of Justice
950 Pennsylvania Avenue Northwest
Washington, DC 20530-00001
Certified Mail: _7002 0510 0001 9996 1778_



DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

**Criminal Investigation**

September 12, 2007

Rodney K. Justin
620 Virginia Drive
Woodleaf, NC 27054

VIA CERTIFIED MAIL

Dear Mr. Justin:

A report recommending you be prosecuted for attempting to evade the assessment of income taxes for the years 2001 through 2004 and in violation of Title 26, United States Code, Section 7201, was forwarded to Department of Justice, Tax Division on this date.

Department of Justice, Tax Division will review this matter and make the final determination as to the disposition of this prosecution recommendation.

Any further inquiry concerning your investigation should be made to:

The Honorable Richard T. Morrison
Deputy Assistant Attorney General
Department of Justice, Tax Division
601 D. Street, NW, Room 7334
Washington, DC  20004

ATTN:        Bruce M. Salad, Chief
             Southern, Criminal Enforcement Section

Sincerely,

Charles E. Hunter
Special Agent in Charge, CI
Charlotte Field Office

**EXHIBIT D**:
IR Manual Delegation Order No. 4 (Rev. 21) and Treasury Regulations at 26 CFR §
301.7602-1(b)(2) and Title 26 § 7602 – Examination of books and witnesses
(11 pages)

## 1.2.2
## Delegations of Authority

This IRM contains all existing Delegation Orders for the Service. Distribution of the IRM should be to all persons having a need for any of the Delegation Orders.

Each Delegation Order is numbered sequentially as it is created and issued. There is no relationship between Delegation Order numbering and functional part numbers. However, the Delegation Orders apply to all Service personnel involved in the type of program, activity, function, or work process covered by the Delegations of Authority.

This will be the last issue of IRM 1.2.2 in this format. A Delegation Order Revision Task Force is working to restructure all Delegation Orders to conform to the IRM modernization. Each order will be renumbered to coincide with the process to which it applies.

Any Delegation Orders approved after this revision of IRM 1.2.2 can be found on the Office of Servicewide Policy, Directives and Electronic Research (SPDER) web site under the link "Unpublished Del Orders." They will remain on the web until the next revision is made to this IRM. The address is http://spder.web.irs.gov/home.htm

A Portable Document Format (PDF) version of this IRM can be obtained through the Multimedia Publishing Division's web page at http://publish.no.irs.gov.

**1.2.2.1**
**(11-22-2000)**
**Listing of Delegation**
**Orders by Title**

(1)

| Order No. | Title |
|-----------|-------|
| 4 (Rev. 23) | Summonses, Oaths, Certifications, and Related Functions |
| 5 (Rev. 19) | Order of Succession and Designation to Act as Commissioner of Internal Revenue Service |
| 8 (Rev. 11) | Agreements as to Liability for Personal Holding Company Tax |
| 9 (Rev. 11) | Use of Government Owned or Leased Automobiles Between Home and Work |
| 11 (Rev. 29) | To Accept, Reject or Acknowledge Withdrawals of Offers in Compromise |
| 12 (Rev. 14) | Designation of Acting Supervisory Officials |
| 13 (Rev. 1) | Redelegation of Regional Authority to Service Centers and the Austin Compliance Center |
| 14 (Rev. 5) | Extension of Time for Filing Statement of Grounds |
| 16 (Rev. 16) | Authorization to Approve Confidential Expenditures |

FILED

07 2334    DEC 2 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## 1.2   General Management

| Order No. | Title |
|---|---|
| 263 | Criminal Referral Authority |
| 264 | Authority to Offer and Accept Settlement Offers and to Execute Closing Agreements Made under the Targeted Jobs Tax Credit Initiative |
| 265 | Certifying Travel of Internal Revenue Service Employees under Section 162(a) of the Internal Revenue Code of 1986 |
| 266 | Authority to Permit Disclosure of Tax Convention Information |
| 267 | Authority of National Taxpayer Advocate to Perform Certain Tax Administrative Functions |
| 268 | Granting Relief to Taxpayers Affected by Disasters or Terrorist or Military Actions |
| 269 | Designation to Act as Competent or Taxation Authority Under Tax Coordination Agreements and Tax Implementation Agreements with the Possessions of the United States |

**1.2.2.2**
**(08-16-2002)**
**Order Number 4**
**(Rev. 23)**

(1)  **Summonses, Oaths, Certifications, and Related Functions**

(2)  **Authority:** To issue, serve and enforce summonses, to set the time and place for appearance, to take testimony under oath of the person summoned, to receive and examine data produced in compliance with the summons, and to perform other related duties described in Internal Revenue Code Sections 7609(f), (g) and (i)(2).

(3)  **Delegated To:** All District Directors and the following, when the proper name(s) of the taxpayer(s) is not identified because unknown or unidentifiable (hereinafter called a "John Doe" summons): Assistant Chief Inspector (Internal Security), Regional Inspectors, Director (International District Operations), Director (International Programs), and Chiefs of Divisions (District Criminal Investigation, Collection, Examination, and Employee Plans and Exempt Organizations).

*Note:* This authority is also delegated to Small Business/Self-Employed (SB/SE), Wage & Investment (W&I), Large/Mid Size Business (LMSB), and Criminal Investigation (CI) Directors and Directors of Field Operations; Tax Exempt and Government Entities (TE/GE) Directors; Federal, State and Local Governments, Indian Tribal Governments, Field Operations Managers and Area Managers in TE/GE; LMSB and SB/SE Territory Managers, Manager, International Programs; and Chief, National Background Investigation Center.

(4)  **Redelegation:** This authority may not be redelegated.

(5)  **Authority:** To issue summonses except "John Doe" summonses, and to perform other related functions as stated in Authority 1 of this Order.

# Table of Contents

4 .................. Authority to Issue Summonses, to Administer Oaths and Certify, and to Perform Other Functions

5 .................. Order of Succession and Designation to Act as Commissioner of Internal Revenue Service

8 .................. Authority to Sign Agreements as to Liability for Personal Holding Company Tax

9 .................. Use of Government Owned or Leased Automobiles Between Home and Work

11 .................. Authority to Accept or Reject Offers in Compromise

12 .................. Designation of Acting Supervisory Officials

13 .................. Redelegation of Regional Authority to Service Centers and the Austin Compliance Center

14 .................. Extension of Time for Filing Statements of Grounds

16 .................. Authorization to Approve Confidential Expenditures

17 .................. Authorization to Approve Confidential Expenditures for Money Laundering Investigations

19 .................. Payment of Expenses Incident to Transfers or Appointments of Employees to New Official Stations, Tour Renewal Agreement Travel, and Similar Items

20 .................. Extension of Time to Pay Excess Profits, Estate and Gift Taxes

21 .................. Extension of Time to File Returns and Pay Certain Excise Taxes

23 .................. Settlement of Tort Claims, Claims under the Small Claims Act, and Claims Made by an Employee of the Internal Revenue Service for Damage to or Loss of Personal Property Incident to Service

24 .................. Recordkeeping Requirement

25 .................. Reimbursement for Actual Subsistence, Certain Emergency Travel Situations or Temporary Relocation

27 .................. Authority to Administer Oaths Required by Law in Connection with Employment in the Federal Service

28 .................. Designation of Officers and Employees as Authorized Certifying Officers

29 .................. Certification and Approval of Internal Revenue Collections

35 .................. Agreements Treated as Determinations

39 .................. Tours of Duty and Overtime

40 .................. Credits and Refunds

42 .................. Authority to Execute Consents Fixing the Period of Limitations on Assessment or Collection Under Provisions of the 1939, 1954, and 1986 Internal Revenue Codes

46 .................. (Revoked)

47 .................. Authority to Authorize or Approve Attendance at Meetings at Government Expense

48 .................. Foreign Travel

50 .................. Withholding Compensation Due Personnel

51 .................. Authority to Sign Proofs of Claim and Other Documents

56 .................. Gasoline and Lubricating Oil Bonds

57 .................. Notice of Additional Inspection of Books of Account

60 .................. 26 CFR 601.106: Appeals Functions. Settlement of Cases Docketed in the United States Tax Court

66 .................. Authority of Regional Director of Appeals in Protested and Tax Court Cases

Order No. 4 (Rev. 21)

Effective Date: 2-22-91

## Authority to Issue Summonses, to Administer Oaths and Certify, and to Perform Other Functions

1(a). The authorities granted to the Commissioner of Internal Revenue by 26 CFR 301.7602-1(b), 301.7603-1, 301.7604-1 and 301.7605-1(a) and the authorities contained in Section 7609 of the Internal Revenue Code of 1954 and vested in the Commissioner of Internal Revenue Service by Treasury Order No. 150-10 to issue summonses; to set the time and place for appearance; to serve summonses; to take testimony under oath of the person summoned; to receive and examine books, papers, records or other data produced in compliance with the summons; to enforce summonses; to apply for court orders approving the service of John Doe Summonses issued under Section 7609(f) of the Internal Revenue Code; to apply for court orders suspending the notice requirements in the case of summonses issued under Section 7609(g) of the Internal Revenue Code; and under Section 7609(l)(2) of the Internal Revenue Code; may, when requested, certify to third-party recordkeepers that no action to quash has been timely initiated or that the taxpayer has consented to the examination of the records summonsed, are delegated to the officers and employees of the Internal Revenue Service specified in paragraphs 1(b), 1(c), and 1(d) of this Order and subject to the limitations stated in paragraphs 1(b), 1(c), 1(d), 5, and 6 of this Order.

1(b) The authorities to issue summonses and to perform the other functions related thereto specified in paragraph 1(a) of this Order, are delegated to all District Directors and the following officers and employees, provided that the authority to issue a summons in which the proper name or names of the taxpayer or taxpayers is not identified because unknown or unidentifiable (hereinafter called a "John Doe" summons) may be exercised only by said officers and employees.

(1) Inspection: Director, Internal Security Division and Regional Inspectors.

(2) International: Deputy Assistant Commissioner and Directors, Offices of Taxpayer Service and Compliance, and International Programs.

(3) District Criminal Investigation: Chief of Division, except this authority in districts without a Division Chief is limited to the District Director.

(4) District Collection Activity: Chief of Division, except this authority in districts without a division chief is limited to the District Director.

(5) District Examination: Chief of Division, except this authority in districts without a division chief is limited to the District Director.

(6) District Employee Plans and Exempt Organizations: Chief of Division.

1(c) The authorities to issue summonses except "John Doe" summonses, and to perform other functions related thereto specified in paragraph 1(a) of this Order, are delegated to the following officers and employees:

(1) Inspection: Assistant Regional Inspectors (Internal Security) and Chief, Investigations Branch.

(2) Assistant Commissioner (International): Criminal Investigation Special Agents; Collection Group Managers; and Examination Group Managers (including large case managers).

(3) District Criminal Investigation: Assistant Chief of Division; and Special Agents.

(4) District Collection Activity: Assistant Chief of Division; Group Managers.

(5) District Examination: Case Managers, Group Managers (including large case managers).

(6) District Employee Plans and Exempt Organizations: Group Managers.

1(d) The authority to issue summonses except "John Doe" summonses and to perform the other functions related thereto specified in paragraph 1(a) of this Order is delegated to the following officers and employees except that in the instance of a summons to a third party witness, the issuing officer's case manager, group manager, or any supervisory official above that level, has in advance personally authorized the issuance of the summons. Such authorization shall be manifested by the signature of the authorizing officer on the face of the original and all copies of the summons or by a statement on the face of the original and all copies of the summons, signed by the issuing officer, that he/she had prior authorization to issue said summons and stating the name and

title of the authorizing official and the date of authorization.

(1) Assistant Commissioner (International): Internal Revenue Agents; Attorneys, Estate Tax; Estate Tax Examiners; Revenue Service and Assistant Revenue Service Representatives; Tax Auditors; and Revenue Officers, GS–9 and above.

(2) District Collection: Revenue Officers, GS–9 and above.

(3) District Examination: Internal Revenue Agents; Tax Auditors; Attorneys, Estate Tax; and Estate Tax Examiners.

(4) District Employee Plans and Exempt Organizations: Internal Revenue Agents; Tax Law Specialists; and Tax Auditors.

1(e) Each of the officers and employees referred to in paragraphs 1(b), 1(c), and 1(d) of this Order may serve a summons whether it is issued by him/her or another official.

1(f) Tax Examiners, GS–5 and above, whose duties include contacting taxpayers in person, Revenue Officer Aides, GS–5 and above, and Revenue Officers, who are assigned to the district or International Collection activity may serve any summons issued by the officers and employees referred to in paragraphs 1(b), 1(c) and 1(d) of this Order.

1(g) Tax Fraud Investigative Aides, GS–5 and above, who are assigned to the district Criminal Investigation activity may serve any summons issued by the officers and employees referred to in Paragraphs 1(b) and 1(c) of this Order.

2. Each of the officers and employees referred to in paragraphs 1(b), 1(c) and 1(d) of this Order authorized to issue summonses, is delegated the authority under 26 CFR 301.7602–1(b) to designate any other officer or employee of the Internal Revenue Service referred to in paragraph 4(b) of this Order, as the individual before whom a person summoned pursuant to Section 7602 of the Internal Revenue Code shall appear. Any such other officer or employee of the Internal Revenue Service when so designated in a summons is authorized to take testimony under oath of the person summoned and to receive and examine books, papers, records or other data produced in compliance with the summons.

3. Internal Security Inspectors are delegated the authority under 26 CFR 301.7603–1 to serve summonses issued in accordance with this Order by any of the officers and employees of the Inspection Service referred to in paragraphs 1(b)(1) and 1(c)(1) of this Order even though Internal Security Inspectors do not have the authority to issue summonses.

4(a). The authorities granted to the Commissioner of Internal Revenue by 26 CFR 301.7602–1(a), and 301.7605–1(a) to examine books, papers, records or other data, to take testimony under oath and to set the time and place of examination are delegated to the officers and employees of the Internal Revenue Service specified in paragraphs 4(b) and 4(c) of this Order and subject to the limitations stated in paragraphs 4(c) and 6 of this Order.

4(b)  General Designations

(1) Inspection: Director, Internal Security Division; Director, Internal Audit Division; Regional Inspectors; Internal Auditors; Management Auditors; Internal Security Inspectors; Investigators (Internal Security); and Internal Security Assistants.

(2) District Criminal Investigation: Assistant Chief of Division; and Special Agents.

(3) International: Deputy Assistant Commissioner (International), Special Agents; Case Managers; Group Managers, Internal Revenue Agents; Estate Tax Attorneys; Estate Tax Law Clerks; Estate Tax Examiners; Revenue Service and Assistant Revenue Service Representatives; Tax Auditors; Revenue Officers; and Tax Examiners whose duties include contacting taxpayers in person.

(4) District Collection Activity: Assistant Chiefs of Division; Revenue Officers; and Tax Examiners whose duties include contacting taxpayers in person.

(5) District Examination: Internal Revenue Agents; Tax Auditors; Estate Tax Attorneys; Estate Tax Law Clerks; and Estate Tax Examiners.

(6) District Employee Plans and Exempt Organization: Internal Revenue Agents; Tax Law Specialists; and Tax Auditors.

(7) Service Center/Austin Compliance Center: Revenue Agents; Tax Auditors; Tax Examiners in the correspondence examination function; and Special Agents.

4(c) District Directors, Service Center Directors, Austin Compliance Center Director, Regional Inspectors, and the Chief of Investigation Branch, Internal Security Division, may redelegate the authority under 4(a) of this Order to student trainees (Revenue Officer), (Revenue Agent), (Internal Audit), and (Internal Security), and Examination Aides, and Tax Fraud Investigative Aides, provided that each student trainee or aide shall exercise said authority only under the appropriate supervision of a Revenue Officer, Tax Auditor, Revenue Agent, Special Agent, Internal Auditor, or Internal Security Inspector, as applicable.

5. With the exceptions noted below, the officers and employees of the Internal Revenue Service referred to in paragraphs 1(b), 1(c), 1(d), and 4(b) and 4(c) of this Order are designated to administer oaths and affirmations and to certify to such papers as may be necessary under the internal revenue laws and regulations *except* that the authority to certify shall not be construed as applying to those papers or documents the certification of which is authorized by separate order or directive. This authority is granted to the Commissioner of Internal Revenue by 26 CFR 301.7622–1.

6. Tax Examiners, referred to in paragraph 4(b)4 of this Order, and Tax Fraud Investigative Aides, GS–5 and above, referred to in paragraph 4(c), are not designated to administer oaths or to perform the other functions mentioned in these paragraphs, except as follows. Tax Examiners, and Tax Fraud Investigative Aides, GS–5 and above, are authorized to certify the method and manner of giving notice when performing the functions and duties contained in paragraphs 1(f) and 1(g), respectively.

7. The authority delegated herein may not be redelegated except as provided in paragraph 4(c).

8. Delegation Order No. 4 (Rev. 20), effective March 5, 1990, is superseded.

/s/ David G. Blattner
Chief Operations Officer

## Order No. 5 (Rev. 16)
Effective Date: 4–3–91

## Order of Succession and Designation to Act as Commissioner of Internal Revenue Service

1. By virtue of the authority vested in the Commissioner of Internal Revenue by Treasury Order No. 150–10, as revised, and Treasury Directive 23–01, the officials in the positions listed below are hereby authorized, in the event of an enemy attack on the United States, and the disability of the Commissioner,

his/her absence from the main Treasury Relocation Site, or if there is a vacancy in the office, to succeed to the position of Acting Commissioner in the order listed, and are authorized to perform the functions of Commissioner to insure the continuity of the functions of that office:

Deputy Commissioner
Chief Operations Officer
Chief Financial Officer
Chief Information Officer
Chief Inspector
Assistant Commissioner (Examination)
Assistant Commissioner (International)
Assistant Commissioner (Collection)
Assistant Commissioner (Criminal Investigation)
Assistant Commissioner (Taxpayer Services)
Assistant Commissioner (Returns Processing)
Assistant Commissioner (Planning and Research)
Assistant Commissioner (Procurement)
Assistant Commissioner (Human Resources and Support)
Assistant Commissioner (Employee Plans and Exempt Organization)
Assistant Commissioner (Information Systems Management)
Assistant Commissioner (Information Systems Development)

2. If none of these officials is available, the first available Regional Commissioner, in the order of appointment as Regional Commissioner, will become Acting Commissioner.

3. If none of the officials listed in Paragraphs 1 and 2 is available, the first available District Director in the order shown on the list on file at each National Office Relocation Site (prepared on the basis of the higher ES grade first, date of promotion to the grade and alphabetical order where grade and promotion dates are identical) will assume the position of Acting Commissioner until relieved or further instructions are given by proper authority.

4. There is hereby delegated to Regional Commissioners and District Directors, or the officials acting in their stead, in the event of an enemy attack on the United States, all authority vested in the Commissioner of Internal Revenue by law or transfer from the Secretary of the Treasury to insure the continuous performance of Internal Revenue Service functions in their areas of jurisdiction. This delegation of authority will remain in effect until notice is received from proper authority that it has been terminated.

courses conducted by the Internal Revenue Service, and to supply them with texts and other training aids. Requests for such training or training aids should be addressed to the Commissioner of Internal Revenue, Washington, D.C. 20224, Attention: A: T, except that requests involving officials or visitors of foreign governments should be addressed to the Commissioner of Internal Revenue, Washington, D.C. 20224. Attention: C: FA. The Commissioner may require payment from the party or parties making the request of a reasonable fee not to exceed the cost of the training and training aids supplied pursuant to such request.

§301.7517–1 Furnishing on request of statement explaining estate or gift valuation.

(a) *In general.* Section 7517 requires the Service to furnish to a taxpayer, at the request of that taxpayer, a statement explaining the estate, gift or generation-skipping transfer valuation of any item contained on a return filed by the taxpayer as to which a determination or proposed determination of value has been made. The request must be filed no later than the latest time to file a claim for refund of the tax which is dependent on the value with respect to which the determination has been made. The request should be filed with the district director's office that has jurisdiction over the return of the taxpayer.

(b) *Effective date*—(1) *Estates of decedents.* Section 7517 applies to estates of decedents dying after December 31, 1976.

(2) *Gifts.* Section 7517 applies to gifts made after December 31, 1976.

(3) *Generation-skipping transfer.* Section 7517 applies to any generation-skipping transfer subject to chapter 13.

[T.D. 7757, 46 FR 6930, Jan. 22, 1981]

## Discovery of Liability and Enforcement of Title

EXAMINATION AND INSPECTION

§301.7601–1 Canvass of districts for taxable persons and objects.

Each district director shall, to the extent he deems it practicable, cause officers or employees under his super-

vision and control to proceed, from time to time, through his district and inquire after and concerning all persons therein who may be liable to pay any internal revenue tax, and all persons owning or having the care and management of any objects with respect to which any tax is imposed.

[T.D. 7297, 38 FR 34803, Dec. 19, 1973]

§301.7602–1 Examination of books and witnesses.

(a) *In general.* For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax (including any interest, additional amount, addition to the tax, or civil penalty) or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, collecting any such liability or inquiring into any offense connected with the administration or enforcement of the internal revenue laws, any authorized officer or employee of the Internal Revenue Service may examine any books, papers, records or other data which may be relevant or material to such inquiry; and take such testimony of the person concerned, under oath, as may be relevant to such inquiry.

(b) *Summons*—(1) *In general.* For the purposes described in §301.7602–1(a), the Commissioner is authorized to summon the person liable for tax or required to perform the act, or any officer or employee of such person or any person having possession, custody, or care of books of accounts containing entries relating to the business of the person liable for tax or required to perform the act, or any other person deemed proper, to appear before one or more officers or employees of the Internal Revenue Service at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry. This summons power may be used in an investigation of either civil or criminal tax-related

liability. The Commissioner may designate one or more officers or employees of the IRS as the individuals before whom a person summoned pursuant to section 6420(e)(2), 6421(g)(2), 6427(j)(2), or 7602 shall appear. Any such officer or employee is authorized to take testimony under oath of the person summoned and to receive and examine books, papers, records, or other data produced in compliance with the summons.

(2) *Officer or employee of the IRS.* For purposes of this paragraph (b), officer or employee of the IRS means all officers and employees of the United States, who are engaged in the administration and enforcement of the internal revenue laws or any other laws administered by the IRS, and who are appointed or employed by, or subject to the directions, instructions, or orders of the Secretary of the Treasury or the Secretary's delegate. An officer or employee of the IRS, for purposes of this paragraph (b), shall include an officer or employee of the Office of Chief Counsel.

(c) *Proscription on issuing of administrative summons when a Justice Department referral is in effect*—(1) *In general.* The Commissioner may neither issue a summons under this title nor initiate a proceeding to enforce a previously issued summons by way of section 7604 with respect to any person whose tax liability is in issue, if a Justice Department referral is in effect with respect to that person for that liability.

(2) *Justice Department referral in effect.* A Justice Department referral is in effect with respect to any person when:

(i) The Secretary recommends, within the meaning of this paragraph, that the Attorney General either commence a grand jury investigation of or criminal prosecution of such person for any alleged offense connected with the administration or enforcement of the internal revenue laws, or

(ii) The Attorney General (or Deputy Attorney General or Assistant Attorney General) under section 6103(h)(3)(B) requests in writing that the Secretary disclose a return of, or return information relating to, such person. The request must set forth that the need for disclosure is for the purpose of a grand jury investigation of or potential or

pending criminal prosecution of such person for any alleged offense connected with the administration or enforcement of the internal revenue laws.

The referral is effective at the time the document recommending criminal prosecution or grand jury investigation is signed by the Secretary or upon the Secretary's receipt of the section 6103(h)(3)(B) request.

(3) *Cessation of Justice Department referral.* A Justice Department referral ceases to be in effect with respect to a person:

(i) When the Secretary receives written notification from the Attorney General that the Justice Department:

(A) Will not prosecute that person for any offense connected with the administration or enforcement of the internal revenue laws that gave rise to the referral under paragraph (2)(i) of this section, or

(B) Will not authorize a grand jury investigation of that person with respect to such offense, or

(C) Will discontinue any grand jury investigation of that person with respect to such offense;

(ii) When a final disposition with respect to a criminal proceeding brought against that person has been made; or

(iii) When the Secretary receives written notification from the Attorney General, Deputy Attorney General, or an Assistant Attorney General, that the Justice Department will not prosecute such person for any offense connected with the administration or enforcement of the internal revenue laws, based upon a previous request for disclosure under section 6103(h)(3)(B).

(4) *Taxable years and taxes imposed by separate chapters of the Code treated separately*—(1) *In general.* For purposes of this section, each taxable period (or, if there is no taxable period, each taxable event) and each tax imposed by a separate chapter of the Code is treated separately.

(ii) *Examples.* The following examples illustrate the application of this paragraph (c)(4):

*Example 1.* A Justice Department referral is in effect for D's criminal evasion of income tax for the taxable year 1979. The Commission may issue a summons respecting D's 1980 criminal and/or civil tax liability. The

Internal Revenue Service, Treasury §301.7602-2

Commissioner may not issue a summons respecting D's 1979 income tax liability.

*Example 2.* A referral has been made to the Department of Justice for the criminal prosecution of F with regard to F's income tax liability for the taxable year 1978. The Commissioner may issue a summons respecting F's gift tax liability for the taxable year 1978.

*Example 3.* A referral has been made to the Department of Justice for a grand jury investigation respecting G's 1980 income tax liability. The Commissioner may issue a summons related to an investigation of G's liability for Federal Insurance Contribution Act (FICA) taxes for the taxable year 1980.

*Example 4.* A referral has been made to the Department of Justice respecting J's criminal evasion of windfall profit tax for all quarters of the calendar year 1982. The Commissioner may issue a summons respecting J's liability for highway motor vehicle use tax covering the same periods.

*Example 5.* A referral has been made to the Department of Justice for a grand jury investigation respecting L's 1983 income tax liability. The Commissioner may issue a summons related to the investigation of L's liability under sections 6700 (abusive tax shelter promoter penalty) and 7408 of the Code for his conduct during 1983.

(d) *Effective dates.* This section is applicable after September 3, 1982, except for paragraph (b), which is applicable on and after April 1, 2005. For rules under paragraph (b) that are applicable to summonses issued on or after September 10, 2002, see 26 CFR 301.7602-1T. For rules applicable on or before September 3, 1982, see 26 CFR 301.7602-1 (revised as of April 1, 1984).

[T.D. 8091, 51 FR 23053, June 25, 1986, as amended by T.D. 9015, 67 FR 57331, Sept. 10, 2002; T.D. 9195, 70 FR 16711, Apr. 1, 2005]

§301.7602-2  Third party contacts.

(a) *In general.* Subject to the exceptions in paragraph (f) of this section, no officer or employee of the Internal Revenue Service (IRS) may contact any person other than the taxpayer with respect to the determination or collection of such taxpayer's tax liability without giving the taxpayer reasonable notice in advance that such contacts may be made. A record of persons so contacted must be made and given to the taxpayer upon the taxpayer's request.

(b) *Third-party contact defined.* Contacts subject to section 7602(c) and this regulation shall be called "third-party

contacts." A third-party contact is a communication which—

(1) Is initiated by an IRS employee;

(2) Is made to a person other than the taxpayer;

(3) Is made with respect to the determination or collection of the tax liability of such taxpayer;

(4) Discloses the identity of the taxpayer being investigated; and

(5) Discloses the association of the IRS employee with the IRS.

(c) *Elements of third-party contact explained*—(1) *Initiation by an IRS employee*—(i) *Explanation*—(A) *Initiation.* An IRS employee initiates a communication whenever it is the employee who first tries to communicate with a person other than the taxpayer. Returning unsolicited telephone calls or speaking with persons other than the taxpayer as part of an attempt to speak to the taxpayer are not initiations of third-party contacts.

(B) *IRS employee.* For purposes of this section, an IRS employee includes all officers and employees of the IRS, the Chief Counsel of the IRS and the National Taxpayer Advocate, as well as a person described in section 6103(n), an officer or employee of such person, or a person who is subject to disclosure restrictions pursuant to a written agreement in connection with the solicitation of an agreement described in section 6103(n) and its implementing regulations. No inference about the employment or contractual relationship of such other persons with the IRS may be drawn from this regulation for any purpose other than the requirements of section 7602(c).

(ii) *Examples.* The following examples illustrate this paragraph (c)(1):

*Example 1.* An IRS employee receives a message to return an unsolicited call. The employee returns the call and speaks with a person who reports information about a taxpayer who is not meeting his tax responsibilities. Later, the employee makes a second call to the person and asks for more information. The first call is not a contact initiated by an IRS employee. Just because the employee must return the call does not change the fact that it is the other person, and not the employee, who initiated the contact. The second call, however, is initiated by the employee and so meets the first element.

*Example 2.* An IRS employee wants to hire an appraiser to help determine the value of a

585

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

# TITLE 26 - INTERNAL REVENUE CODE
## Subtitle F - Procedure and Administration
### CHAPTER 78 - DISCOVERY OF LIABILITY AND ENFORCEMENT OF TITLE
#### Subchapter A - Examination and Inspection

## § 7602. Examination of books and witnesses

### (a) Authority to summon, etc.

For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary is authorized—

(1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;

(2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary may deem proper, to appear before the Secretary at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and

(3) To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry.

### (b) Purpose may include inquiry into offense

The purposes for which the Secretary may take any action described in paragraph (1), (2), or (3) of subsection (a) include the purpose of inquiring into any offense connected with the administration or enforcement of the internal revenue laws.

### (c) Notice of contact of third parties

#### (1) General notice

An officer or employee of the Internal Revenue Service may not contact any person other than the taxpayer with respect to the determination or collection of the tax liability of such taxpayer without providing reasonable notice in advance to the taxpayer that contacts with persons other than the taxpayer may be made.

#### (2) Notice of specific contacts

The Secretary shall periodically provide to a taxpayer a record of persons contacted during such period by the Secretary with respect to the determination or collection of the tax liability of such taxpayer. Such record shall also be provided upon request of the taxpayer.

#### (3) Exceptions

This subsection shall not apply—

(A) to any contact which the taxpayer has authorized;

(B) if the Secretary determines for good cause shown that such notice would jeopardize collection of any tax or such notice may involve reprisal against any person; or

(C) with respect to any pending criminal investigation.

### (d) No administrative summons when there is Justice Department referral

#### (1) Limitation of authority

No summons may be issued under this title, and the Secretary may not begin any action under section 7604 to enforce any summons, with respect to any person if a Justice Department referral is in effect with respect to such person.

**(2) Justice Department referral in effect**

For purposes of this subsection—

**(A) In general**

A Justice Department referral is in effect with respect to any person if—

**(i)** the Secretary has recommended to the Attorney General a grand jury investigation of, or the criminal prosecution of, such person for any offense connected with the administration or enforcement of the internal revenue laws, or

**(ii)** any request is made under section 6103 (h)(3)(B) for the disclosure of any return or return information (within the meaning of section 6103 (b)) relating to such person.

**(B) Termination**

A Justice Department referral shall cease to be in effect with respect to a person when—

**(i)** the Attorney General notifies the Secretary, in writing, that—

**(I)** he will not prosecute such person for any offense connected with the administration or enforcement of the internal revenue laws,

**(II)** he will not authorize a grand jury investigation of such person with respect to such an offense, or

**(III)** he will discontinue such a grand jury investigation,

**(ii)** a final disposition has been made of any criminal proceeding pertaining to the enforcement of the internal revenue laws which was instituted by the Attorney General against such person, or

**(iii)** the Attorney General notifies the Secretary, in writing, that he will not prosecute such person for any offense connected with the administration or enforcement of the internal revenue laws relating to the request described in subparagraph (A)(ii).

**(3) Taxable years, etc., treated separately**

For purposes of this subsection, each taxable period (or, if there is no taxable period, each taxable event) and each tax imposed by a separate chapter of this title shall be treated separately.

**(e) Limitation on examination on unreported income**

The Secretary shall not use financial status or economic reality examination techniques to determine the existence of unreported income of any taxpayer unless the Secretary has a reasonable indication that there is a likelihood of such unreported income.

(Aug. 16, 1954, ch. 736, 68A Stat. 901; Pub. L. 94–455, title XIX, § 1906(b)(13)(A), Oct. 4, 1976, 90 Stat. 1834; Pub. L. 97–248, title III, § 333(a), Sept. 3, 1982, 96 Stat. 622; Pub. L. 105–206, title III, §§ 3412, 3417 (a), July 22, 1998, 112 Stat. 751, 757.)

## Amendments

1998—Subsec. (c). Pub. L. 105–206, § 3417(a), added subsec. (c). Former subsec. (c) redesignated (d).

Subsec. (d). Pub. L. 105–206, § 3417(a), redesignated subsec. (c) as (d). Former subsec. (d) redesignated (e).

Pub. L. 105–206, § 3412, added subsec. (d).

Subsec. (e). Pub. L. 105–206, § 3417(a), redesignated subsec. (d) as (e).

1982—Pub. L. 97–248 redesignated existing provisions as subsec. (a), added subsec. (a) heading, and added subsecs. (b) and (c).

1976—Pub. L. 94–455 struck out "or his delegate" after "Secretary" wherever appearing.

**EXHIBIT E:**
Title 26 U.S.C. §§ 6212 and 6213- Notice of Deficiency and Restrictions, Treasury
Regulations 26 CFR §§ 301.6212 and 301.6212
(9 pages)

*26 USC 6212*

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

**TITLE 26 - INTERNAL REVENUE CODE**
  **Subtitle F - Procedure and Administration**
    **CHAPTER 63 - ASSESSMENT**
      **Subchapter B - Deficiency Procedures in the Case of Income, Estate, Gift, and Certain Excise Taxes**

## § 6212. Notice of deficiency

### (a) In general

If the Secretary determines that there is a deficiency in respect of any tax imposed by subtitles A or B or chapter 41, 42, 43, or 44 he is authorized to send notice of such deficiency to the taxpayer by certified mail or registered mail. Such notice shall include a notice to the taxpayer of the taxpayer's right to contact a local office of the taxpayer advocate and the location and phone number of the appropriate office.

### (b) Address for notice of deficiency

#### (1) Income and gift taxes and certain excise taxes

In the absence of notice to the Secretary under section 6903 of the existence of a fiduciary relationship, notice of a deficiency in respect of a tax imposed by subtitle A, chapter 12, chapter 41, chapter 42, chapter 43, or chapter 44 if mailed to the taxpayer at his last known address, shall be sufficient for purposes of subtitle A, chapter 12, chapter 41, chapter 42, chapter 43, chapter 44, and this chapter even if such taxpayer is deceased, or is under a legal disability, or, in the case of a corporation, has terminated its existence.

#### (2) Joint income tax return

In the case of a joint income tax return filed by husband and wife, such notice of deficiency may be a single joint notice, except that if the Secretary has been notified by either spouse that separate residences have been established, then, in lieu of the single joint notice, a duplicate original of the joint notice shall be sent by certified mail or registered mail to each spouse at his last known address.

#### (3) Estate tax

In the absence of notice to the Secretary under section 6903 of the existence of a fiduciary relationship, notice of a deficiency in respect of a tax imposed by chapter 11, if addressed in the name of the decedent or other person subject to liability and mailed to his last known address, shall be sufficient for purposes of chapter 11 and of this chapter.

### (c) Further deficiency letters restricted

#### (1) General rule

If the Secretary has mailed to the taxpayer a notice of deficiency as provided in subsection (a), and the taxpayer files a petition with the Tax Court within the time prescribed in section 6213 (a), the Secretary shall have no right to determine any additional deficiency of income tax for the same taxable year, of gift tax for the same calendar year, of estate tax in respect of the taxable estate of the same decedent, of chapter 41 tax for the same taxable year, of chapter 43 tax for the same taxable year, of chapter 44 tax for the same taxable year, of section 4940 tax for the same taxable year, or of chapter 42 tax, (other than under section 4940) with respect to any act (or failure to act) to which such petition relates, except in the case of fraud, and except as provided in section 6214 (a) (relating to assertion of greater deficiencies before the Tax Court), in section 6213 (b)(1) (relating to mathematical or clerical errors), in section 6851 or 6852 (relating to termination assessments), or in section 6861 (c) (relating to the making of jeopardy assessments).

#### (2) Cross references

**FILED**

**07 2334**

DEC 2 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

For assessment as a deficiency notwithstanding the prohibition of further deficiency letters, in the case of—

**(A)** Deficiency attributable to change of treatment with respect to itemized deductions, see section 63 (e)(3).

**(B)** Deficiency attributable to gain on involuntary conversion, see section 1033 (a)(2)(C) and (D).

**(C)** Deficiency attributable to activities not engaged in for profit, see section 183 (e)(4).

For provisions allowing determination of tax in title 11 cases, see section 505 (a) of title 11 of the United States Code.

**(d)  Authority to rescind notice of deficiency with taxpayer's consent**

The Secretary may, with the consent of the taxpayer, rescind any notice of deficiency mailed to the taxpayer. Any notice so rescinded shall not be treated as a notice of deficiency for purposes of subsection (c)(1) (relating to further deficiency letters restricted), section 6213 (a) (relating to restrictions applicable to deficiencies; petition to Tax Court), and section 6512 (a) (relating to limitations in case of petition to Tax Court), and the taxpayer shall have no right to file a petition with the Tax Court based on such notice. Nothing in this subsection shall affect any suspension of the running of any period of limitations during any period during which the rescinded notice was outstanding.

(Aug. 16, 1954, ch. 736, 68A Stat. 770; Pub. L. 85–866, title I, §§ 76, 89 (b), Sept. 2, 1958, 72 Stat. 1661, 1665; Pub. L. 88–272, title I, § 112(d)(1), Feb. 26, 1964, 78 Stat. 24; Pub. L. 91–172, title I, § 101(f)(2), (j)(40), (41), Dec. 30, 1969, 83 Stat. 524, 530; Pub. L. 91–614, title I, § 102(d)(5), Dec. 31, 1970, 84 Stat. 1842; Pub. L. 93–406, title II, § 1016(a)(10), Sept. 2, 1974, 88 Stat. 930; Pub. L. 94–455, title II, § 214(b), title XII, §§ 1204(c)(5), 1206 (c)(3), title XIII, § 1307(d)(2)(F)(ii), (G), title XVI, § 1605(b)(5), title XIX, §§ 1901(b)(31)(C), (37)(C), 1906 (b)(13)(A), Oct. 4, 1976, 90 Stat. 1549, 1698, 1704, 1728, 1754, 1800, 1803, 1834; Pub. L. 95–30, title I, § 101(d)(15), May 23, 1977, 91 Stat. 134; Pub. L. 95–600, title IV, § 405(c)(5), title VII, § 701(t)(3)(C), Nov. 6, 1978, 92 Stat. 2871, 2912; Pub. L. 96–223, title I, § 101(f)(1)(C), (4), (5), Apr. 2, 1980, 94 Stat. 252, 253; Pub. L. 96–589, § 6(d)(2), Dec. 24, 1980, 94 Stat. 3408; Pub. L. 97–34, title IV, § 442(d)(4), Aug. 13, 1981, 95 Stat. 323; Pub. L. 99–514, title I, § 104(b)(17), title XV, § 1562(a), Oct. 22, 1986, 100 Stat. 2106, 2761; Pub. L. 100–203, title X, § 10713(b)(2)(C), Dec. 22, 1987, 101 Stat. 1330–470; Pub. L. 100–418, title I, § 1941(b)(2)(B)(iii), (E), (F), Aug. 23, 1988, 102 Stat. 1323; Pub. L. 100–647, title I, § 1015(m), Nov. 10, 1988, 102 Stat. 3572; Pub. L. 105–34, title III, § 312(d)(12), Aug. 5, 1997, 111 Stat. 840; Pub. L. 105–206, title I, § 1102(b), July 22, 1998, 112 Stat. 703.)

## Amendments

1998—Subsec. (a). Pub. L. 105–206 inserted at end "Such notice shall include a notice to the taxpayer of the taxpayer's right to contact a local office of the taxpayer advocate and the location and phone number of the appropriate office."

1997—Subsec. (c)(2)(C) to (E). Pub. L. 105–34, which directed the amendment of par. (2) by striking out subpar. (C) and redesignating succeeding subpars. accordingly, was executed by redesignating subpar. (E) as (C) and striking out former subpar. (C). Prior to amendment, subpar. (C) read as follows: "Deficiency attributable to gain on sale or exchange of principal residence, see section 1034 (j)." Former subpar. (D) was repealed previously.

1988—Subsec. (a). Pub. L. 100–418, § 1941(b)(2)(B)(iii), substituted "or 44" for "44, or 45".

Subsec. (b)(1). Pub. L. 100–418, § 1941(b)(2)(E), substituted "or chapter 44" for "chapter 44, or chapter 45" and "chapter 44, and this chapter" for "chapter 44, chapter 45, and this chapter".

Subsec. (c)(1). Pub. L. 100–418, § 1941(b)(2)(F), substituted "or of chapter 42 tax" for "of chapter 42 tax" and struck out ", or of chapter 45 tax for the same taxable period" after "such petition relates".

Subsec. (d). Pub. L. 100–647 inserted sentence at end that nothing in this subsection shall affect suspension of running of period of limitations during period during which rescinded notice was outstanding.

1987—Subsec. (c)(1). Pub. L. 100–203 inserted reference to section 6852.

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

**TITLE 26 - INTERNAL REVENUE CODE**
  **Subtitle F - Procedure and Administration**
    **CHAPTER 63 - ASSESSMENT**
      **Subchapter B - Deficiency Procedures in the Case of Income, Estate, Gift, and Certain Excise Taxes**

## § 6213. Restrictions applicable to deficiencies; petition to Tax Court

### (a) Time for filing petition and restriction on assessment

Within 90 days, or 150 days if the notice is addressed to a person outside the United States, after the notice of deficiency authorized in section 6212 is mailed (not counting Saturday, Sunday, or a legal holiday in the District of Columbia as the last day), the taxpayer may file a petition with the Tax Court for a redetermination of the deficiency. Except as otherwise provided in section 6851, 6852, or 6861 no assessment of a deficiency in respect of any tax imposed by subtitle A, or B, chapter 41, 42, 43, or 44 and no levy or proceeding in court for its collection shall be made, begun, or prosecuted until such notice has been mailed to the taxpayer, nor until the expiration of such 90-day or 150-day period, as the case may be, nor, if a petition has been filed with the Tax Court, until the decision of the Tax Court has become final. Notwithstanding the provisions of section 7421 (a), the making of such assessment or the beginning of such proceeding or levy during the time such prohibition is in force may be enjoined by a proceeding in the proper court, including the Tax Court, and a refund may be ordered by such court of any amount collected within the period during which the Secretary is prohibited from collecting by levy or through a proceeding in court under the provisions of this subsection. The Tax Court shall have no jurisdiction to enjoin any action or proceeding or order any refund under this subsection unless a timely petition for a redetermination of the deficiency has been filed and then only in respect of the deficiency that is the subject of such petition. Any petition filed with the Tax Court on or before the last date specified for filing such petition by the Secretary in the notice of deficiency shall be treated as timely filed.

### (b) Exceptions to restrictions on assessment

#### (1) Assessments arising out of mathematical or clerical errors

If the taxpayer is notified that, on account of a mathematical or clerical error appearing on the return, an amount of tax in excess of that shown on the return is due, and that an assessment of the tax has been or will be made on the basis of what would have been the correct amount of tax but for the mathematical or clerical error, such notice shall not be considered as a notice of deficiency for the purposes of subsection (a) (prohibiting assessment and collection until notice of the deficiency has been mailed), or of section 6212 (c)(1) (restricting further deficiency letters), or of section 6512 (a) (prohibiting credits or refunds after petition to the Tax Court), and the taxpayer shall have no right to file a petition with the Tax Court based on such notice, nor shall such assessment or collection be prohibited by the provisions of subsection (a) of this section. Each notice under this paragraph shall set forth the error alleged and an explanation thereof.

#### (2) Abatement of assessment of mathematical or clerical errors

##### (A) Request for abatement

Notwithstanding section 6404 (b), a taxpayer may file with the Secretary within 60 days after notice is sent under paragraph (1) a request for an abatement of any assessment specified in such notice, and upon receipt of such request, the Secretary shall abate the assessment. Any reassessment of the tax with respect to which an abatement is made under this subparagraph shall be subject to the deficiency procedures prescribed by this subchapter.

##### (B) Stay of collection

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

In the case of any assessment referred to in paragraph (1), notwithstanding paragraph (1), no levy or proceeding in court for the collection of such assessment shall be made, begun, or prosecuted during the period in which such assessment may be abated under this paragraph.

**(3)  Assessments arising out of tentative carryback or refund adjustments**

If the Secretary determines that the amount applied, credited, or refunded under section 6411 is in excess of the overassessment attributable to the carryback or the amount described in section 1341 (b)(1) with respect to which such amount was applied, credited, or refunded, he may assess without regard to the provisions of paragraph (2) the amount of the excess as a deficiency as if it were due to a mathematical or clerical error appearing on the return.

**(4)  Assessment of amount paid**

Any amount paid as a tax or in respect of a tax may be assessed upon the receipt of such payment notwithstanding the provisions of subsection (a). In any case where such amount is paid after the mailing of a notice of deficiency under section 6212, such payment shall not deprive the Tax Court of jurisdiction over such deficiency determined under section 6211 without regard to such assessment.

**(c)  Failure to file petition**

If the taxpayer does not file a petition with the Tax Court within the time prescribed in subsection (a), the deficiency, notice of which has been mailed to the taxpayer, shall be assessed, and shall be paid upon notice and demand from the Secretary.

**(d)  Waiver of restrictions**

The taxpayer shall at any time (whether or not a notice of deficiency has been issued) have the right, by a signed notice in writing filed with the Secretary, to waive the restrictions provided in subsection (a) on the assessment and collection of the whole or any part of the deficiency.

**(e)  Suspension of filing period for certain excise taxes**

The running of the time prescribed by subsection (a) for filing a petition in the Tax Court with respect to the taxes imposed by section 4941 (relating to taxes on self-dealing), 4942 (relating to taxes on failure to distribute income), 4943 (relating to taxes on excess business holdings), 4944 (relating to investments which jeopardize charitable purpose), 4945 (relating to taxes on taxable expenditures), 4951 (relating to taxes on self-dealing), or 4952 (relating to taxes on taxable expenditures), 4955 (relating to taxes on political expenditures), 4958 (relating to private excess benefit), 4971 (relating to excise taxes on failure to meet minimum funding standard), 4975 (relating to excise taxes on prohibited transactions) shall be suspended for any period during which the Secretary has extended the time allowed for making correction under section 4963 (e).

**(f)  Coordination with title 11**

**(1)  Suspension of running of period for filing petition in title 11 cases**

In any case under title 11 of the United States Code, the running of the time prescribed by subsection (a) for filing a petition in the Tax Court with respect to any deficiency shall be suspended for the period during which the debtor is prohibited by reason of such case from filing a petition in the Tax Court with respect to such deficiency, and for 60 days thereafter.

**(2)  Certain action not taken into account**

For purposes of the second and third sentences of subsection (a), the filing of a proof of claim or request for payment (or the taking of any other action) in a case under title 11 of the United States Code shall not be treated as action prohibited by such second sentence.

**(g)  Definitions**

For purposes of this section—

**(1)  Return**

---

Internal Revenue Service, Treasury §301.6212–1

$600 and makes a refund of $300, no part of such refund constitutes a "rebate" since the refund is not made on the ground that the tax imposed by subtitle A is less than the tax shown on the return. If, however, the district director determines that the tax imposed by subtitle A is $500 and refunds $400, the amount of $100 of such refund would constitute a rebate since it is made on the ground that the tax imposed by subtitle A ($500) is less than the tax shown on the return ($600). The amount of such rebate ($100) would be taken into account in arriving at the amount of any deficiency subsequently determined.

[32 FR 15241, Nov. 3, 1967, as amended by T.D. 7102, 36 FR 5498, Mar. 24, 1971; T.D. 7575, 43 FR 58817, Dec. 18, 1978; T.D. 7838, 47 FR 44249, Oct. 7, 1982; T.D. 8628, 60 FR 62212, Dec. 5, 1995]

§301.6212–1  Notice of deficiency.

(a) *General rule.* If a district director or director of a service center (or regional director of appeals), determines that there is a deficiency in respect of income, estate, or gift tax imposed by subtitle A or B, or excise tax imposed by chapter 41, 42, 43, or 44, of the Code, such official is authorized to notify the taxpayer of the deficiency by either registered or certified mail.

(b) *Address for notice of deficiency*—(1) *Income, gift, and chapter 41, 42, 43, and 44 taxes.* Unless the district director for the district in which the return in question was filed has been notified under the provisions of section 6903 as to the existence of a fiduciary relationship, notice of a deficiency in respect of income tax, gift tax, or tax imposed by chapter 41, 42, 43, or 44 shall be sufficient if mailed to the taxpayer at his last known address, even though such taxpayer is deceased, or is under a legal disability, or, in the case of a corporation, has terminated its existence.

(2) *Joint income tax returns.* If a joint income tax return has been filed by husband and wife, the district director (or assistant regional commissioner, appellate) may, unless the district director for the district in which such joint return was filed has been notified by either spouse that a separate residence has been established, send either a joint or separate notice of deficiency to the taxpayers at their last known

address. If, however, the proper district director has been so notified, a separate notice of deficiency that is a duplicate original of the joint notice, must be sent by registered mail prior to September 3, 1958, and by either registered or certified mail on and after September 3, 1958, to each spouse at his or her last known address. The notice of separate residences should be addressed to the district director for the district in which the joint return was filed.

(3) *Estate tax.* In the absence of notice, under the provisions of section 6903 as to the existence of a fiduciary relationship, to the district director for the district in which the estate tax return was filed, notice of a deficiency in respect of the estate tax imposed by chapter 11, subtitle B, of the Code shall be sufficient if addressed in the name of the decedent or other person subject to liability and mailed to his last known address.

(c) *Further deficiency letters restricted.* If the district director or director of a service center (or regional director of appeals) mails to the taxpayer notice of a deficiency, and the taxpayer files a petition with the Tax Court within the prescribed period, no additional deficiency may be determined with respect to income tax for the same taxable year, gift tax for the same "calendar period" (as defined in §25.2502–1(c)(1)), estate tax with respect to the taxable estate of the same decedent, chapter 41, 43, or 44 tax of the taxpayer for the same taxable year, section 4940 tax for the same taxable year, or chapter 42 tax of the taxpayer (other than under section 4940) with respect to the same act (or failure to act) to which such petition relates. This restriction shall not apply in the case of fraud, assertion of deficiencies with respect to any qualified tax (as defined in paragraph (b) of §301.6361–4) in respect of which no deficiency was asserted for the taxable year in the notice, assertion of deficiencies with respect to the Federal tax when deficiencies with respect to only a qualified tax (and not the Federal tax) were asserted for the taxable year in the notice, assertion of greater deficiencies before the Tax Court as provided in section 6214(a), mathematical errors as provided in section 6213(b)(1),

165

termination assessments in section 6851 or 6852, or jeopardy assessments as provided in section 6861(c). Solely for purposes of applying the restriction of section 6212(c), a notice of deficiency with respect to second tier tax under chapter 43 shall be deemed to be a notice of deficiency for the taxable year in which the taxable event occurs. See §53.4963–1(e)(7)(iii) or (iv) for the date on which the taxable event occurs.

[32 FR 15241, Nov. 3, 1967, as amended by T.D. 7238, 37 FR 28739, Dec. 29, 1972; T.D. 7579, 43 FR 59360, Dec. 20, 1978; T.D. 7838, 47 FR 44249, Oct. 7, 1982; T.D. 7910, 48 FR 40376, Sept. 7, 1983; T.D. 8084, 51 FR 16305, May 2, 1986; T.D. 8628, 60 FR 62212, Dec. 5, 1995]

§301.6212–2 Definition of last known address.

(a) *General rule.* Except as provided in paragraph (b)(2) of this section, a taxpayer's last known address is the address that appears on the taxpayer's most recently filed and properly processed Federal tax return, unless the Internal Revenue Service (IRS) is given clear and concise notification of a different address. Further information on what constitutes clear and concise notification of a different address and a properly processed Federal tax return can be found in Rev. Proc. 90–18 (1990–1 C.B. 491) or in procedures subsequently prescribed by the Commissioner.

(b) *Address obtained from third party—* (1) *In general.* Except as provided in paragraph (b)(2) of this section, change of address information that a taxpayer provides to a third party, such as a payor or another government agency, is not clear and concise notification of a different address for purposes of determining a last known address under this section.

(2) *Exception for address obtained from the United States Postal Service—*(i) *Updating taxpayer addresses.* The IRS will update taxpayer addresses maintained in IRS records by referring to data accumulated and maintained in the United States Postal Service (USPS) National Change of Address database that retains change of address information for thirty-six months (NCOA database). As provided in paragraph (b)(2)(ii) of this section, if the taxpayer's name and last known address

in IRS records match the taxpayer's name and old mailing address contained in the NCOA database, the new address in the NCOA database is the taxpayer's last known address, unless the IRS is given clear and concise notification of a different address.

(ii) *Duration of address obtained from NCOA database.* The address obtained from the NCOA database under paragraph (b)(2)(i) of this section is the taxpayer's last known address until one of the following events occurs—

(A) The taxpayer files and the IRS properly processes a Federal tax return with an address different from the address obtained from the NCOA database; or

(B) The taxpayer provides the Internal Revenue Service with clear and concise notification of a change of address, as defined in procedures prescribed by the Commissioner, that is different from the address obtained from the NCOA database.

(3) *Examples.* The following examples illustrate the rules of paragraph (b)(2) of this section:

*Example 1.* (i) A is an unmarried taxpayer. The address on A's 1999 Form 1040, U.S. Individual Income Tax Return, filed on April 14, 2000, and 2000 Form 1040 filed on April 13, 2001, is 1234 Anyplace Street, Anytown, USA 43210. On May 15, 2001, A informs the USPS of a new permanent address (9876 Newplace Street, Newtown, USA 12345) using the USPS Form 3575, "Official Mail Forwarding Change of Address Form." The change of address is included in the weekly update of the USPS NCOA database. On May 29, 2001, A's address maintained in IRS records is changed to 9876 Newplace Street, Newtown, USA 12345.

(ii) In June 2001 the IRS determines a deficiency for A's 1999 tax year and prepares to issue a notice of deficiency. The IRS obtains A's address for the notice of deficiency from IRS records. On June 15, 2001, the Internal Revenue Service mails the notice of deficiency to A at 9876 Newplace Street, Newtown, USA 12345. For purposes of section 6212(b), the notice of deficiency mailed on June 15, 2001, is mailed to A's last known address.

*Example 2.* (i) The facts are the same as in *Example 1,* except that instead of determining a deficiency for A's 1999 tax year in June 2001, the IRS determines a deficiency for A's 1999 tax year in May 2001.

(ii) On May 21, 2001, the IRS prepares a notice of deficiency for A and obtains A's address from IRS records. Because A did not inform the USPS of the change of address in sufficient time for the IRS to process and

post the new address in Internal Revenue Service's records by May 21, 2001, the notice of deficiency is mailed to 1234 Anyplace Street, Anytown, USA 43210. For purposes of section 6212(b), the notice of deficiency mailed on May 21, 2001, is mailed to A's last known address.

*Example 3.* (i) C and D are married taxpayers. The address on C and D's 2000 Form 1040, U.S. Individual Income Tax Return, filed on April 13, 2001, and 2001 Form 1040 filed on April 15, 2002, is 2468 Spring Street, Little City, USA 97531. On August 15, 2002, D informs the USPS of a new permanent address (8642 Peachtree Street, Big City, USA 13579) using the USPS Form 3575, "Official Mail Forwarding Change of Address Form." The change of address is included in the weekly update of the USPS NCOA database. On August 29, 2002, D's address maintained in IRS records is changed to 8642 Peachtree Street, Big City, USA 13579.

(ii) In October 2002 the IRS determines a deficiency for C and D's 2000 tax year and prepares to issue a notice of deficiency. The Internal Revenue Service obtains C's address and D's address for the notice of deficiency from IRS records. On October 15, 2002, the IRS mails a copy of the notice of deficiency to C at 2468 Spring Street, Little City, USA 97531, and to D at 8642 Peachtree Street, Big City, USA 13579. For purposes of section 6212(b), the notices of deficiency mailed on October 15, 2002, are mailed to C and D's respective last known addresses.

(c) *Last known address for all notices, statements, and documents.* The rules in paragraphs (a) and (b) of this section apply for purposes of determining whether all notices, statements, or other documents are mailed to a taxpayer's last known address whenever the term *last known address* is used in the Internal Revenue Code or the regulations thereunder.

(d) *Effective Date*—(1) *In general.* Except as provided in paragraph (d)(2) of this section, this section is effective on January 29, 2001.

(2) *Individual moves in the case of joint filers.* In the case of taxpayers who file joint returns under section 6013, if the NCOA database contains change of address information for only one spouse, paragraphs (b)(2) and (3) of this section will not apply to notices, statements, and other documents mailed before the processing of the taxpayers' 2000 joint return.

[T.D. 8939, 66 FR 2820, Jan. 12, 2001]

§ 301.6213-1 **Restrictions applicable to deficiencies; petition to Tax Court.**

(a) *Time for filing petition and restrictions on assessment*—(1) *Time for filing petition.* Within 90 days after notice of the deficiency is mailed (or within 150 days after mailing in the case of such notice addressed to a person outside the States of the Union and the District of Columbia) as provided in section 6212, a petition may be filed with the Tax Court of the United States for a redetermination of the deficiency. In determining such 90-day or 150-day period, Saturday, Sunday, or a legal holiday in the District of Columbia is not counted as the 90th or 150th day. In determining the time for filing a petition with the Tax Court in the case of a notice of deficiency mailed to a resident of Alaska prior to 12:01 p.m., e.s.t., January 3, 1959, and in the case of a notice of deficiency mailed to a resident of Hawaii prior to 4 p.m., e.d.s.t., August 21, 1959, the term "States of the Union" does not include Alaska or Hawaii, respectively, and the 150-day period applies. In determining the time within which a petition to the Tax Court may be filed in the case of a notice of deficiency mailed to a resident of Alaska after 12:01 p.m., e.s.t., January 3, 1959, and in the case of a notice of deficiency mailed to a resident of Hawaii after 4 p.m., e.d.s.t., August 21, 1959, the term "States of the Union" includes Alaska and Hawaii, respectively, and the 90-day period applies.

(2) *Restrictions on assessment.* Except as otherwise provided by this section, by sections 6851, 6852, and 6861(a) (relating to termination and jeopardy assessments), by section 6871(a) (relating to immediate assessment of claims for income, estate, and gift taxes in bankruptcy and receivership cases), or by section 7485 (in case taxpayer petitions for a review of a Tax Court decision without filing bond), no assessment of a deficiency in respect of a tax imposed by subtitle A or B or chapter 41, 42, 43, or 44 of the Code and no levy or proceeding in court for its collection shall be made until notice of deficiency has been mailed to the taxpayer, nor until the expiration of the 90-day or 150-day period within which a petition may be filed with the Tax Court, nor, if a petition has been filed with the Tax Court,

until the decision of the Tax Court has become final. As to the date on which a decision of the Tax court becomes final, see section 7481. Notwithstanding the provisions of section 7421(a), the making of an assessment or the beginning of a proceeding or levy which is forbidden by this paragraph may be enjoined by a proceeding in the proper court. In any case where the running of the time prescribed for filing a petition in the Tax Court with respect to a tax imposed by chapter 42 or 43 is suspended under section 6213(e), no assessment of a deficiency in respect of such tax shall be made until expiration of the entire period for filing the petition.

(b) *Exceptions to restrictions on assessment of deficiencies*—(1) *Mathematical errors.* If a taxpayer is notified of an additional amount of tax due on account of a mathematical error appearing upon the return, such notice is not deemed a notice of deficiency, and the taxpayer has no right to file a petition with the Tax Court upon the basis of such notice, nor is the assessment of such additional amount prohibited by section 6213(a).

(2) *Tentative carryback adjustments.* (i) If the district director or the director of the regional service center determines that any amount applied, credited, or refunded under section 6411(b) with respect to an application for a tentative carryback adjustment is in excess of the overassessment properly attributable to the carryback upon which such application was based, the district director or the director of the regional service center may assess the amount of the excess as a deficiency as if such deficiency were due to a mathematical error appearing on the return. That is, the district director or the director of the regional service center may assess an amount equal to the excess, and such amount may be collected, without regard to the restrictions on assessment and collection imposed by section 6213(a). Thus, the district director or the director of the regional service center may assess such amount without regard to whether the taxpayer has been mailed a prior notice of deficiency. Either before or after assessing such an amount, the district director or the director of the regional service center will notify the taxpayer

that such assessment has been or will be made. Such notice will not constitute a notice of deficiency, and the taxpayer may not file a petition with the Tax Court of the United States based on such notice. However, the taxpayer, within the applicable period of limitation, may file a regular claim for credit or refund based on the carryback, if he has not already filed such a claim, and may maintain a suit based on such claim if it is disallowed or if it is not acted upon by the Internal Revenue Service within 6 months from the date the claim was filed.

(ii) The method provided in subdivision (i) of this subparagraph to recover any amount applied, credited, or refunded in respect of an application for a tentative carryback adjustment which should not have been so applied, credited, or refunded is not an exclusive method. Two other methods are available to recover such amount: (*a*) By way of a deficiency notice under section 6212; or (*b*) by a suit to recover an erroneous refund under section 7405. Any one or more of the three available methods may be used to recover any amount which was improperly applied, credited, or refunded in respect of an application for a tentative carryback adjustment.

(3) *Assessment of amount paid.* Any payment made after the mailing of a notice of deficiency which is made by the taxpayer as a payment with respect to the proposed deficiency may be assessed without regard to the restrictions on assessment and collection imposed by section 6213(a) even though the taxpayer has not filed a waiver of restrictions on assessment as provided in section 6213(d). A payment of all or part of the deficiency asserted in the notice together with the assessment of the amount so paid will not affect the jurisdiction of the Tax Court. If any payment is made before the mailing of a notice of deficiency, the district director or the director of the regional service center is not prohibited by section 6213(a) from assessing such amount, and such amount may be assessed if such action is deemed to be proper. If such amount is assessed, the

**Internal Revenue Service, Treasury**

assessment is taken into account in determining whether or not there is a deficiency for which a notice of deficiency must be issued. Thus, if such a payment satisfies the taxpayer's tax liability, no notice of deficiency will be mailed and the Tax Court will have no jurisdiction over the matter. In any case in which there is a controversy as to the correct amount of the tax liability, the assessment of any amount pursuant to the provisions of section 6213(b)(3) shall in no way be considered to be the acceptance of an offer by the taxpayer to settle such controversy.

(4) *Jeopardy.* If the district director believes that the assessment or collection of a deficiency will be jeopardized by delay, such deficiency shall be assessed immediately, as provided in section 6861(a).

(c) *Failure to file petition.* If no petition is filed with the Tax Court within the period prescribed in section 6213(a), the district director or the director of the regional service center shall assess the amount determined as the deficiency and of which the taxpayer was notified by registered or certified mail and the taxpayer shall pay the same upon notice and demand therefor. In such case the district director will not be precluded from determining a further deficiency and notifying the taxpayer thereof by registered or certified mail. If a petition is filed with the Tax Court the taxpayer should notify the district director who issued the notice of deficiency that the petition has been filed in order to prevent an assessment of the amount determined to be the deficiency.

(d) *Waiver of restrictions.* The taxpayer may at any time by a signed notice in writing filed with the district director waive the restrictions on the assessment and collection of the whole or any part of the deficiency. The notice must in all cases be filed with the district director or other authorized official under whose jurisdiction the audit or other consideration of the return in question is being conducted. The filing of such notice with the Tax Court does not constitute filing with the district director within the meaning of the Code. After such waiver has been acted upon by the district director and the assessment has been made in accord-

ance with its terms, the waiver cannot be withdrawn.

(e) *Suspension of filing period for certain chapter 42 and chapter 43 taxes.* The period prescribed by section 6213(a) for filing a petition in the Tax Court with respect to the taxes imposed by section 4941, 4942, 4943, 4944, 4945, 4951, 4952, 4955, 4958, 4971, or 4975, shall be suspended for any other period which the Commissioner has allowed for making correction under § 53.4963–1(e)(3). Where the time for filing a petition with the Tax Court has been suspended under the authority of this paragraph (e), the extension shall not be reduced as a result of the correction being made prior to expiration of the period allowed for making correction.

[32 FR 15241, Nov. 3, 1967, as amended by T.D. 7838, 47 FR 44250, Oct. 7, 1982; T.D. 8084, 51 FR 16035, May 2, 1986; T.D. 8628, 60 FR 62212, Dec. 5, 1995; T.D. 8920, 66 FR 2171, Jan. 10, 2001]

### § 301.6215–1  Assessment of deficiency found by Tax Court.

Where a petition has been filed with the Tax Court, the entire amount redetermined as the deficiency by the decision of the Tax Court which has become final shall be assessed by the district director or the director of the regional service center and the unpaid portion of the amount so assessed shall be paid by the taxpayer upon notice and demand therefor.

### § 301.6221–1  Tax treatment determined at partnership level.

(a) *In general.* A partner's treatment of partnership items on the partner's return may not be changed except as provided in sections 6222 through 6231 and the regulations thereunder. Thus, for example, if a partner treats an item on the partner's return consistently with the treatment of the item on the partnership return, the IRS generally cannot adjust the treatment of that item on the partner's return except through a partnership-level proceeding. Similarly, the taxpayer may not put partnership items in issue in a proceeding relating to nonpartnership items. For example, the taxpayer may not offset a potential increase in taxable income based on changes to nonpartnership items by a potential decrease based on partnership items.

**EXHIBIT F**:
Title 26 U.S.C. § 7201- Attempt to evade or defeat tax , Title 26
U.S.C. § 7203 – Willful failure to file return, supply information, or pay tax
(3 pages)

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

**TITLE 26 - INTERNAL REVENUE CODE**
   **Subtitle F - Procedure and Administration**
      **CHAPTER 75 - CRIMES, OTHER OFFENSES, AND FORFEITURES**
         **Subchapter A - Crimes**
            **PART I - GENERAL PROVISIONS**

## § 7201. Attempt to evade or defeat tax

Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.

(Aug. 16, 1954, ch. 736, 68A Stat. 851; Pub. L. 97–248, title III, § 329(a), Sept. 3, 1982, 96 Stat. 618.)

### Amendments

1982—Pub. L. 97–248 substituted "$100,000 ($500,000 in the case of a corporation)" for "$10,000".

### Effective Date of 1982 Amendment

Section 329(e) of Pub. L. 97–248 provided that: "The amendments made by this section [amending this section and sections 7203, 7206, and 7207 of this title] shall apply to offenses committed after the date of the enactment of this Act [Sept. 3, 1982]."

07 2334

**FILED**

DEC 2 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**EXHIBIT G**
Title 26 U.S.C. § 7203 -- Willful failure to file return, supply information, or pay tax
(2 pages)

26 USC 7203

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).*

**TITLE 26 - INTERNAL REVENUE CODE**
    **Subtitle F - Procedure and Administration**
        **CHAPTER 75 - CRIMES, OTHER OFFENSES, AND FORFEITURES**
            **Subchapter A - Crimes**
                **PART I - GENERAL PROVISIONS**

## § 7203. Willful failure to file return, supply information, or pay tax

Any person required under this title to pay any estimated tax or tax, or required by this title or by regulations made under authority thereof to make a return, keep any records, or supply any information, who willfully fails to pay such estimated tax or tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $25,000 ($100,000 in the case of a corporation), or imprisoned not more than 1 year, or both, together with the costs of prosecution. In the case of any person with respect to whom there is a failure to pay any estimated tax, this section shall not apply to such person with respect to such failure if there is no addition to tax under section 6654 or 6655 with respect to such failure. In the case of a willful violation of any provision of section 6050I, the first sentence of this section shall be applied by substituting "felony" for "misdemeanor" and "5 years" for "1 year".

(Aug. 16, 1954, ch. 736, 68A Stat. 851; Pub. L. 90–364, title I, § 103(e)(5), June 28, 1968, 82 Stat. 264; Pub. L. 97–248, title III, §§ 327, 329 (b), Sept. 3, 1982, 96 Stat. 617, 618; Pub. L. 98–369, div. A, title IV, § 412(b)(9), July 18, 1984, 98 Stat. 792; Pub. L. 100–690, title VII, § 7601(a)(2)(B), Nov. 18, 1988, 102 Stat. 4504; Pub. L. 101–647, title XXXIII, § 3303(a), Nov. 29, 1990, 104 Stat. 4918.)

### Amendments

1990—Pub. L. 101–647 substituted "substituting 'felony' for 'misdemeanor' and" for "substituting".

1988—Pub. L. 100–690 inserted at end "In the case of a willful violation of any provision of section 6050I, the first sentence of this section shall be applied by substituting '5 years' for '1 year'."

1984—Pub. L. 98–369 struck out "(other than a return required under the authority of section 6015)" after "to make a return".

1982—Pub. L. 97–248, § 329(b), substituted "$25,000 ($100,000 in the case of a corporation)" for "$10,000".

Pub. L. 97–248, § 327, inserted last sentence providing that, in the case of any person with respect to whom there is a failure to pay any estimated tax, this section shall not apply to such person with respect to such failure if there is no addition to tax under section 6654 or 6655 with respect to such failure.

1968—Pub. L. 90–364 struck out reference to section 6016.

### Effective Date of 1990 Amendment

Section 3303(c) of Pub. L. 101–647 provided that: "The amendment made by subsection (a) [amending this section] shall apply to actions, and failures to act, occurring after the date of the enactment of this Act [Nov. 29, 1990]."

### Effective Date of 1988 Amendment

Amendment by Pub. L. 100–690 applicable to actions after Nov. 18, 1988, see section 7601(a)(3) of Pub. L. 100–690, set out as a note under section 6050I of this title.

### Effective Date of 1984 Amendment

Amendment by Pub. L. 98–369 applicable with respect to taxable years beginning after Dec. 31, 1984, see section 414(a)(1) of Pub. L. 98–369, set out as a note under section 6654 of this title.

07 2334

FILED

DEC 2 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

*26 USC 7203*

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

## Effective Date of 1982 Amendment

Amendment by section 329(b) of Pub. L. 97–248 applicable to offenses committed after Sept. 3, 1982, see section 329(e) of Pub. L. 97–248, set out as a note under section 7201 of this title.

## Effective Date of 1968 Amendment

Amendment by Pub. L. 90–364 applicable with respect to taxable years beginning after Dec. 31, 1967, except as provided by section 104 of Pub. L. 90–364, see section 103(f) of Pub. L. 90–364, set out as a note under section 243 of this title.

**EXHIBIT H**
Title 26 U.S.C. § 6001 – Notice or regulations requiring records, statements, etc.
(1 page)

*26 USC 6001*

NB: *This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).*

**TITLE 26 - INTERNAL REVENUE CODE**
  **Subtitle F - Procedure and Administration**
    **CHAPTER 61 - INFORMATION AND RETURNS**
      **Subchapter A - Returns and Records**
        **PART I - RECORDS, STATEMENTS, AND SPECIAL RETURNS**

## § 6001. Notice or regulations requiring records, statements, and special returns

Every person liable for any tax imposed by this title, or for the collection thereof, shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary may from time to time prescribe. Whenever in the judgment of the Secretary it is necessary, he may require any person, by notice served upon such person or by regulations, to make such returns, render such statements, or keep such records, as the Secretary deems sufficient to show whether or not such person is liable for tax under this title. The only records which an employer shall be required to keep under this section in connection with charged tips shall be charge receipts, records necessary to comply with section 6053 (c), and copies of statements furnished by employees under section 6053 (a).

(Aug. 16, 1954, ch. 736, 68A Stat. 731; Pub. L. 94–455, title XIX, § 1906(b)(13)(A), Oct. 4, 1976, 90 Stat. 1834; Pub. L. 95–600, title V, § 501(a), Nov. 6, 1978, 92 Stat. 2878; Pub. L. 97–248, title III, § 314(d), Sept. 3, 1982, 96 Stat. 605.)

### Amendments

1982—Pub. L. 97–248 inserted ",  records necessary to comply with section 6053 (c)," after "charge receipts".

1978—Pub. L. 95–600 inserted provision at end relating to only records which an employer shall be required to keep in connection with charged tips.

1976—Pub. L. 94–455 struck out "or his delegate" after "Secretary" wherever appearing.

### Effective Date of 1982 Amendment

Amendment by Pub. L. 97–248 applicable to calendar years beginning after Dec. 31, 1982, see section 314(e) of Pub. L. 97–248, set out as a note under section 6053 of this title.

### Effective Date of 1978 Amendment

Section 501(c) of Pub. L. 95–600 provided that: "The amendments made by this section [amending this section and section 6041 of this title] shall apply to payments made after December 31, 1978."

07 2334

FILED

DEC 7 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**EXHIBIT I**
Title 26 U.S.C. § 7491 –Burden of Proof
(1 page)

26 USC 7491

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).*

TITLE 26 - INTERNAL REVENUE CODE
   Subtitle F - Procedure and Administration
      CHAPTER 76 - JUDICIAL PROCEEDINGS
         Subchapter E - Burden of Proof

## § 7491. Burden of proof

### (a)  Burden shifts where taxpayer produces credible evidence

#### (1)  General rule

If, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue.

#### (2)  Limitations

Paragraph (1) shall apply with respect to an issue only if—

**(A)**  the taxpayer has complied with the requirements under this title to substantiate any item;

**(B)**  the taxpayer has maintained all records required under this title and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews; and

**(C)**  in the case of a partnership, corporation, or trust, the taxpayer is described in section 7430 (c)(4)(A)(ii).

Subparagraph (C) shall not apply to any qualified revocable trust (as defined in section 645 (b)(1)) with respect to liability for tax for any taxable year ending after the date of the decedent's death and before the applicable date (as defined in section 645 (b)(2)).

#### (3)  Coordination

Paragraph (1) shall not apply to any issue if any other provision of this title provides for a specific burden of proof with respect to such issue.

### (b)  Use of statistical information on unrelated taxpayers

In the case of an individual taxpayer, the Secretary shall have the burden of proof in any court proceeding with respect to any item of income which was reconstructed by the Secretary solely through the use of statistical information on unrelated taxpayers.

### (c)  Penalties

Notwithstanding any other provision of this title, the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount imposed by this title.

(Added Pub. L. 105–206, title III, § 3001(a), July 22, 1998, 112 Stat. 726; amended Pub. L. 105–277, div. J, title IV, § 4002(b), Oct. 21, 1998, 112 Stat. 2681–906.)

**FILED**

**DEC 2 8 2007**

07 2334 NANCY MAYER WHITTINGTON, CLE
U.S. DISTRICT COURT

### Prior Provisions

A prior section 7491, act Aug. 16, 1954, ch. 736, 68A Stat. 893, placed the burden of proof in establishing the applicability of an exemption upon the defendant in the case of marihuana offenses, prior to repeal by Pub. L. 91–513, title III, §§ 1101(b)(5)(A), 1103, 1105 (a), Oct. 27, 1970, 84 Stat. 1292, 1294, 1295, effective on first day of seventh calendar month that begins after Oct. 26, 1970, with prosecutions commenced prior to such date not to be affected or abated by reason thereof.

A prior section 7492, act Aug. 16, 1954, ch. 736, 68A Stat. 893, related to the enforceability of cotton futures contracts, prior to repeal by Pub. L. 94–455, title XIX, § 1952(n)(4)(A), (o), Oct. 4, 1976, 90 Stat. 1846, effective on the 90th day after Oct. 4, 1976.

A prior section 7493, act Aug. 16, 1954, ch. 736, 68A Stat. 893, provided that no person whose evidence is deemed material by the officer prosecuting on behalf of the United States in any case brought under any provision of subchapter

**EXHIBIT J**
Title 26 U.S.C. §§ 6301, 6302 and 6303 and 7429
(9 pages)

*26 USC 6301*

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

**TITLE 26 - INTERNAL REVENUE CODE**
  **Subtitle F - Procedure and Administration**
    **CHAPTER 64 - COLLECTION**
      **Subchapter A - General Provisions**

### § 6301. Collection authority

The Secretary shall collect the taxes imposed by the internal revenue laws.

(Aug. 16, 1954, ch. 736, 68A Stat. 775; Pub. L. 94–455, title XIX, § 1906(b)(13)(A), Oct. 4, 1976, 90 Stat. 1834.)

### Amendments

1976—Pub. L. 94–455 struck out "or his delegate" after "Secretary".

### Approval Process for Liens, Levies, and Seizures

Pub. L. 105–206, title III, § 3421, July 22, 1998, 112 Stat. 758, provided that:

"(a) In General.—The Commissioner of Internal Revenue shall develop and implement procedures under which—

"(1) a determination by an employee to file a notice of lien or levy with respect to, or to levy or seize, any property or right to property would, where appropriate, be required to be reviewed by a supervisor of the employee before the action was taken; and

"(2) appropriate disciplinary action would be taken against the employee or supervisor where the procedures under paragraph (1) were not followed.

"(b) Review Process.—The review process under subsection (a)(1) may include a certification that the employee has—

"(1) reviewed the taxpayer's information;

"(2) verified that a balance is due; and

"(3) affirmed that the action proposed to be taken is appropriate given the taxpayer's circumstances, considering the amount due and the value of the property or right to property.

"(c) Effective Dates.—

"(1) In general.—Except as provided in paragraph (2), this section shall take effect on the date of the enactment of this Act [July 22, 1998].

"(2) Automated collection system actions.—In the case of any action under an automated collection system, this section shall apply to actions initiated after December 31, 2000."

07 2334

**FILED**

DEC 2 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

**TITLE 26 - INTERNAL REVENUE CODE**
  **Subtitle F - Procedure and Administration**
    **CHAPTER 64 - COLLECTION**
      **Subchapter A - General Provisions**

## § 6302. Mode or time of collection

### (a) Establishment by regulations

If the mode or time for collecting any tax is not provided for by this title, the Secretary may establish the same by regulations.

### (b) Discretionary method

Whether or not the method of collecting any tax imposed by chapter 21, 31, 32, or 33, or by section 4481 is specifically provided for by this title, any such tax may, under regulations prescribed by the Secretary, be collected by means of returns, stamps, coupons, tickets, books, or such other reasonable devices or methods as may be necessary or helpful in securing a complete and proper collection of the tax.

### (c) Use of Government depositaries

The Secretary may authorize Federal Reserve banks, and incorporated banks, trust companies, domestic building and loan associations, or credit unions which are depositaries or financial agents of the United States, to receive any tax imposed under the internal revenue laws, in such manner, at such times, and under such conditions as he may prescribe; and he shall prescribe the manner, times, and conditions under which the receipt of such tax by such banks, trust companies, domestic building and loan associations, and credit unions is to be treated as payment of such tax to the Secretary.

### (d) Time for payment of manufacturers' excise tax on sporting goods

The taxes imposed by subsections (a) and (b) of section 4161 (relating to taxes on sporting goods) shall be due and payable on the date for filing the return for such taxes.

### (e) Time for deposit of taxes on communications services and airline tickets

#### (1) In general

Except as provided in paragraph (2), if, under regulations prescribed by the Secretary, a person is required to make deposits of any tax imposed by section 4251 or subsection (a) or (b) of section 4261 with respect to amounts considered collected by such person during any semimonthly period, such deposit shall be made not later than the 3rd day (not including Saturdays, Sundays, or legal holidays) after the close of the 1st week of the 2nd semimonthly period following the period to which such amounts relate.

#### (2) Special rule for tax due in September

##### (A) Amounts considered collected

In the case of a person required to make deposits of the tax imposed by—

(i) section 4251, or

(ii) effective on January 1, 1997, section 4261 or 4271,

with respect to amounts considered collected by such person during any semimonthly period, the amount of such tax included in bills rendered or tickets sold during the period beginning on September 1 and ending on September 11 shall be deposited not later than September 29.

##### (B) Special rule where September 29 is on Saturday or Sunday

If September 29 falls on a Saturday or Sunday, the due date under subparagraph (A) shall be—

(i) in the case of Saturday, the preceding day, and

(ii) in the case of Sunday, the following day.

##### (C) Taxpayers not required to use electronic funds transfer

In the case of deposits not required to be made by electronic funds transfer, subparagraphs (A) and (B) shall be applied by substituting "September 10" for "September 11" and "September 28" for "September 29".

**(f) Time for deposit of certain excise taxes**

    **(1) General rule**

Except as otherwise provided in this subsection and subsection (e), if any person is required under regulations to make deposits of taxes under subtitle D with respect to semimonthly periods, such person shall make deposits of such taxes for the period beginning on September 16 and ending on September 26 not later than September 29. In the case of taxes imposed by sections 4261 and 4271, this paragraph shall not apply to periods before January 1, 1997.

    **(2) Taxes on ozone depleting chemicals**

If any person is required under regulations to make deposits of taxes under subchapter D of chapter 38 with respect to semimonthly periods, in lieu of paragraph (1), such person shall make deposits of such taxes for—

        **(A)** the second semimonthly period in August, and

        **(B)** the period beginning on September 1 and ending on September 11,

not later than September 29.

    **(3) Taxpayers not required to use electronic funds transfer**

In the case of deposits not required to be made by electronic funds transfer, paragraphs (1) and (2) shall be applied by substituting "September 25" for "September 26", "September 10" for "September 11", and "September 28" for "September 29".

    **(4) Special rule where due date on Saturday or Sunday**

If, but for this paragraph, the due date under paragraph (1), (2), or (3) would fall on a Saturday or Sunday, such due date shall be deemed to be—

        **(A)** in the case of Saturday, the preceding day, and

        **(B)** in the case of Sunday, the following day.

**(g) Deposits of social security taxes and withheld income taxes**

If, under regulations prescribed by the Secretary, a person is required to make deposits of taxes imposed by chapters 21, 22, and 24 on the basis of eighth-month periods, such person shall make deposits of such taxes on the 1st banking day after any day on which such person has $100,000 or more of such taxes for deposit.

**(h) Use of electronic fund transfer system for collection of certain taxes**

    **(1) Establishment of system**

        **(A) In general**

The Secretary shall prescribe such regulations as may be necessary for the development and implementation of an electronic fund transfer system which is required to be used for the collection of depository taxes. Such system shall be designed in such manner as may be necessary to ensure that such taxes are credited to the general account of the Treasury on the date on which such taxes would otherwise have been required to be deposited under the Federal tax deposit system.

        **(B) Exemptions**

The regulations prescribed under subparagraph (A) may contain such exemptions as the Secretary may deem appropriate.

    **(2) Phase-in requirements**

        **(A) In general**

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

Except as provided in subparagraph (B), the regulations referred to in paragraph (1)—

    **(i)** shall contain appropriate procedures to assure that an orderly conversion from the Federal tax deposit system to the electronic fund transfer system is accomplished, and

    **(ii)** may provide for a phase-in of such electronic fund transfer system by classes of taxpayers based on the aggregate undeposited taxes of such taxpayers at the close of specified periods and any other factors the Secretary may deem appropriate.

  **(B) Phase-in requirements**

The phase-in of the electronic fund transfer system shall be designed in such manner as may be necessary to ensure that—

    **(i)** during each fiscal year beginning after September 30, 1993, at least the applicable required percentage of the total depository taxes imposed by chapters 21, 22, and 24 shall be collected by means of electronic fund transfer, and

    **(ii)** during each fiscal year beginning after September 30, 1993, at least the applicable required percentage of the total other depository taxes shall be collected by means of electronic fund transfer.

  **(C) Applicable required percentage**

    **(i)** In the case of the depository taxes imposed by chapters 21, 22, and 24, the applicable required percentage is—

      **(I)** 3 percent for fiscal year 1994,

      **(II)** 16.9 percent for fiscal year 1995,

      **(III)** 20.1 percent for fiscal year 1996,

      **(IV)** 58.3 percent for fiscal years 1997 and 1998, and

      **(V)** 94 percent for fiscal year 1999 and all fiscal years thereafter.

    **(ii)** In the case of other depository taxes, the applicable required percentage is—

      **(I)** 3 percent for fiscal year 1994,

      **(II)** 20 percent for fiscal year 1995,

      **(III)** 30 percent for fiscal year 1996,

      **(IV)** 60 percent for fiscal years 1997 and 1998, and

      **(V)** 94 percent for fiscal year 1999 and all fiscal years thereafter.

**(3) Definitions**

For purposes of this subsection—

  **(A) Depository tax**

The term "depository tax" means any tax if the Secretary is authorized to require deposits of such tax.

  **(B) Electronic fund transfer**

The term "electronic fund transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution or other financial intermediary to debit or credit an account.

**(4) Coordination with other electronic fund transfer requirements**

  **(A) Coordination with certain excise taxes**

In determining whether the requirements of subparagraph (B) of paragraph (2) are met, taxes required to be paid by electronic fund transfer under sections 5061 (e) and 5703 (b) shall be disregarded.

  **(B) Additional requirement**

*26 USC 6302*

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

Under regulations, any tax required to be paid by electronic fund transfer under section 5061 (e) or 5703 (b) shall be paid in such a manner as to ensure that the requirements of the second sentence of paragraph (1)(A) of this subsection are satisfied.

**(i)  Cross references**

For treatment of earned income advance amounts as payment of withholding and FICA taxes, see section 3507 (d).

(Aug. 16, 1954, ch. 736, 68A Stat. 775; June 29, 1956, ch. 462, title II, § 206(b), 70 Stat. 391; Pub. L. 94–455, title XIX, § 1906(a)(17), (b)(13)(A), Oct. 4, 1976, 90 Stat. 1825, 1834; Pub. L. 95–147, § 3(a), Oct. 28, 1977, 91 Stat. 1228; Pub. L. 95–600, title I, § 105(e), Nov. 6, 1978, 92 Stat. 2776; Pub. L. 96–223, title I, § 101(c)(2), Apr. 2, 1980, 94 Stat. 250; Pub. L. 98–369, div. A, title X, § 1015(c), July 18, 1984, 98 Stat. 1018; Pub. L. 100–418, title I, § 1941(b)(2)(G), Aug. 23, 1988, 102 Stat. 1323; Pub. L. 100–647, title VI, § 6107(a), Nov. 10, 1988, 102 Stat. 3712; Pub. L. 101–239, title VII, §§ 7502(a), 7507 (a), 7632 (a), Dec. 19, 1989, 103 Stat. 2362, 2369, 2379; Pub. L. 101–508, title XI, §§ 11217(b)(1), 11334 (a), 11801 (c)(22)(A), Nov. 5, 1990, 104 Stat. 1388–437, 1388–470, 1388–528; Pub. L. 103–66, title XIII, § 13242(d)(15), Aug. 10, 1993, 107 Stat. 524; Pub. L. 103–182, title V, § 523(a), Dec. 8, 1993, 107 Stat. 2161; Pub. L. 103–465, title VII, § 712(a), (d), Dec. 8, 1994, 108 Stat. 4999, 5001; Pub. L. 104–188, title I, §§ 1702(c)(3), 1704 (t)(52), Aug. 20, 1996, 110 Stat. 1869, 1890.)

## Amendments

1996—Subsec. (b). Pub. L. 104–188, § 1704(t)(52), provided that section 11801(c)(22)(A) of Pub. L. 101–508 shall be applied as if "chapters 21" appeared instead of "chapter 21" in the material to be stricken. See 1990 Amendment note below.

Subsec. (g). Pub. L. 104–188, § 1702(c)(3), inserted ", 22," after "chapters 21".

1994—Subsec. (e). Pub. L. 103–465, § 712(d), reenacted heading without change and amended text generally. Prior to amendment, text read as follows: "If, under regulations prescribed by the Secretary, a person is required to make deposits of any tax imposed by section 4251 or subsection (a) or (b) of section 4261 with respect to amounts considered collected by such person during any semimonthly period, such deposit shall be made not later than the 3rd day (not including Saturdays, Sundays, or legal holidays) after the close of the 1st week of the 2nd semimonthly period following the period to which such amounts relate."

Subsec. (f). Pub. L. 103–465, § 712(a), substituted "certain excise taxes" for "taxes on gasoline and diesel fuel" in heading and amended text generally. Prior to amendment, text read as follows:

"(1) General rule.—Notwithstanding section 518 of the Highway Revenue Act of 1982, any person whose liability for tax under section 4081 is payable with respect to semimonthly periods shall, not later than September 27, make deposits of such tax for the period beginning on September 16 and ending on September 22.

"(2) Special rule where due date falls on saturday, sunday, or holiday.—If, but for this paragraph, the due date under paragraph (1) would fall on a Saturday, Sunday, or holiday in the District of Columbia, such due date shall be deemed to be the immediately preceding day which is not a Saturday, Sunday, or such a holiday."

1993—Subsec. (f). Pub. L. 103–66 inserted "and diesel fuel" after "gasoline" in heading.

Subsecs. (h), (i). Pub. L. 103–182 added subsec. (h) and redesignated former subsec. (h) as (i).

1990—Subsec. (b). Pub. L. 101–508, § 11801(c)(22)(A), which directed the substitution of "chapter 21, 31, 32, or 33, or by section 4481" for "chapter 21" and all that follows down through "chapter 37,", was executed by making the substitution for "chapters 21, 31, 32, 33, section 4481 of chapter 36, section 4501(a) of chapter 37" to reflect the probable intent of Congress. See 1996 Amendment note above.

Subsec. (e). Pub. L. 101–508, § 11217(b)(1), inserted "communications services and" before "airline" in heading and "section 4251 or" after "imposed by" in text.

Subsec. (g). Pub. L. 101–508, § 11334(a), amended subsec. (g) generally, striking out par. (1) designation and striking heading, striking out ", for the years specified in paragraph (2)," after "such person shall", substituting "on the 1st banking day" for "on the applicable banking day", and striking out par. (2), which provided that for purposes of par. (1) the applicable banking day for 1990 is the 1st, for 1991 the 2nd, for 1992 the 3rd, for 1993 the 1st, and for 1994 the 1st.

1989—Subsec. (e). Pub. L. 101–239, § 7502(a), added subsec. (e). Former subsec. (e) redesignated (f).

*26 USC 6303*

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

# TITLE 26 - INTERNAL REVENUE CODE
## Subtitle F - Procedure and Administration
### CHAPTER 64 - COLLECTION
#### Subchapter A - General Provisions

## § 6303. Notice and demand for tax

### (a) General rule

Where it is not otherwise provided by this title, the Secretary shall, as soon as practicable, and within 60 days, after the making of an assessment of a tax pursuant to section 6203, give notice to each person liable for the unpaid tax, stating the amount and demanding payment thereof. Such notice shall be left at the dwelling or usual place of business of such person, or shall be sent by mail to such person's last known address.

### (b) Assessment prior to last date for payment

Except where the Secretary believes collection would be jeopardized by delay, if any tax is assessed prior to the last date prescribed for payment of such tax, payment of such tax shall not be demanded under subsection (a) until after such date.

(Aug. 16, 1954, ch. 736, 68A Stat. 775; Pub. L. 94–455, title XIX, § 1906(b)(13)(A), Oct. 4, 1976, 90 Stat. 1834.)

## Amendments

1976—Pub. L. 94–455 struck out "or his delegate" after "Secretary" wherever appearing.

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

**TITLE 26 - INTERNAL REVENUE CODE**
   **Subtitle F - Procedure and Administration**
      **CHAPTER 76 - JUDICIAL PROCEEDINGS**
         **Subchapter B - Proceedings by Taxpayers and Third Parties**

### § 7429. Review of jeopardy levy or assessment procedures

**(a) Administrative review**

  **(1) Administrative review**

    **(A) Prior approval required**

No assessment may be made under section 6851 (a), 6852 (a), 6861 (a), or 6862, and no levy may be made under section 6331 (a) less than 30 days after notice and demand for payment is made, unless the Chief Counsel for the Internal Revenue Service (or such Counsel's delegate) personally approves (in writing) such assessment or levy.

    **(B) Information to taxpayer**

Within 5 days after the day on which such an assessment or levy is made, the Secretary shall provide the taxpayer with a written statement of the information upon which the Secretary relied in making such assessment or levy.

  **(2) Request for review**

Within 30 days after the day on which the taxpayer is furnished the written statement described in paragraph (1), or within 30 days after the last day of the period within which such statement is required to be furnished, the taxpayer may request the Secretary to review the action taken.

  **(3) Redetermination by Secretary**

After a request for review is made under paragraph (2), the Secretary shall determine—

    **(A)** whether or not—

      **(i)** the making of the assessment under section 6851, 6861, or 6862, as the case may be, is reasonable under the circumstances, and

      **(ii)** the amount so assessed or demanded as a result of the action taken under section 6851, 6861, or 6862 is appropriate under the circumstances, or

    **(B)** whether or not the levy described in subsection (a)(1) is reasonable under the circumstances.

**(b) Judicial review**

  **(1) Proceedings permitted**

Within 90 days after the earlier of—

    **(A)** the day the Secretary notifies the taxpayer of the Secretary's determination described in subsection (a)(3), or

    **(B)** the 16th day after the request described in subsection (a)(2) was made,

the taxpayer may bring a civil action against the United States for a determination under this subsection in the court with jurisdiction determined under paragraph (2).

  **(2) Jurisdiction for determination**

    **(A) In general**

Except as provided in subparagraph (B), the district courts of the United States shall have exclusive jurisdiction over any civil action for a determination under this subsection.

    **(B) Tax Court**

If a petition for a redetermination of a deficiency under section 6213 (a) has been timely filed with the Tax Court before the making of an assessment or levy that is subject to the review

procedures of this section, and 1 or more of the taxes and taxable periods before the Tax Court because of such petition is also included in the written statement that is provided to the taxpayer under subsection (a), then the Tax Court also shall have jurisdiction over any civil action for a determination under this subsection with respect to all the taxes and taxable periods included in such written statement.

**(3) Determination by court**

Within 20 days after a proceeding is commenced under paragraph (1), the court shall determine—

    **(A)** whether or not—

        **(i)** the making of the assessment under section 6851, 6861, or 6862, as the case may be, is reasonable under the circumstances, and

        **(ii)** the amount so assessed or demanded as a result of the action taken under section 6851, 6861, or 6862 is appropriate under the circumstances, or

    **(B)** whether or not the levy described in subsection (a)(1) is reasonable under the circumstances.

If the court determines that proper service was not made on the United States or on the Secretary, as may be appropriate, within 5 days after the date of the commencement of the proceeding, then the running of the 20-day period set forth in the preceding sentence shall not begin before the day on which proper service was made on the United States or on the Secretary, as may be appropriate.

**(4) Order of court**

If the court determines that the making of such levy is unreasonable, that the making of such assessment is unreasonable, or that the amount assessed or demanded is inappropriate, then the court may order the Secretary to release such levy, to abate such assessment, to redetermine (in whole or in part) the amount assessed or demanded, or to take such other action as the court finds appropriate.

**(c) Extension of 20-day period where taxpayer so requests**

If the taxpayer requests an extension of the 20-day period set forth in subsection (b)(2) and establishes reasonable grounds why such extension should be granted, the court may grant an extension of not more than 40 additional days.

**(d) Computation of days**

For purposes of this section, Saturday, Sunday, or a legal holiday in the District of Columbia shall not be counted as the last day of any period.

**(e) Venue**

    **(1) District court**

A civil action in a district court under subsection (b) shall be commenced only in the judicial district described in section 1402 (a)(1) or (2) of title 28, United States Code.

    **(2) Transfer of actions**

If a civil action is filed under subsection (b) with the Tax Court and such court finds that there is want of jurisdiction because of the jurisdiction provisions of subsection (b)(2), then the Tax Court shall, if such court determines it is in the interest of justice, transfer the civil action to the district court in which the action could have been brought at the time such action was filed. Any civil action so transferred shall proceed as if such action had been filed in the district court to which such action is transferred on the date on which such action was actually filed in the Tax Court from which such action is transferred.

**(f) Finality of determination**

Any determination made by a court under this section shall be final and conclusive and shall not be reviewed by any other court.

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

## (g) Burden of proof

### (1) Reasonableness of levy, termination, or jeopardy assessment

In a proceeding under subsection (b) involving the issue of whether the making of a levy described in subsection (a)(1) or the making of an assessment under section 6851, 6852, 6861, or 6862 is reasonable under the circumstances, the burden of proof in respect to such issue shall be upon the Secretary.

### (2) Reasonableness of amount of assessment

In a proceeding under subsection (b) involving the issue of whether an amount assessed or demanded as a result of action taken under section 6851, 6852, 6861, or 6862 is appropriate under the circumstances, the Secretary shall provide a written statement which contains any information with respect to which his determination of the amount assessed was based, but the burden of proof in respect of such issue shall be upon the taxpayer.

(Added Pub. L. 94–455, title XII, § 1204(a), Oct. 4, 1976, 90 Stat. 1695; amended Pub. L. 98–369, div. A, title IV, § 446(a), July 18, 1984, 98 Stat. 817; Pub. L. 100–203, title X, § 10713(b)(2)(F), Dec. 22, 1987, 101 Stat. 1330–470; Pub. L. 100–647, title VI, § 6237(a)–(e)(3), Nov. 10, 1988, 102 Stat. 3741–3743; Pub. L. 105–206, title III, § 3434(a), July 22, 1998, 112 Stat. 760.)

### Amendments

1998—Subsec. (a)(1). Pub. L. 105–206 substituted "Administrative review" for "Information to taxpayer" in heading and amended text of par. (1) generally. Prior to amendment, text read as follows: "Within 5 days after the day on which an assessment is made under section 6851 (a), 6852 (a), 6861 (a), or 6862, or levy is made under section 6331 (a) less than 30 days after notice and demand for payment is made under section 6331 (a), the Secretary shall provide the taxpayer with a written statement of the information upon which the Secretary relies in making such assessment or levy."

1988—Pub. L. 100–647, § 6237(e)(3), inserted "levy or" after "jeopardy" in section catchline.

Subsec. (a)(1). Pub. L. 100–647, § 6237(a), inserted "or levy is made under section 6331 (a) less than 30 days after notice and demand for payment is made under section 6331 (a)," after "6862," and "or levy" after "such assessment".

Subsec. (a)(3). Pub. L. 100–647, § 6237(b), amended par. (3) generally. Prior to amendment, par. (3) read as follows: "After a request for review is made under paragraph (2), the Secretary shall determine whether or not—

"(A) the making of the assessment under section 6851, 6852, 6861, or 6862, as the case may be, is reasonable under the circumstances, and

"(B) the amount so assessed or demanded as a result of the action taken under section 6851, 6852, 6861, or 6862 is appropriate under the circumstances."

Subsec. (b). Pub. L. 100–647, § 6237(c), amended subsec. (b) generally, substituting provisions of pars. (1) to (4) for provisions of former pars. (1) to (3) relating to actions permitted, determination by district court, and order of district court.

Subsec. (c). Pub. L. 100–647, § 6237(e)(1), struck out "district" before "court".

Subsec. (e). Pub. L. 100–647, § 6237(d), amended subsec. (e) generally. Prior to amendment, subsec. (e) read as follows: "A civil action under subsection (b) shall be commenced only in the judicial district described in section 1402 (a)(1) or (2) of title 28, United States Code."

Subsec. (f). Pub. L. 100–647, § 6237(e)(1), struck out "district" after "made by a".

Subsec. (g)(1). Pub. L. 100–647, § 6237(e)(2), in heading substituted "levy, termination," for "termination" and in text substituted "a proceeding" for "an action" and inserted "the making of a levy described in subsection (a)(1) or" after "whether".

Subsec. (g)(2). Pub. L. 100–647, § 6237(e)(2)(C), substituted "a proceeding" for "an action".

1987—Subsec. (a)(1). Pub. L. 100–203, § 10713(b)(2)(F)(i), substituted "6851(a), 6852(a)" for "6851(a),".

Subsecs. (a)(3)(A), (B), (b)(2)(A), (B), (g)(1), (2). Pub. L. 100–203, § 10713(b)(2)(F)(ii), substituted "6851, 6852," for "6851," wherever appearing.

**EXHIBIT K**
Article I § 7 Clauses 1 and 2 of the Constitution for the United States of America
(6 pages)

4                   CONSTITUTION OF THE UNITED STATES

paid out of the Treasury of the United States.[6] They shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

[2] No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time; and no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office.

SECTION. 7. [1] All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills.

[2] Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law. But in all such Cases the Votes of both Houses shall be determined by yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively. If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law.

[3] Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill.

SECTION. 8. [1] The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States;

[2] To borrow Money on the credit of the United States;

[3] To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes;

[4] To establish an uniform Rule of Naturalization, and uniform Laws on the subject of Bankruptcies throughout the United States;

[5] To coin Money, regulate the Value thereof, and of foreign Coin, and fix the Standard of Weights and Measures;

---

[6] This clause has been affected by amendment XXVII.

FILED

DEC 2 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

THE CONGRESS | REVENUE BILLS | **Art. I § 7, cl. 1**

ent to his appointment.
.Op.) 3 Op.O.L.C. 286.

**during** tenure

s not prohibit the ap-
legislator to an office
e of appointment it is
certain that a proposed
· that office may receive
a future date. 1969, 42
ary 3.

and confirmation of a
e time, is ineligible for
e of this clause, cannot
s of his appointment to
his ineligibility ceases.
ivil Office, 1883, 17 Op.

ι was elected and quali-
·tates senator for a term
, 1883, and in Mar.,
l to accept the position
.e time, which office
· resigned, after his sec-
he office of tariff com-
reated by Act of Con-
ttorney-general advised
of the Constitution dis-
· appointment as com-
intment to Civil Office,
Sen. 365.

e in Congress does not
·r of the House until he
office as such represen-
he may lawfully hold
his election until that
p.Atty.Gen. 408.

and holding an office
h that of representative
.eligible to the latter of-
)e Large, Smith Ell.Cas.

and forfeiture of office
n holding an office in-
h at of senator is elected
e, his resignation of the
)ffering to assume the
r will remove any objec-
this clause. Stanton v.
. 205.

execute the duties of an
Jnited States after one is
ess, but before he takes
a disqualification; such
ϩned prior to the taking
le, Cl. & H.El.Cas. 314.

lection to Congress, ac-
ce, and subsequently re-

signs the same before his term in Con-
gress is to begin, he will not thereby be
rendered incapable of holding his seat in
Congress. Washburn v. Ripley, Cl. &
H.El.Cas. 679 to 682.

The acceptance by any member of any
office under the United States, after he
has been elected to and taken his seat in
Congress, operates as a forfeiture of his
seat. Van Ness, Cl. & H.El.Cas. 122.

If the office to which a person is ap-
pointed does not in fact exist, such ap-
pointment will not render him ineligible
to election as senator. Stanton v. Lane,
Taft El.Cas. 205.

The formal resignation of an office held
by a member-elect is not necessary if the
duties of it have so far ceased as,.to have
operated a virtual abolition of the office.
Munford, Cl. & H.El.Cas. 316.

**7.  Service in armed** forces

Plaintiff committee and certain named
members thereof who were reservists and
former reservists in the armed forces had
no standing **as** citizens to bring action
challenging armed forces reserve mem-
bership of members of Congress as being
in violation of this clause, since claimed
nonobservance of this clause presented
merely an abstract injury rather than a
concrete injury which was essential to
satisfy the case or controversy require-
ment of Constitution. Schlesinger v. Re-
servists Committee to Stop the War,
U.S.Dist.Col.1974, 94 S.Ct. 2925, 418

U.S. 208, 41 L.Ed.2d 706. Federal
Courts ⬅ 13

One who accepts a commission as colo-
nel of volunteers is disqualified to become
or remain a member of the House of
Representatives, and the rule is not al-
tered by reason of the fact that the com-
mission is issued by the governor of the
state. Baker, 1 Bart.El.Cas. 92. See,
also, Byington v. Vandever, 1 Bart.
El.Cas. 395.

Under the practice which has long pre-
vailed, Members of Congress may enter
the armed forces by enlistment, commis-
sion or otherwise but thereupon cease to
be Members of Congress provided the
House or the Senate, as the case may be,
chooses to act. 1943, 40 Op.Atty.Gen.
Dec. 23.

The exclusive responsibility for inter-
preting and enforcing this clause rests
with the Congress, and therefor does not
require the President to take action with
respect to the reserve commissions cur-
rently held by Members of Congress.
1977 (Counsel-Inf.Op.) 1 Op.O.L.C. 242.

The office of major of militia is an
office incompatible with that of senator
or representative. Van Ness, Cl. & H.El.
Cas. 122.

The office of brigadier-general in the
volunteer forces of the United States is
incompatible with that of member of ei-
ther house of Congress. Stanton v. Lane,
Taft El.Cas. 205.

# Section 7, Clause 1. Revenue Bills to Originate in House; Amendments by Senate

All Bills for raising Revenue shall originate in the House of
Representatives; but the Senate may propose or concur with Amend-
ments as on other Bills.

## CROSSREFERENCES

"Appropriation law" defined as in this section for purposes of line item veto, see 2
USCA § 691e.
Power of Congress to lay and collect taxes, see USCA Const. Art. I, § 8, cl. 1.
Preferences by regulation of commerce or revenue to ports of one state over those
of another prohibited, see USCA Const. Art. I, § 9, cl. 6.
Presidential line item veto authority, see 2 USCA § 691.

## LAW REVIEW AND JOURNAL COMMENTARIES

Original penumbras: Constitutional interpretation in the first year of Congress.
Kent Greenfield, 26 Conn.L.Rev. 79 (1993).

*Art.* I § 7, cl. 1                                    THE CONGRESS          REVENUE BILLS

Pulling the purse strings of the Commander in Chief.  Peter Raven–Hansen and William C. Banks, 80 Va.L.Rev. 833 (1994).

## WESTLAW ELECTRONIC RESEARCH

See WESTLAW guide following the Explanation pages of this volume.

## Notes of Decisions

Amendments by Senate  4
Bills for raising revenue  2
Justiciability  6
Origination in House  3
Penalties  5
Purpose  1

### 1.  Purpose

Origination requirement was intended to grant primary power over taxation to the house more closely tied to the popular will.  U.S. v. Munoz-Flores, C.A.9 (Cal.) 1988, 863 F.2d 654, certiorari granted 110 S.Ct. 48, 493 U.S. 808, 107 L.Ed.2d 17, reversed on other grounds 110 S.Ct. 1964, 495 U.S. 385, 109 L.Ed.2d 384. Statutes ⬤ 6

### 2.  Bills for raising revenue

Statute requiring courts to impose a monetary "special assessment" on persons convicted of federal crimes is not a revenue raising bill for purposes of the origination clause, considering that statute was passed as part of a particular program to provide money for that program, the Crime Victims Fund, and not to raise revenue to support government generally; any revenue for the general Treasury that statute created was incidental to provision's primary purpose.  U.S. v. Munoz-Flores, U.S.Cal.1990, 110 S.Ct. 1964, 495 U.S. 385, 109 L.Ed.2d 384. Costs ⬤ 285; Statutes ⬤ 6

A bill providing for the taxation of property in the District of Columbia for the purpose of aiding in a scheme for the providing of adequate railroad terminal facilities in the District of Columbia, was not one to raise revenue to be applied in meeting the expenses or obligations of the government generally, and therefore it was not necessary that it should originate in the House of Representatives. Millard v. Roberts, U.S.Dist.Col.1906, 26 S.Ct. 674, 202 U.S. 429, 50 L.Ed. 1090.

An Act of Congress providing a national currency secured by a pledge of bonds of the United States, and imposing, in the furtherance of that object and also to meet the expense attending the execution of the Act, a tax on the notes in circulation of a banking association organized under the statutes, is clearly not a revenue bill which the Constitution declares must originate in the House of Representatives.  Twin City Nat. Bank of New Brighton v. Nebecker, U.S.Dist.Col.1897, 17 S.Ct. 766, 167 U.S. 196, 42 L.Ed. 134. See, also, Rainey v. U.S., N.Y.1914, 34 S.Ct. 429, 232 U.S. 310, 58 L.Ed. 617. Statutes ⬤ 6

The construction of this limitation is practically well settled by the uniform action of Congress; according to that construction, it has been confined to bills to levy taxes in the strict sense of the word, and has not been understood to extend to bills for other purposes which incidentally create revenue.  U.S. v. Norton, U.S.N.Y.1875, 91 U.S. 566, 1 Otto 566, 23 L.Ed. 454.  United States ⬤ 22

Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) does not violate Originations Clause.  Walthall v. U.S., C.A.9 (Alaska) 1997, 131 F.3d 1289. Statutes ⬤ 6

Enactment of Iran Claims Settlement Act, authorizing 1.5% deduction from Iran-United States Claims Tribunal awards as "user fee," did not violate origination clause even though bill originated in Senate; fact that deductions were recovered as "miscellaneous receipts" into United States Treasury did not require holding that bill's primary purpose was for "raising revenue." Sperry Corp. v. U.S., C.A.Fed.1991, 925 F.2d 399, certiorari denied 112 S.Ct. 53, 502 U.S. 809, 116 L.Ed.2d 30.

Act is not subject to challenge under origination clause, which provides that all bills for raising revenue shall originate in House of Representatives, where main purpose of act is other than raising revenue.  U.S. v. King, C.A.10 (Kan.) 1989, 891 F.2d 780.  Constitutional Law ⬤ 6

Special assessment of $50 pursuant to statute imposing special assessments on those convicted of offenses against United

States violated origin[ation] [con]stitution.  Shah v. U.S. 878 F.2d 1156, cer[tiorari denied] S.Ct. 195, 493 U.S. 86[ ] Costs ⬤ 285; Statute[s]

Term "Bills for ra[ising revenue"] used in the originati[on clause] refer only to laws in [ ] rather, refers in gene[ral to laws relat-] ing to taxes.  Armst[ ] (Cal.) 1985, 759 F.2d [ ] 6

Tax Equity and F[iscal Responsibility] Act, which authorize[d civil] penalty is constitution[al and tax-pay-] er contended statute v[iolated origina-] tion of origination cla[use, that House] of Representatives' ve[rsion did raise] revenue, while Senat[e version raised] revenue so that "reve[nue provisions] of bill originated in [House.] U.S., C.A.8 (Minn.) 1[ ] Internal Revenue ⬤ [ ]

Merchant Marine [Act,] U.S.C.A. § 861 et se[q., does not] raise revenue, but one [through which] can merchant marin[e be placed on] permanent basis, and [is not unconsti-] tutional because orig[ination clause.] Bertelsen v. White, C.[ ] 65 F.2d 719.  Statute[s]

A "bill" is a draft o[f a law] submitted to the Leg[islature for enact-] ment, though the w[ord may be] loosely as synonymo[us with "act,"] and it is not the st[atute, but the] product of the legisla[tive branch, sub-] ject for a statute, wh[ich a statute] may take a very dif[ferent form by the] time it is ready for [adoption as a] law, to which this cla[use applies to] all bills for raising rev[enue shall originate in] the House of Represe[ntatives.  People] v. Lowe, S.D.N.Y.191[ ]

While the primary [consideration] is the raising of reve[nue for support] of the government, a[s distinguished from] general purpose are "[bills for rais-] enue," in the sense [ ] and therefore must or[iginate in House] of Representatives, it [does not, however,] follow that every bill f[or which an ult-] imate and well-defin[ed purpose] becomes a revenue [measure in the] sense, because, as an [incidental] object, it may contain [provisions for the] payment of certain du[ties, or even] special taxes.  Twin [City Nat. Bank of] New Brighton v. Neb[ecker]

| | | |

Raven–Hansen and

lume.

ding the execution
e notes in circula-
ociation organized
clearly not a reve-
nstitution declares
House of Represen-
lat. Bank of New
U.S.Dist.Col.1897,
196, 42 L.Ed. 134.
U.S., N.Y.1914, 34
10, 58 L.Ed. 617.

f this limitation is
d by the uniform
according to that
en confined to bills
strict sense of the
een understood to
er purposes which
enue. U.S. v. Nor-
U.S. 566, 1 Otto
United States ☞ 22

iscal Responsibility
) does not violate
Walthall v. U.S.,
131 F.3d 1289.

Claims Settlement
% deduction from
Claims Tribunal
did not violate orig-
ough bill originated
deductions were re-
eous receipts" into
ury did not require
imary purpose was
"Sperry Corp. v.
25 F.2d 399, certio-
53, 502 U.S. 809,

to challenge under
vhich provides that
renue shall originate
atives, where main
er than raising reve-
C.A.10 (Kan.) 1989,
titutional Law ☞ 6

: of $50 pursuant to
cial assessments on
enses against United

States violated origination clause of Constitution. Shah v. U.S., C.A.9 (Cal.) 1989, 878 F.2d 1156, certiorari denied 110 S.Ct. 195, 493 U.S. 869, 107 L.Ed.2d 149. Costs ☞ 285; Statutes ☞ 6

Term "Bills for raising Revenue" as used in the origination clause does not refer only to laws increasing taxes but, rather, refers in general to all laws relating to taxes. Armstrong v. U.S., C.A.9 (Cal.) 1985, 759 F.2d 1378. Statutes ☞ 6

Tax Equity and Fiscal Responsibility Act, which authorizes frivolous return penalty is constitutional, although taxpayer contended statute was enacted in violation of origination clause because House of Representatives' version of bill reduced revenue, while Senate version increased revenue so that "revenue-raising" aspect of bill originated in Senate. Wardell v. U.S., C.A.8 (Minn.) 1985, 757 F.2d 203. Internal Revenue ☞ 5201; Statutes ☞ 6

Merchant Marine Act of 1920, 46 U.S.C.A. § 861 et seq. was not bill to raise revenue, but one to establish American merchant marine upon sound and permanent basis, and hence not unconstitutional because originating in Senate. Bertelsen v. White, C.C.A.1 (Mass.) 1933, 65 F.2d 719. Statutes ☞ 6

A "bill" is a draft of a proposed statute submitted to the Legislature for enactment, though the word is often used loosely as synonymous with act or law, and it is not the statute, or the final product of the legislative will, but a project for a statute, which by amendment may take a very different shape by the time it is ready for promulgation as a law, to which this clause refers requiring all bills for raising revenue to originate in the House of Representatives. Hubbard v. Lowe, S.D.N.Y.1915, 226 F. 135.

While the primary object of all taxation is the raising of revenue for the support of the government, and all bills for that general purpose are "bills for raising revenue," in the sense of the Constitution, and therefore must originate in the House of Representatives, it does not necessarily follow that every bill for some other legitimate and well-defined general purpose becomes a revenue bill, in the same sense, because, as an incident to the main object, it may contain a provision for the payment of certain dues, license fees, or special taxes. Twin City Nat. Bank of New Brighton v. Nebeker, App.D.C.1894,

3 App.D.C. 190, affirmed 17 S.Ct. 766, 167 U.S. 196, 42 L.Ed. 134.

Special assessment statute did not violate origination clause, inasmuch as any revenue raising resulting from imposition of special assessment was only incidental to Congress' primary purpose of punishing convicted defendants and assisting victims of crime. U.S. v. Vines, S.D.Ala. 1989, 718 F.Supp. 895. Statutes ☞ 6

Treaty which creates exemption from taxation of income of United States citizens, contrary to 26 U.S.C.A. § 61, would be in contravention of exclusive constitutional authority of the House of Representatives to originate all bills for raising revenues. Swearingen v. U.S., D.C.Colo. 1983, 565 F.Supp. 1019. Statutes ☞ 6

A provision in an Act of Congress increasing the rate of postage from one cent for two ounces to one cent an ounce was held not unconstitutional though the clause originated in the Senate and was not an amendment to a bill for raising the revenue originating in the House of Representatives. U.S. v. James, C.C.N.Y. 1875, 26 F.Cas. 577, 8 Chi.Leg.N. 111, No. 15464. Statutes ☞ 6

Victims of Crime Act did not raise revenue within meaning of origination clause and, therefore, did not need to originate in House of Representatives, even though program established by Act involved a fund with $100 million cap, and, even though all contributions to fund were terminated after certain date; nothing in Act or legislative history affirmatively suggested any purpose behind Act other than to subsidize victim assistance programs. U.S. v. Simpson, C.A.3 (Pa.) 1989, 885 F.2d 36, certiorari denied 110 S.Ct. 2565, 495 U.S. 958, 109 L.Ed.2d 747. Statutes ☞ 6

Legislation authorizing imposition of special assessment on persons convicted of offenses against United States was not revenue measure and, thus, that legislation originated in Senate did not violate origination clause. U.S. v. Yearwood, E.D.La.1989, 718 F.Supp. 14, affirmed 894 F.2d 404. Statutes ☞ 6

**3. Origination in House**

The section of the Tariff Act of August 5, 1909, which substituted a corporation tax as proposed in the Senate for a plan of inheritance taxation as contained in the bill as originally introduced in the House of Representatives, was not invalid

199

**Art. I § 7, cl. 1**
Note 3

THE CONGRESS

APPROVAL OR

for having originated in the Senate, as the bill properly originated in the House and the amendment was germane to the subject-matter of the bill. Flint v. Stone Tracy Co., U.S.Vt.1911, 31 S.Ct. 342, 220 U.S. 107, 55 L.Ed. 389, Am.Ann.Cas. 1912B,1312. See, also, Rainey v. U.S., N.Y.1914, 34 S.Ct. 429, 232 U.S. 310, 58 L.Ed. 617.

Tax Equity and Fiscal Responsibility Act of 1982 [26 U.S.C.A. § 1 note] did not violate origination clause [U.S.C.A. Const. Art. 1, § 7, cl. 1]. Jolly v. U.S., C.A.9 (Cal.) 1985, 764 F.2d 642. Statutes ⊙ 6

Where the Cotton Futures Act, Act Aug. 18, 1914, c. 255, 38 Stat. 693, as originally passed by the Senate, sought to prohibit contracts for cotton futures not in the form therein prescribed, by excluding from the mails all matter relating to the business of those exchanges not using the statutory contract, and the House of Representatives struck out everything after the enacting clause and substituted a different Act, seeking to prohibit such contracts by the imposition of a prohibitive tax, the bill originated in the Senate, within this clause requiring revenue bills to originate in the House of Representatives, but providing that the Senate may propose or concur with amendments as on other bills; even though the journals of Congress were resorted to, the result would be the same, as is shown by the certificate of the Secretary of the Senate that the bill originated in the Senate, as it is a common practice and in a parliamentary sense is proper and permissible to substitute by amendment anything germane to the matter of a pending bill, and the court cannot substitute its own opinion for the congressional opinion of congressional procedure and the meaning of amendments. Hubbard v. Lowe, S.D.N.Y.1915, 226 F. 135.

Frivolous tax return section of Tax Equity and Fiscal Responsibility Act, 26 U.S.C.A. § 6702, is not unconstitutional on theory that Act originated in Senate in contravention of this clause. Stamp v. C.I.R., N.D.Ill.1984, 579 F.Supp. 168. Internal Revenue ⊙ 5201; Statutes ⊙ 6

Assuming arguendo that taxpayer could raise constitutional questions in action notwithstanding his failure to raise them in his claim for refund, Tax Equity and Fiscal Responsibility Act, Pub.L. 97–248, Sept. 3, 1982, which included 26 U.S.C.A. § 6702, providing $500 civil penalty for

frivolous returns, was not unconstitutional on ground that Act originated in Senate instead of House of Representatives, in that Act in fact originated in the House and was merely amended in the House. Tibbetts v. Secretary of the Treasury, W.D.N.C.1984, 577 F.Supp. 911. Statutes ⊙ 6

**4. Amendments by Senate**

Tax Equity and Fiscal Responsibility Act, which added frivolous return penalty to Internal Revenue Code was constitutionally enacted where bill originated in House of Representatives, even if Senate completely amended content of bill. Boday v. U.S., C.A.9 (Ariz.) 1985, 759 F.2d 1472. Statutes ⊙ 6

Senate did not exceed its authority under the origination clause when it proposed the extensive amendments which eventually became the Tax Equity and Fiscal Responsibility Act in which Armstrong v. U.S., C.A.9 (Cal.) 1985, 759 F.2d 1378.

Taxation bill which originates in the House and is subsequently amended in the Senate is constitutionally enacted when the amendment is germane to the subject matter of the bill and not beyond the power of the Senate to propose. Harris v. U.S.I.R.S., C.A.9 (Ariz.) 1985, 758 F.2d 456. Statutes ⊙ 6

Procedure by which 26 U.S.C.A. § 6702 providing for imposition of penalty for filing frivolous income tax return was enacted as part of Tax Equity and Fiscal Responsibility Act, Pub.L. 97–248, Sept. 3, 1982, 96 Stat. 324, which was passed after Senate struck entirety of House bill and substituted its own language by amendment, did not violate this clause providing that all bills for raising revenue shall originate in House of Representatives. Vaughn v. U.S., W.D.La. 1984, 589 F.Supp. 1528. Statutes ⊙ 6

26 U.S.C.A. § 6702 providing for assessment of penalty against taxpayers for filing frivolous income tax returns was not unconstitutional on the ground that it violated this clause because the Senate had amended the original House bill by striking out all of the text following the enacting clause and inserted a substitute text where the Senate amendments were germane to the subject matter of the House bill. Scull v. U.S., E.D.Va.1984, 585 F.Supp. 956. Statutes ⊙ 6

Procedure under Fiscal Responsibilit 97–248, 96 Stat. 61 with the bill origina by House of Repre and then the bill be tracting all languag except enacting cla new text and Hous sion was constituti D.C.Ariz.1984, 582 firmed in part, app 765 F.2d 148. Stat

As long as rever House, even substa ments do not viol clause. Ueckert v. 581 F.Supp. 1262, nied. Statutes ⊙ 6

Tax Equity and Act, 26 U.S.C.A. § 6 tutional as contrave tax measures origin Representatives whe signed into law as t the House but the S the House bill and a ment. Bearden v. C 575 F.Supp. 1459. 3020; Statutes ⊙ 6

**5. Penalties**

Statute which auth impose $50 special a fendant who pleaded knowingly and unla arm identified as pir late origination claus

**Section 7, C
o**

Every Bill whi and the Senate, President of the not he shall retu shall have origin; Journal, and pro two thirds of tha together with the likewise be reco House, it shall b both Houses shal

was not unconstitution-
Act originated in Sen-
use of Representatives,
originated in the House
mended in the Senate.
tary of the Treasury,
7 F.Supp. 911. Stat-

Fiscal Responsibility
frivolous return penalty
ue Code was constitu-
where bill originated in
ntatives, even if Senate
led content of bill. Bo-
(Ariz.) 1985, 759 F.2d
6

exceed its authority un-
n clause when it pro-
ve amendments which
e the Tax Equity and
lity Act in 1982. *Arm-
.9* (Cal.) 1985, 759 F.2d

hich originates in the
osequently amended in
onstitutionally enacted
nent is germane to the
the bill and not beyond
enate to propose. Har-
CA9 (Ariz.) 1985, 758
s ⇔ 6

which 26 U.S.C.A.
for imposition of penal-
lous income tax return
art of Tax Equity and
lity Act, Pub.L. 97–248,
Stat. 324, which was
ate struck entirety of
ubstituted its own lan-
lent, did not violate this
hat all bills for raising
inate in House of Rep-
ughn v. U.S., W.D.La.
1528. Statutes ⇔ 6

5702 providing for as-
ty against taxpayers for
income tax returns was
al on the ground that it
se because the Senate
original House bill by
the text following the
nd inserted a substitute
nate amendments were
subject matter of the
l v. U.S., E.D.Va.1984,
Statutes ⇔ 6

Procedure under which Tax Equity and
Fiscal Responsibility Act of 1982, Pub.L.
97–248, 96 Stat. 611 **(1982)**, was enacted
with the bill originating and being passed
by House of Representatives and Senate
and then the bill being amended by sub-
tracting all language approved by House,
except enacting clause, and inserting a
new text and House accepting that ver-
sion was constitutional. Aune v. U.S.,
D.C.Ariz.1984, 582 F.Supp. 1132, af-
firmed in part, appeal dismissed in part
765 F.2d 148. Statutes ⇔ 6

As long as revenue bill originates in
House, even substantial Senate amend-
ments do not violate dictates of this
clause. Ueckert v. U.S., D.C.N.D.1984,
581 F.Supp. 1262, reconsideration de-
nied. Statutes ⇔ 6

Tax Equity and Fiscal Responsibility
Act, 26 U.S.C.A. § 6702, is not unconsti-
tutional as contravening requirement that
tax measures originate in the House of
Representatives where the bill that was
signed into law as the Act originated in
the House but the Senate struck most of
the House bill and added its own amend-
ment. Bearden v. C.I.R., D.C.Utah 1983,
575 F.Supp. 1459. Internal Revenue ⇔
3020; Statutes ⇔ 6

**5. Penalties**

Statute which authorized trial court to
impose $50 special assessment upon de-
fendant who pleaded guilty to charge of
knowingly and unlawfully making fire-
arm identified as pipe bomb did not vio-
late origination clause. U.S. v. Michael,

CA5 (Tex.) 1990, 894 F.2d 1457. Costs
⇔ 285; Statutes ⇔ 6

For purposes of determining whether
assessment is a "penalty" or a revenue
raising measure required to have origi-
nated in the House of Representatives,
penalties are defined functionally, by
their effect, rather than by the word used
to describe them; if special assessment is
intended to raise revenue for the Govern-
ment's use, rather than to punish offend-
ers, the name by which it is called is
irrelevant. U.S. v. Munoz–Flores, CA9
(Cal.) 1988, 863 F.2d 654, certiorari
granted 110 S.Ct. 48, 493 U.S. 808, 107
L.Ed.2d 17, reversed on other grounds
110 S.Ct. 1964, 495 U.S. 385, 109
L.Ed.2d 384. Statutes ⇔ 6

**6. Justiciability**

Claim that statute requiring courts to
impose a monetary "special assessment"
on any person convicted of a federal
crime was passed in violation of the origi-
nation clause did not present a nonjustici-
able question on theory that Supreme
Court could not fashion "judicially man-
ageable standards" for determining
whether a bill is "for raising Revenue" or
where a bill "originates." U.S. v. Munoz-
Flores, U.S.Cal.1990, 110 S.Ct. 1964, 495
U.S. 385, 109 L.Ed.2d 384. Federal
Courts ⇔ 13.15

Origination clause challenge to special
assessment pursuant to Victims of Crime
Act was not political question and was
justiciable. U.S. v. Simpson, C.A.3 (Pa.)
1989, 885 F.2d 36, certiorari denied 110
S.Ct. 2565, 495 U.S. 958, 109 L.Ed.2d
747. Constitutional Law ⇔ 68(1)

# Section 7, Clause 2. Approval or Veto of Bills; Repassage Over Veto

Every Bill which shall have passed the House of Representatives
and the Senate, shall, before it become a Law, be presented to the
President of the United States; If he approve he shall sign it, but if
not he shall return it, with his Objections to that House in which it
shall have originated, who shall enter the Objections at large on their
Journal, and proceed to reconsider it. If after such Reconsideration
two thirds of that House shall agree to pass the Bill, it shall be sent,
together with the Objections, to the other House, by which it shall
likewise be reconsidered, and if approved by two thirds of that
House, it shall become a Law. But in all such Cases the Votes of
both Houses shall be determined by yeas and Nays, and the Names of

**EXHIBIT L**
26 U.S.C. § 7851 - Applicability of revenue laws
(4 pages)

NB: *This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).*

## TITLE 26 - INTERNAL REVENUE CODE
### Subtitle F - Procedure and Administration
#### CHAPTER 80 - GENERAL RULES
##### Subchapter B - Effective Date and Related Provisions

### § 7851. Applicability of revenue laws

**(a) General rules**

Except as otherwise provided in any section of this title—

**(1) Subtitle A**

**(A)** Chapters 1, 2, 4,[1] and 6 of this title shall apply only with respect to taxable years beginning after December 31, 1953, and ending after the date of enactment of this title, and with respect to such taxable years, chapters 1 (except sections 143 and 144) and 2, and section 3801, of the Internal Revenue Code of 1939 are hereby repealed.

**(B)** Chapters 3 and 5 [1] of this title shall apply with respect to payments and transfers occurring after December 31, 1954, and as to such payments and transfers sections 143 and 144 and chapter 7sections 143 and 144 and chapter 7 of the Internal Revenue Code of 1939 are hereby repealed.

**(C)** Any provision of subtitle A of this title the applicability of which is stated in terms of a specific date (occurring after December 31, 1953), or in terms of taxable years ending after a specific date (occurring after December 31, 1953), shall apply to taxable years ending after such specific date. Each such provision shall, in the case of a taxable year subject to the Internal Revenue Code of 1939, be deemed to be included in the Internal Revenue Code of 1939, but shall be applicable only to taxable years ending after such specific date. The provisions of the Internal Revenue Code of 1939 superseded by provisions of subtitle A of this title the applicability of which is stated in terms of a specific date (occurring after December 31, 1953) shall be deemed to be included in subtitle A of this title, but shall be applicable only to the period prior to the taking effect of the corresponding provision of subtitle A.

**(D)** Effective with respect to taxable years ending after March 31, 1954, and subject to tax under chapter 1 of the Internal Revenue Code of 1939—

**(i)** Sections 13 (b)(3), 26 (b)(2)(C), 26 (h) (1)(C) (including the comma and the word "and" immediately preceding such section), 26(i)(3), 108(k), 207(a)(1)(C), 207(a)(3)(C), and the last sentence of section 362(b)(3) of such Code are hereby repealed; and

**(ii)** Sections 13 (b)(2), 26 (b)(2)(B), 26 (h) (1)(B), 26 (i)(2), 207 (a)(1)(B), 207 (a)(3)(B), 421 (a)(1)(B), and the second sentence of section 362(b)(3) of such Code are hereby amended by striking out "and before April 1, 1954" (and any accompanying punctuation) wherever appearing therein.

**(2) Subtitle B**

**(A)** Chapter 11 of this title shall apply with respect to estates of decedents dying after the date of enactment of this title, and with respect to such estates chapter 3 of the Internal Revenue Code of 1939 is hereby repealed.

**(B)** Chapter 12 of this title shall apply with respect to the calendar year 1955 and all calendar years thereafter, and with respect to such years chapter 4 of the Internal Revenue Code of 1939 is hereby repealed.

**(3) Subtitle C**

Subtitle C of this title shall apply only with respect to remuneration paid after December 31, 1954, except that chapter 22 of such subtitle shall apply only with respect to remuneration paid after December 31, 1954, which is for services performed after such date. Chapter 9 of the Internal Revenue Code of 1939 is hereby repealed with respect to remuneration paid after December 31, 1954.

07 2334

FILED

DEC 2 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

1954, except that subchapter B of such chapter (and subchapter E of such chapter to the extent it relates to subchapter B) shall remain in force and effect with respect to remuneration paid after December 31, 1954, for services performed on or before such date.

### (4) Subtitle D

Subtitle D of this title shall take effect on January 1, 1955. Subtitles B and C of the Internal Revenue Code of 1939 (except chapters 7, 9, 15, 26, and 28, subchapter B of chapter 25, and parts VII and VIII of subchapter A of chapter 27 of such code) are hereby repealed effective January 1, 1955.

Provisions having the same effect as section 6416 (b)(2)(H),[1] and so much of section 4082 (c)[1] as refers to special motor fuels, shall be considered to be included in the Internal Revenue Code of 1939 effective as of May 1, 1954. Section 2450(a) of the Internal Revenue Code of 1939 (as amended by the Excise Tax Reduction Act of 1954) applies to the period beginning on April 1, 1954, and ending on December 31, 1954.

### (5) Subtitle E

Subtitle E shall take effect on January 1, 1955, except that the provisions in section 5411 permitting the use of a brewery under regulations prescribed by the Secretary for the purpose of producing and bottling soft drinks, section 5554, and chapter 53section 5554, and chapter 53 shall take effect on the day after the date of enactment of this title. Subchapter B of chapter 25, and part VIII of subchapter A of chapter 27, of the Internal Revenue Code of 1939 are hereby repealed effective on the day after the date of enactment of this title. Chapters 15 and 26, and part VII of subchapter A of chapter 27, of the Internal Revenue Code of 1939 are hereby repealed effective January 1, 1955.

### (6) Subtitle F

#### (A) General rule

The provisions of subtitle F shall take effect on the day after the date of enactment of this title and shall be applicable with respect to any tax imposed by this title. The provisions of subtitle F shall apply with respect to any tax imposed by the Internal Revenue Code of 1939 only to the extent provided in subparagraphs (B) and (C) of this paragraph.

#### (B) Assessment, collection, and refunds

Notwithstanding the provisions of subparagraph (A), and notwithstanding any contrary provision of subchapter A of chapter 63 (relating to assessment), chapter 64 (relating to collection), or chapter 65 (relating to abatements, credits, and refunds) of this title, the provisions of part II of subchapter A of chapter 28 and chapters 35, 36, and 37 (except section 3777) of subtitle D of the Internal Revenue Code of 1939 shall remain in effect until January 1, 1955, and shall also be applicable to the taxes imposed by this title. On and after January 1, 1955, the provisions of subchapter A of chapter 63, chapter 64, and chapter 65 (except section 6405) of this title shall be applicable to all internal revenue taxes (whether imposed by this title or by the Internal Revenue Code of 1939), notwithstanding any contrary provision of part II of subchapter A of chapter 28, or of chapter 35, 36, or 37, of the Internal Revenue Code of 1939. The provisions of section 6405 (relating to reports of refunds and credits) shall be applicable with respect to refunds or credits allowed after the date of enactment of this title, and section 3777 of the Internal Revenue Code of 1939 is hereby repealed with respect to such refunds and credits.

#### (C) Taxes imposed under the 1939 Code

After the date of enactment of this title, the following provisions of subtitle F shall apply to the taxes imposed by the Internal Revenue Code of 1939, notwithstanding any contrary provisions of such code:

(i) Chapter 73, relating to bonds.

(ii) Chapter 74, relating to closing agreements and compromises.

**(iii)** Chapter 75, relating to crimes and other offenses, but only insofar as it relates to offenses committed after the date of enactment of this title, and in the case of such offenses, section 6531, relating to periods of limitation on criminal prosecution, shall be applicable. The penalties (other than penalties which may be assessed) provided by the Internal Revenue Code of 1939 shall not apply to offenses, committed after the date of enactment of this title, to which chapter 75 of this title is applicable.

**(iv)** Chapter 76, relating to judicial proceedings.

**(v)** Chapter 77, relating to miscellaneous provisions, except that section 7502 shall apply only if the mailing occurs after the date of enactment of this title, and section 7503 shall apply only if the last date referred to therein occurs after the date of enactment of this title.

**(vi)** Chapter 78, relating to discovery of liability and enforcement of title.

**(vii)** Chapter 79, relating to definitions.

**(viii)** Chapter 80, relating to application of internal revenue laws, effective date, and related provisions.

**(D)  Chapter 28 and subtitle D of 1939 Code**

Except as otherwise provided in subparagraphs (B) and (C), the provisions of chapter 28 and of subtitle D of the Internal Revenue Code of 1939 shall remain in effect with respect to taxes imposed by the Internal Revenue Code of 1939.

**(7)  Other provisions**

If the effective date of any provision of the Internal Revenue Code of 1986 is not otherwise provided in this section or in any other section of this title, such provision shall take effect on the day after the date of enactment of this title. If the repeal of any provision of the Internal Revenue Code of 1939 is not otherwise provided by this section or by any other section of this title, such provision is hereby repealed effective on the day after the date of enactment of this title.

**(b)  Effect of repeal of Internal Revenue Code of 1939**

**(1)  Existing rights and liabilities**

The repeal of any provision of the Internal Revenue Code of 1939 shall not affect any act done or any right accruing or accrued, or any suit or proceeding had or commenced in any civil cause, before such repeal; but all rights and liabilities under such code shall continue, and may be enforced in the same manner, as if such repeal had not been made.

**(2)  Existing offices**

The repeal of any provision of the Internal Revenue Code of 1939 shall not abolish, terminate, or otherwise change—

**(A)**  any internal revenue district,

**(B)**  any office, position, board, or committee, or

**(C)**  the appointment or employment of any officer or employee,

existing immediately preceding the enactment of this title, the continuance of which is not manifestly inconsistent with any provision of this title, but the same shall continue unless and until changed by lawful authority.

**(3)  Existing delegations of authority**

Any delegation of authority made pursuant to the provisions of Reorganization Plan Numbered 26 of 1950 or Reorganization Plan Numbered 1 of 1952, including any redelegation of authority made pursuant to any such delegation of authority, and in effect under the Internal Revenue Code of 1939 immediately preceding the enactment of this title shall, notwithstanding the repeal of such code, remain in effect for purposes of this title, unless distinctly inconsistent or manifestly incompatible with the provisions of this title. The preceding sentence shall not be construed as limiting in any manner the power to amend, modify, or revoke any such delegation or redelegation of authority.

*26 USC 7851*

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

### (c) Crimes and forfeitures

All offenses committed, and all penalties or forfeitures incurred, under any provision of law hereby repealed, may be prosecuted and punished in the same manner and with the same effect as if this title had not been enacted.

### (d) Periods of limitation

All periods of limitation, whether applicable to civil causes and proceedings, or to the prosecution of offenses, or for the recovery of penalties or forfeitures, hereby repealed shall not be affected thereby, but all suits, proceedings, or prosecutions, whether civil or criminal, for causes arising, or acts done or committed, prior to said repeal, may be commenced and prosecuted within the same time as if this title had not been enacted.

### (e) Reference to other provisions

For the purpose of applying the Internal Revenue Code of 1939 or the Internal Revenue Code of 1986 to any period, any reference in either such code to another provision of the Internal Revenue Code of 1939 or the Internal Revenue Code of 1986 which is not then applicable to such period shall be deemed a reference to the corresponding provision of the other code which is then applicable to such period.

### *Footnotes*

[1] See References in Text note below.

(Aug. 16, 1954, ch. 736, 68A Stat. 919; Pub. L. 94–455, title XIX, § 1906(b)(13)(A), Oct. 4, 1976, 90 Stat. 1834; Pub. L. 99–514, § 2, Oct. 22, 1986, 100 Stat. 2095.)

### References in Text

Chapter 4 of this title, referred to in subsec. (a)(1)(A), was repealed by Pub. L. 101–508, title XI, § 11801(a)(37), Nov. 5, 1990, 104 Stat. 1388–521.

The date of enactment of this title, referred to in subsecs. (a)(1)(A), (5), (6)(A) to (C), (7), (b)(2), (3), is Aug. 16, 1954.

Various provisions of the Internal Revenue Code of 1939, referred to in text and described below, have corresponding provisions appearing in the Internal Revenue Code of 1986 [formerly I.R.C. 1954]. For table of comparisons of the 1939 Code to the 1986 Code, see Table I preceding section 1 of this title. See, also, subsec. (e) of this section for provision that references in the 1986 Code to a provision in the 1939 Code, not then applicable, shall be deemed a reference to the corresponding provision of the 1986 Code, which is then applicable.

Chapter 1 of the Internal Revenue Code of 1939, referred to in subsec. (a)(1)(A), (D), was comprised of sections 1 to 482 of former Title 26, Internal Revenue Code. Sections 1 to 33 were repealed by subsec. (a)(1)(A) of this section, section 34 was repealed by act Feb. 25, 1944, ch. 63, title I, § 106(c)(2), 58 Stat. 31, sections 35 to 184 were repealed by subsec. (a)(1)(A) of this section, section 185 was repealed by act Feb. 25, 1944, ch. 63, title I, § 107(a), 58 Stat. 31, sections 201 to 263 were repealed by subsec. (a)(1)(A) of this section, section 264 was repealed by act Oct. 21, 1942, ch. 619, title I, § 159(e), 56 Stat. 860, sections 265 to 362 were repealed by subsec. (a)(1)(A) of this section, section 363 was repealed by act Oct. 21, 1942, ch. 619, title I, § 170(a), 56 Stat. 878, sections 371 to 482 were repealed by subsec. (a)(1)(A) of this section.

Sections 143 and 144 of the Internal Revenue Code of 1939, referred to in subsec. (a)(1)(A), (B), were classified to sections 143 and 144 of former Title 26, Internal Revenue Code.

Chapter 2 of the Internal Revenue Code of 1939, referred to in subsec. (a)(1)(A), was comprised of sections 500 to 784 of former Title 26, Internal Revenue Code. Sections 500 to 511 and 650 to 706 were repealed by subsec. (a)(1)(A) of this section, sections 600 to 605 were repealed by act Nov. 8, 1945, ch. 453, title II, § 202, 59 Stat. 574, sections 710 to 736, 740, 742 to 744, 750, 751, 760, 761 and 780 to 784 were repealed by act Nov. 8, 1945, ch. 453, title I, § 122(a), 59 Stat. 568, section 741 was repealed by act Oct. 21, 1942, ch. 619, title II, §§ 224(b), 228 (b), 56 Stat. 920, 925, section 752 was repealed by act Oct. 21, 1942, ch. 619, title II, § 229(a)(1), 56 Stat. 931, eff. as of Oct. 8, 1940.

Section 3801 of the Internal Revenue Code of 1939, referred to in subsec. (a)(1)(A), was classified to section 3801 of former Title 26, Internal Revenue Code. Section 3801 was repealed by subsec. (a)(1)(A) of this section.

Chapter 5 of this title, referred to in subsec. (a)(1)(B), was repealed by Pub. L. 105–34, title XI, § 1131(a), Aug. 5, 1997, 111 Stat. 978.

**EXHIBIT M**
United States Government Manual 2005/2006 – Commissioner of Internal Revenue,
Title 26 U.S.C. §§ 7801 and 7802 – Internal Revenue Service Oversight Board
(11 pages)

# The United States Government Manual 2005/2006

07 2334

FILED

DEC 2 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Office of the Federal Register
National Archives and Records Administration

**336    U.S. GOVERNMENT MANUAL**

| | |
|---|---|
| Assistant Commissioner (Information Technology) | CYNTHIA Z. SPRINGER |
| Assistant Commissioner (Public Debt Accounting) | DEBRA HINES |
| Assistant Commissioner (Securities Operations) | JOHN R. SWALES III |
| Assistant Commissioner (Investor Services) | FRED PYATT |
| Executive Director (Administration Resource Center) | GLENN E. BALL |
| Executive Director (Government Securities Regulation Staff) | LORI SANTAMORENA |
| Executive Director (Savings Bonds Marketing Office) | PAUL VOGELZANG |

## OFFICE OF THRIFT SUPERVISION

*1700 G Street NW., Washington, DC 20552*
*Phone, 202–906–6000. Internet, www.ots.treas.gov.*

| | |
|---|---|
| Director | JAMES E. GILLERAN |
| Deputy Director | RICHARD M. RICCOBONO |
| Chief Counsel | JOHN E. BOWMAN |
| Managing Director, Information Systems, Administration and Finance | TIMOTHY T. WARD |
| Managing Director, External Affairs | KEVIN PETRASIC |
| Managing Director, Examinations and Supervision | SCOTT M. ALBINSON |
| Associate Director for Federal Deposit Insurance Corporation | WALTER B. MASON |
| Director of Human Resources | SUE A. RENDLEMAN |

*The Department of the Treasury performs four basic functions: formulating and recommending economic, financial, tax, and fiscal policies; serving as financial agent for the U.S. Government; enforcing the law; and manufacturing coins and currency.*

The Treasury Department was created by act of September 2, 1789 (31 U.S.C. 301 and 301 note). Many subsequent acts have figured in the development of the Department, delegating new duties to its charge and establishing the numerous bureaus and divisions that now comprise the Treasury.

**Secretary**  As a major policy adviser to the President, the Secretary has primary responsibility for formulating and recommending domestic and international financial, economic, and tax policy; participating in the formulation of broad fiscal policies that have general significance for the economy; and managing the public debt. The Secretary also oversees the activities of the Department in carrying out its major law enforcement responsibility; in serving as the financial agent for the U.S. Government; and in manufacturing coins, currency, and other products for customer agencies. The Secretary also serves as the Government's chief financial officer.

## Activities

**Economic Policy**  The Office of the Assistant Secretary for Economic Policy assists policymakers in the determination of economic policies. The Office:

—reviews and analyzes domestic and international economic issues and developments in the financial markets;

—assists in the development of official economic projections; and



DEPARTMENT OF THE TREASURY



# DEPARTMENT OF THE TREASURY

[1] Assistant Secretary (Management) and Chief Financial Officer is Treasury's Chief Operating Officer.

TREASURY BUREAUS

RINGER

s III

RENA

NG

AN
CCOBONO
AN
RD

ISON

ON

IAN

nulating and
g as financial
ing coins and

t responsibility; in
l agent for the U.S.
anufacturing
ther products for
e Secretary also
ent's chief

Office of the
Economic Policy
the determination
The Office:

zes domestic and
issues and
nancial markets;

mptroller of the Currency,

 documents,
 use invitations and
 on cards. It also is
 sing and assisting
 the design and
 Government
 cause of their innate
 easons, require
 eit-deterrence

 operates a second
 ring plant in Fort
 ue Mound Road,
 –231–4000.

 iving and Printing,
 gton, DC 20228. Phone,

advance payments, and access to payment history.

The Treasury Offset Program is one of the methods used to collect delinquent debt. FMS uses the program to withhold Federal payments, such as Federal income tax refunds, Federal salary payments, and Social Security benefits, to recipients with delinquent debts, including past-due child support obligations and State and Federal income tax debt.

**Electronic Commerce**   Through its electronic money program, FMS tests new payments and collection technologies using the Internet and card technology, as well as related technologies such as digital signatures and biometrics. FMS has initiated electronic money pilot programs to help Federal agencies modernize their payments and collection activities. Examples include stored-value cards used on military bases and in Government hospitals, electronic checks, point-of-sale check truncations, and Internet credit card collection programs.

**Payments**   Each year, FMS disburses nearly 1 billion with an access dollar value of more than 1.7 trillion, to a wide variety of recipients, such as those who receive Social Security, IRS tax refunds, and veterans' benefits. For fiscal year 2004, nearly 75 percent of these transactions were issued by electronic funds transfer. The remainder of FMS payments are disbursed by check.

### Regional Financial Centers—Financial Management Service

| Center/Address | Director |
| --- | --- |
| Austin, TX (P.O. Box 149058, 78741) | Robert Mange |
| Kansas City, MO (P.O. Box 12599, 64116) | Gary Beets |
| Philadelphia, PA (P.O. Box 8676, 19101) | Michael Colarusso |
| San Francisco, CA (P.O. Box 193858, 94119) | Philip Belisle |

For further information, contact the Office of Legislative and Public Affairs, Financial Management Service, Department of the Treasury, Room 555, 401 Fourteenth Street SW., Washington, DC 20227. Phone, 202–874–6740. Internet, www.fms.treas.gov.

# Internal Revenue Service

 overnment Annual
 ncial Report of the

 dministers the
 ction system,
 $2.2 trillion
 network of more than
 itutions. It also
 on of Federal
 lividual and
 x deposits, customs
 ents, fines, and
 s.
 ched the Electronic
 t System
 ich allows
 nesses to pay
 n the Internet.
 rovides such
 printable
 documenting each
 y to schedule

The Office of the Commissioner of Internal Revenue was established by act of July 1, 1862 (26 U.S.C. 7802). The Internal Revenue Service (IRS) is responsible for administering and enforcing the internal revenue laws and related statutes, except those relating to alcohol, tobacco, firearms, and explosives. Its mission is to collect the proper amount of tax revenue, at the least cost to the public, by efficiently applying the tax law with integrity and fairness. To achieve that purpose, the IRS:

—strives to achieve the highest possible degree of voluntary compliance in accordance with the tax laws and regulations;

—advises the public of their rights and responsibilities;

—determines the extent of compliance and the causes of noncompliance;

—properly administers and enforces the tax laws; and

—continually searches for and implements new, more efficient ways of accomplishing its mission.

Basic activities include

—ensuring satisfactory resolution of taxpayer complaints, providing taxpayer service and education;

—determining, assessing, and collecting internal revenue taxes;

—determining pension plan qualifications and exempt organization status; and

—preparing and issuing rulings and regulations to supplement the provisions of the Internal Revenue Code.

The source of most revenues collected is the individual income tax and the social insurance and retirement taxes. Other major sources are corporate income, excise, estate, and gift taxes.

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

TITLE 26 - INTERNAL REVENUE CODE
Subtitle F - Procedure and Administration
CHAPTER 80 - GENERAL RULES
Subchapter A - Application of Internal Revenue Laws

## § 7801. Authority of Department of the Treasury

(a) **Powers and duties of Secretary**

(1) **In general**

Except as otherwise expressly provided by law, the administration and enforcement of this title shall be performed by or under the supervision of the Secretary of the Treasury.

(2) **Administration and enforcement of certain provisions by Attorney General**

(A) **In general**

The administration and enforcement of the following provisions of this title shall be performed by or under the supervision of the Attorney General; and the term "Secretary" or "Secretary of the Treasury" shall, when applied to those provisions, mean the Attorney General; and the term "internal revenue officer" shall, when applied to those provisions, mean any officer of the Bureau of Alcohol, Tobacco, Firearms, and Explosives so designated by the Attorney General:

(i) Chapter 53.

(ii) Chapters 61 through 80, to the extent such chapters relate to the enforcement and administration of the provisions referred to in clause (i).

(B) **Use of existing rulings and interpretations**

Nothing in this Act [1] alters or repeals the rulings and interpretations of the Bureau of Alcohol, Tobacco, and Firearms in effect on the effective date of the Homeland Security Act of 2002, which concern the provisions of this title referred to in subparagraph (A). The Attorney General shall consult with the Secretary to achieve uniformity and consistency in administering provisions under chapter 53 of title 26, United States Code.

[(b) **Repealed.** Pub. L. 97–258, § 5(b), Sept. 13, 1982, 96 Stat. 1068, 1078]

(c) **Functions of Department of Justice unaffected**

Nothing in this section or section 301 (f) of title 31 shall be considered to affect the duties, powers, or functions imposed upon, or vested in, the Department of Justice, or any officer thereof, by law existing on May 10, 1934.

*Footnotes*

[1] So in original.

(Aug. 16, 1954, ch. 736, 68A Stat. 915; Pub. L. 86–368, § 1, Sept. 22, 1959, 73 Stat. 647; Pub. L. 88–426, title III, § 305(39), Aug. 14, 1964, 78 Stat. 427; Pub. L. 94–455, title XIX, § 1906(b)(13)(B), Oct. 4, 1976, 90 Stat. 1834; Pub. L. 97–258, §§ 2(f)(1), 5 (b), Sept. 13, 1982, 96 Stat. 1059, 1068, 1078; Pub. L. 107–296, title XI, § 1112(k), Nov. 25, 2002, 116 Stat. 2277.)

### References in Text

The effective date of the Homeland Security Act of 2002, referred to in subsec. (a)(2)(B), is 60 days after Nov. 25, 2002, see section 4 of Pub. L. 107–296, set out as an Effective Date note under section 101 of Title 6, Domestic Security.

### Amendments

2002—Subsec. (a). Pub. L. 107–296 designated existing provisions as par. (1), inserted par. heading, and added par. (2).

1982—Subsec. (b). Pub. L. 97–258, § 5(b), struck out subsec. (b) which related to Office of General Counsel of Department of the Treasury. See section 301 of Title 31, Money and Finance.

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

**TITLE 26 - INTERNAL REVENUE CODE**
  **Subtitle F - Procedure and Administration**
    **CHAPTER 80 - GENERAL RULES**
      **Subchapter A - Application of Internal Revenue Laws**

## § 7802. Internal Revenue Service Oversight Board

(a) **Establishment**

There is established within the Department of the Treasury the Internal Revenue Service Oversight Board (hereafter in this subchapter referred to as the "Oversight Board").

(b) **Membership**

(1) **Composition**

The Oversight Board shall be composed of nine members, as follows:

(A)  six members shall be individuals who are not otherwise Federal officers or employees and who are appointed by the President, by and with the advice and consent of the Senate.

(B)  one member shall be the Secretary of the Treasury or, if the Secretary so designates, the Deputy Secretary of the Treasury.

(C)  one member shall be the Commissioner of Internal Revenue.

(D)  one member shall be an individual who is a full-time Federal employee or a representative of employees and who is appointed by the President, by and with the advice and consent of the Senate.

(2) **Qualifications and terms**

(A) **Qualifications**

Members of the Oversight Board described in paragraph (1)(A) shall be appointed without regard to political affiliation and solely on the basis of their professional experience and expertise in one or more of the following areas:

(i)  Management of large service organizations.

(ii)  Customer service.

(iii)  Federal tax laws, including tax administration and compliance.

(iv)  Information technology.

(v)  Organization development.

(vi)  The needs and concerns of taxpayers.

(vii)  The needs and concerns of small businesses.

In the aggregate, the members of the Oversight Board described in paragraph (1)(A) should collectively bring to bear expertise in all of the areas described in the preceding sentence.

(B) **Terms**

Each member who is described in subparagraph (A) or (D) of paragraph (1) shall be appointed for a term of 5 years, except that of the members first appointed under paragraph (1)(A)—

(i)  two members shall be appointed for a term of 3 years,

(ii)  two members shall be appointed for a term of 4 years, and

(iii)  two members shall be appointed for a term of 5 years.

(C) **Reappointment**

An individual who is described in subparagraph (A) or (D) of paragraph (1) may be appointed to no more than two 5-year terms on the Oversight Board.

(D) **Vacancy**

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

Any vacancy on the Oversight Board shall be filled in the same manner as the original appointment. Any member appointed to fill a vacancy occurring before the expiration of the term for which the member's predecessor was appointed shall be appointed for the remainder of that term.

### (3) Ethical considerations

#### (A) Financial disclosure

During the entire period that an individual appointed under subparagraph (A) or (D) of paragraph (1) is a member of the Oversight Board, such individual shall be treated as serving as an officer or employee referred to in section 101(f) of the Ethics in Government Act of 1978 for purposes of title I of such Act, except that section 101(d) of such Act shall apply without regard to the number of days of service in the position.

#### (B) Restrictions on post-employment

For purposes of section 207 (c) of title 18, United States Code, an individual appointed under subparagraph (A) or (D) of paragraph (1) shall be treated as an employee referred to in section 207(c)(2)(A)(i) of such title during the entire period the individual is a member of the Board, except that subsections (c)(2)(B) and (f) of section 207 of such title shall not apply.

#### (C) Members who are special Government employees

If an individual appointed under subparagraph (A) or (D) of paragraph (1) is a special Government employee, the following additional rules apply for purposes of chapter 11 of title 18, United States Code:

##### (i) Restriction on representation

In addition to any restriction under section 205 (c) of title 18, United States Code, except as provided in subsections (d) through (i) of section 205 of such title, such individual (except in the proper discharge of official duties) shall not, with or without compensation, represent anyone to or before any officer or employee of—

(I) the Oversight Board or the Internal Revenue Service on any matter;

(II) the Department of the Treasury on any matter involving the internal revenue laws or involving the management or operations of the Internal Revenue Service; or

(III) the Department of Justice with respect to litigation involving a matter described in subclause (I) or (II).

##### (ii) Compensation for services provided by another

For purposes of section 203 of such title—

(I) such individual shall not be subject to the restrictions of subsection (a)(1) thereof for sharing in compensation earned by another for representations on matters covered by such section, and

(II) a person shall not be subject to the restrictions of subsection (a)(2) thereof for sharing such compensation with such individual.

#### (D) Waiver

The President may, only at the time the President nominates the member of the Oversight Board described in paragraph (1)(D), waive for the term of the member any appropriate provision of chapter 11 of title 18, United States Code, to the extent such waiver is necessary to allow such member to participate in the decisions of the Board while continuing to serve as a full-time Federal employee or a representative of employees. Any such waiver shall not be effective unless a written intent of waiver to exempt such member (and actual waiver language) is submitted to the Senate with the nomination of such member.

### (4) Quorum

*26 USC 7802*

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

Five members of the Oversight Board shall constitute a quorum. A majority of members present and voting shall be required for the Oversight Board to take action.

### (5) Removal

#### (A) In general

Any member of the Oversight Board appointed under subparagraph (A) or (D) of paragraph (1) may be removed at the will of the President.

#### (B) Secretary and Commissioner

An individual described in subparagraph (B) or (C) of paragraph (1) shall be removed upon termination of service in the office described in such subparagraph.

### (6) Claims

#### (A) In general

Members of the Oversight Board who are described in subparagraph (A) or (D) of paragraph (1) shall have no personal liability under Federal law with respect to any claim arising out of or resulting from an act or omission by such member within the scope of service as a member.

#### (B) Effect on other law

This paragraph shall not be construed—

(i) to affect any other immunities and protections that may be available to such member under applicable law with respect to such transactions;

(ii) to affect any other right or remedy against the United States under applicable law; or

(iii) to limit or alter in any way the immunities that are available under applicable law for Federal officers and employees.

## (c) General responsibilities

### (1) Oversight

#### (A) In general

The Oversight Board shall oversee the Internal Revenue Service in its administration, management, conduct, direction, and supervision of the execution and application of the internal revenue laws or related statutes and tax conventions to which the United States is a party.

#### (B) Mission of IRS

As part of its oversight functions described in subparagraph (A), the Oversight Board shall ensure that the organization and operation of the Internal Revenue Service allows it to carry out its mission.

#### (C) Confidentiality

The Oversight Board shall ensure that appropriate confidentiality is maintained in the exercise of its duties.

### (2) Exceptions

The Oversight Board shall have no responsibilities or authority with respect to—

(A) the development and formulation of Federal tax policy relating to existing or proposed internal revenue laws, related statutes, and tax conventions,

(B) specific law enforcement activities of the Internal Revenue Service, including specific compliance activities such as examinations, collection activities, and criminal investigations,

(C) specific procurement activities of the Internal Revenue Service, or

(D) except as provided in subsection (d)(3), specific personnel actions.

## (d) Specific responsibilities

*26 USC 7802*

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

The Oversight Board shall have the following specific responsibilities:

### (1) Strategic plans

To review and approve strategic plans of the Internal Revenue Service, including the establishment of—

    **(A)** mission and objectives, and standards of performance relative to either, and

    **(B)** annual and long-range strategic plans.

### (2) Operational plans

To review the operational functions of the Internal Revenue Service, including—

    **(A)** plans for modernization of the tax system,

    **(B)** plans for outsourcing or managed competition, and

    **(C)** plans for training and education.

### (3) Management

To—

    **(A)** recommend to the President candidates for appointment as the Commissioner of Internal Revenue and recommend to the President the removal of the Commissioner;

    **(B)** review the Commissioner's selection, evaluation, and compensation of Internal Revenue Service senior executives who have program management responsibility over significant functions of the Internal Revenue Service; and

    **(C)** review and approve the Commissioner's plans for any major reorganization of the Internal Revenue Service.

### (4) Budget

To—

    **(A)** review and approve the budget request of the Internal Revenue Service prepared by the Commissioner;

    **(B)** submit such budget request to the Secretary of the Treasury; and

    **(C)** ensure that the budget request supports the annual and long-range strategic plans.

### (5) Taxpayer protection

To ensure the proper treatment of taxpayers by the employees of the Internal Revenue Service.
The Secretary shall submit the budget request referred to in paragraph (4)(B) for any fiscal year to the President who shall submit such request, without revision, to Congress together with the President's annual budget request for the Internal Revenue Service for such fiscal year.

### (e) Board personnel matters

#### (1) Compensation of members

##### (A) In general

Each member of the Oversight Board who—

    **(i)** is described in subsection (b)(1)(A); or

    **(ii)** is described in subsection (b)(1)(D) and is not otherwise a Federal officer or employee,

shall be compensated at a rate of $30,000 per year. All other members shall serve without compensation for such service.

##### (B) Chairperson

In lieu of the amount specified in subparagraph (A), the Chairperson of the Oversight Board shall be compensated at a rate of $50,000 per year.

#### (2) Travel expenses

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

**(A) In general**

The members of the Oversight Board shall be allowed travel expenses, including per diem in lieu of subsistence, at rates authorized for employees of agencies under subchapter I of chapter 57 of title 5, United States Code, to attend meetings of the Oversight Board and, with the advance approval of the Chairperson of the Oversight Board, while otherwise away from their homes or regular places of business for purposes of duties as a member of the Oversight Board.

**(B) Report**

The Oversight Board shall include in its annual report under subsection (f)(3)(A) information with respect to the travel expenses allowed for members of the Oversight Board under this paragraph.

**(3) Staff**

**(A) In general**

The Chairperson of the Oversight Board may appoint and terminate any personnel that may be necessary to enable the Board to perform its duties.

**(B) Detail of Government employees**

Upon request of the Chairperson of the Oversight Board, a Federal agency shall detail a Federal Government employee to the Oversight Board without reimbursement. Such detail shall be without interruption or loss of civil service status or privilege.

**(4) Procurement of temporary and intermittent services**

The Chairperson of the Oversight Board may procure temporary and intermittent services under section 3109 (b) of title 5, United States Code.

**(f) Administrative matters**

**(1) Chair**

**(A) Term**

The members of the Oversight Board shall elect for a 2-year term a chairperson from among the members appointed under subsection (b)(1)(A).

**(B) Powers**

Except as otherwise provided by a majority vote of the Oversight Board, the powers of the Chairperson shall include—

    **(i)** establishing committees;

    **(ii)** setting meeting places and times;

    **(iii)** establishing meeting agendas; and

    **(iv)** developing rules for the conduct of business.

**(2) Meetings**

The Oversight Board shall meet at least quarterly and at such other times as the Chairperson determines appropriate.

**(3) Reports**

**(A) Annual**

The Oversight Board shall each year report with respect to the conduct of its responsibilities under this title to the President, the Committees on Ways and Means, Government Reform and Oversight, and Appropriations of the House of Representatives and the Committees on Finance, Governmental Affairs, and Appropriations of the Senate.

**(B) Additional report**

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

Upon a determination by the Oversight Board under subsection (c)(1)(B) that the organization and operation of the Internal Revenue Service are not allowing it to carry out its mission, the Oversight Board shall report such determination to the Committee on Ways and Means of the House of Representatives and the Committee on Finance of the Senate.

(Aug. 16, 1954, ch. 736, 68A Stat. 915; Pub. L. 93–406, title II, § 1051(a), Sept. 2, 1974, 88 Stat. 951; Pub. L. 94–455, title XIX, § 1906(b)(13)(A), (B), Oct. 4, 1976, 90 Stat. 1834; Pub. L. 97–258, § 2(f)(2), Sept. 13, 1982, 96 Stat. 1059; Pub. L. 100–647, title VI, § 6235(a), Nov. 10, 1988, 102 Stat. 3737; Pub. L. 104–168, title I, § 101(a), (b)(2), July 30, 1996, 110 Stat. 1453, 1455; Pub. L. 105–206, title I, § 1101(a), July 22, 1998, 112 Stat. 691; Pub. L. 106–554, § 1(a)(7) [title III, § 319(27)], Dec. 21, 2000, 114 Stat. 2763, 2763A–648.)

## References in Text

The Ethics in Government Act of 1978, referred to in subsec. (b)(3)(A), is Pub. L. 95–521, Oct. 26, 1978, 92 Stat. 1824, as amended. Title I of the Act is set out in the Appendix to Title 5, Government Organization and Employees. For complete classification of this Act to the Code, see Short Title note set out under section 101 of Pub. L. 95–521 in the Appendix to Title 5 and Tables.

## Amendments

2000—Subsec. (b)(2)(B)(ii). Pub. L. 106–554 substituted a comma for semicolon before "and".

1998—Pub. L. 105–206 amended section catchline and text of section generally, substituting present provisions for provisions which: in subsec. (a), declared that there shall be in the Department of the Treasury a Commissioner of Internal Revenue, appointed by the President, with such duties and powers as prescribed by Secretary of the Treasury; in subsec. (b), established Office of Employee Plans and Exempt Organizations to carry out functions with respect to organizations exempt from tax and with respect to plans to which part I of subchapter D of chapter 1 applied; in subsec. (c), established Office for Taxpayer Services such as telephone, walk-in, and taxpayer educational services, and design and production of forms; and in subsec. (d), established Office of Taxpayer Advocate and set forth functions of Office and responsibilities of Commissioner regarding response to recommendations of Office. See section 7803 of this title.

1996—Pub. L. 104–168, § 101(b)(2), substituted "Commissioners; Taxpayer Advocate." for "Commissioner (Employee Plans and Exempt Organizations)" in section catchline.

Subsec. (d). Pub. L. 104–168, § 101(a), added subsec. (d).

1988—Subsec. (c). Pub. L. 100–647 added subsec. (c).

1982—Subsec. (b). Pub. L. 97–258 redesignated existing provisions as par. (1), added par. (1) heading, and added par. (2). Par. (2) is based on provisions that appeared in section 1037 of former Title 31, Money and Finance, prior to enactment of Title 31 by Pub. L. 97–258.

1976—Subsec. (a). Pub. L. 94–455, § 1906(b)(13)(B), substituted "Secretary of the Treasury" for "Secretary" after "prescribed by the".

Subsec. (b). Pub. L. 94–455, § 1906(b)(13)(A), struck out "or his delegate" after "Secretary".

1974—Pub. L. 93–406 designated existing provisions as subsec. (a) and added subsec. (b).

## Change of Name

Committee on Governmental Affairs of Senate changed to Committee on Homeland Security and Governmental Affairs of Senate, effective Jan. 4, 2005, by Senate Resolution No. 445, One Hundred Eighth Congress, Oct. 9, 2004.

Committee on Government Reform and Oversight of House of Representatives changed to Committee on Government Reform of House of Representatives by House Resolution No. 5, One Hundred Sixth Congress, Jan. 6, 1999.

## Effective Date of 1998 Amendment

Pub. L. 105–206, title I, § 1101(d), July 22, 1998, 112 Stat. 697, provided that:

"(1) In general.—The amendments made by this section [amending this section and sections 4946 and 6103 of this title] shall take effect on the date of the enactment of this Act [July 22, 1998].

**EXHIBIT N**
Diversified Metal Products, Inc., v. T-Bow Company Trust, Internal Revenue
Service, etc – IRS Is Not An Agency Of the United States Government; and
Title 26  U.S.C. § 6103(b)(9) - Federal agency
(9 pages)

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

To all to whom these presents shall come, Greeting:

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, that the seal of the National Archives and Records Administration, that the attached reproduction(s) is a true and correct copy of documents in his custody.

SIGNATURE

NAME Steven M. Edwards

TITLE Regional Administrator, Pacific Alaska Region

DATE APR - 6 2000

NAME AND ADDRESS OF DEPOSITORY

National Archives & Records Admin.
6125 Sand Point Way NE
Seattle, WA 98115-7999

NA FORM 13040 (10-86)

07 2334

**FILED**

DEC 2 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

BETTY H. RICHARDSON
United States Attorney
United States Attorney's Office
Box 32
Boise, Idaho  83707
Telephone:  (208) 334-1211



RICHARD R. WARD
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 683
Ben Franklin Station
Washington, D.C.  20044-0683
Telephone:  (202) 307-5867

Attorneys for the United States of America

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF IDAHO

DIVERSIFIED METAL PRODUCTS,
INC.,

        Plaintiff,

    v.

T-BOW COMPANY TRUST, INTERNAL
REVENUE SERVICE, and STEVE
MORGAN,

        Defendants.

)
)
)
)
)
)  Civil No. 93-405-E-EJL
)
)  <u>UNITED STATES' ANSWER AND CLAIM</u>
)
)
)
)
)
)

The United States of America, through undersigned counsel
hereby responds to the numbered paragraphs of plaintiff's
complaint as follows:

    1.    The United States is without information or knowledge
sufficient to form a belief as to the truth of the allegations
contained in paragraph 1 and, on that basis, denies the
allegations.

UNITED STATES ANSWER AND CLAIM - 1

5

9393990P.ANS

2.    The United States is without information or knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 2 and, on that basis, denies the allegations.

3.    The United States is without information or knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 3 and, on that basis, denies the allegations.

4.    Denies that the Internal Revenue Service is an agency of the United States Government but admits that the United States of America would be a proper party to this action.  Admits that the IRS has served a Notice of Levy on plaintiff for funds owed to defendant Steve Morgan.

5.    Admits that the IRS has made a demand on plaintiff for payment of funds owed to Steve Morgan.  The United States is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations, and, on that basis, denies the remaining allegations.

6.    Admits that Exhibits A and B are attached and are respectively, a copy of a letter from Lonnie Crockett and a copy of a Notice of Levy served by the IRS.

7.    The United States is without information or knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 7 and, on that basis, denies the allegations.

UNITED STATES ANSWER AND CLAIM - 2

9393990P.ANS

8.    Admits that copies of two checks in the amounts of $504.00 and $345.60 are attached to the complaint as Exhibit C.

9.    The United States is without information or knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 9 and, on that basis, denies the allegations.

10.   Paragraph 10 contains allegations of law to which no response is required.

• 11.   Paragraph 11 contains allegations of law to which no response is required.

### FIRST DEFENSE

Plaintiff is not entitled to an award of attorney fees or costs that would diminish the recovery of the United States.

### SECOND DEFENSE

The Internal Revenue Service is not a proper defendant and the United States should be substituted in its place.

### THIRD DEFENSE

The United States has not waived its sovereign immunity to suit.

### FOURTH DEFENSE

Plaintiff's complaint should be dismissed for insufficient service of process on the United States.

### FIFTH DEFENSE

Plaintiff's complaint fails to state a jurisdictional basis for suit.

UNITED STATES ANSWER AND CLAIM - 3

9393990P.ANS

## CLAIM OF THE UNITED STATES

1. This claim is made pursuant to 26 U.S.C. Sections 7401 and 7403, at the direction of the Attorney General of the United States, with the authorization and at the request of the Chief Counsel of the Internal Revenue Service, a delegate of the Secretary of the Treasury of the United States.

2. On May 29, 1989, a delegate of the Secretary of the Treasury made an assessment of unpaid personal income taxes against Steven and Koreen Morgan in the amount of $516.50, including penalties and interest, for the taxable period ending December 31, 1988.

3. Notice of and demand for payment of the taxes described in paragraph 1 above was given to and made on Steven and Koreen Morgan in accordance with 26 U.S.C. § 6303.

4. Notice of Federal Tax Lien with respect to the assessment described in paragraph 1 above was filed with the Madison County Recorder, Rexburg, Idaho on August 30, 1993.

5. On May 31, 1993, a delegate of the Secretary of the Treasury made an assessment of unpaid personal income taxes against Steven Morgan in the amount of $2,565.21, including penalties and interest, for the taxable period ending December 31, 1989.

6. Notice of and demand for payment of the taxes described in paragraph 4 above was given to and made on Steven Morgan in accordance with 26 U.S.C. § 6303.

UNITED STATES ANSWER AND CLAIM - 4

9393990P.ANS

7.    Notice of Federal Tax Lien with respect to the assessment described in paragraph 4 above was filed with the Madison County Recorder, Rexburg, Idaho on August 30, 1993.

8.    On May 31, 1993, a delegate of the Secretary of the Treasury made an assessment of unpaid personal income taxes against Steven Morgan in the amount of $2,393.28, including penalties and interest, for the taxable period ending December 31, 1990.

9.    Notice of and demand for payment of the taxes described in paragraph 7 above was given to and made on Steven Morgan in accordance with 26 U.S.C. § 6303.

10.   Notice of Federal Tax Lien with respect to the assessment described in paragraph 7 above was filed with the Madison County Recorder, Rexburg, Idaho on August 30, 1993.

11.   Despite notice and demand, Steve Morgan has failed to pay the taxes assessed and there remains due and owing to the United States the sum of $5,474.99, plus accrued interest, penalties, and other statutory additions.

12.   On or about August 3, 1993, the Internal Revenue Service served a Notice of Levy on Steve Morgan's employer, Diversified Metal Products, Inc., requesting payment of all monies owed to Steve Morgan by Diversified Metal Products.

13.   The interpleaded fund contains money that is owed to Steve Morgan by Diversified Metal Products, Inc. to which the federal tax lien attaches.

UNITED STATES ANSWER AND CLAIM - 5

9393990P.ANS

14. The United States claims priority to the interpleaded fund in such amount remaining after satisfaction of the claims of competing claimants to the fund who are entitled to priority over the United States.

WHEREFORE, the United States of America prays the Court:

1. Adjudge and decree that the defendant the United States of America has valid and subsisting liens in the amount of $5,474.99, plus accrued interest, penalties, and other statutory additions.

2. Determine the rights, titles, and interest of the parties to the fund; and

3. Grant the United States its costs and such other further relief that is just and proper.

Respectfully submitted this _18th_ day of November, 1993.

BETTY H. RICHARDSON
United States Attorney

*Richard R. Ward*

RICHARD R. WARD
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 683
Ben Franklin Station
Washington, D.C.  20044-0683
Telephone:  (202) 307-5867

UNITED STATES ANSWER AND CLAIM - 6

NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).

any other provision of law, shall be construed to require the disclosure of standards used or to be used for the selection of returns for examination, or data used or to be used for determining such standards, if the Secretary determines that such disclosure will seriously impair assessment, collection, or enforcement under the internal revenue laws.

### (3) Taxpayer return information

The term "taxpayer return information" means return information as defined in paragraph (2) which is filed with, or furnished to, the Secretary by or on behalf of the taxpayer to whom such return information relates.

### (4) Tax administration

The term "tax administration"—

> **(A)** means—
>
>> **(i)** the administration, management, conduct, direction, and supervision of the execution and application of the internal revenue laws or related statutes (or equivalent laws and statutes of a State) and tax conventions to which the United States is a party, and
>>
>> **(ii)** the development and formulation of Federal tax policy relating to existing or proposed internal revenue laws, related statutes, and tax conventions, and
>
> **(B)** includes assessment, collection, enforcement, litigation, publication, and statistical gathering functions under such laws, statutes, or conventions.

### (5) State

The term "State" means—

> **(A)** any of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, the Canal Zone, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands, and
>
> **(B)** for purposes of subsections (a)(2), (b)(4), (d)(1), (h)(4), and (p) any municipality—
>
>> **(i)** with a population in excess of 250,000 (as determined under the most recent decennial United States census data available),
>>
>> **(ii)** which imposes a tax on income or wages, and
>>
>> **(iii)** with which the Secretary (in his sole discretion) has entered into an agreement regarding disclosure.

### (6) Taxpayer identity

The term "taxpayer identity" means the name of a person with respect to whom a return is filed, his mailing address, his taxpayer identifying number (as described in section 6109), or a combination thereof.

### (7) Inspection

The terms "inspected" and "inspection" mean any examination of a return or return information.

### (8) Disclosure

The term "disclosure" means the making known to any person in any manner whatever a return or return information.



### (9) Federal agency

The term "Federal agency" means an agency within the meaning of section 551 (1) of title 5, United States Code.

### (10) Chief executive officer

The term "chief executive officer" means, with respect to any municipality, any elected official and the chief official (even if not elected) of such municipality.

### (11) Terrorist incident, threat, or activity

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 2, 2006 (see http://www.law.cornell.edu/uscode/uscprint.html).*

# TITLE 26 - INTERNAL REVENUE CODE
## Subtitle F - Procedure and Administration
### CHAPTER 61 - INFORMATION AND RETURNS
#### Subchapter B - Miscellaneous Provisions

## § 6103. Confidentiality and disclosure of returns and return information

### (a) General rule

Returns and return information shall be confidential, and except as authorized by this title—

(1) no officer or employee of the United States,

(2) no officer or employee of any State, any local law enforcement agency receiving information under subsection (i)(7)(A), any local child support enforcement agency, or any local agency administering a program listed in subsection (l)(7)(D) who has or had access to returns or return information under this section, and

(3) no other person (or officer or employee thereof) who has or had access to returns or return information under subsection (e)(1)(D)(iii), paragraph (6), (12), (16), (19), or (20) of subsection (l), paragraph (2) or (4)(B) of subsection (m), or subsection (n),

shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this section. For purposes of this subsection, the term "officer or employee" includes a former officer or employee.

### (b) Definitions

For purposes of this section—

#### (1) Return

The term "return" means any tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this title which is filed with the Secretary by, on behalf of, or with respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed.

#### (2) Return information

The term "return information" means—

(A) a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense,

(B) any part of any written determination or any background file document relating to such written determination (as such terms are defined in section 6110 (b)) which is not open to public inspection under section 6110,

(C) any advance pricing agreement entered into by a taxpayer and the Secretary and any background information related to such agreement or any application for an advance pricing agreement, and

(D) any agreement under section 7121, and any similar agreement, and any background information related to such an agreement or request for such an agreement,

but such term does not include data in a form which cannot be associated with, or otherwise identify, directly or indirectly, a particular taxpayer. Nothing in the preceding sentence, or in

**EXHIBIT O**

NARA Declassified Document Dated August 25, 1945 Confirming That the Internal Revenue
Service (Bureau of Internal Revenue) Has Never Been Created By Any Act Of Congress
(38 pages)



<u>SECRET</u>

August 25, 1945

To:    Secretary Vinson

From:   Mr. Luxford

Conclusions and Recommendations in
Connection with the Study of Administrative
History of the Bureau of Internal Revenue.

        In preparing the attached memorandum outlining the
administrative history of the Bureau of Internal Revenue,
Mr. Brenner and I made an effort to confine it to the reported
facts and to refrain, so far as possible, from injecting our
own opinions and theories. I believed that this approach would
give you - and others you might consult - the best opportunity
to form an independent judgment of the lessons, if any, to be
learned from the Bureau's history.

        On the other hand, in making this study I have been
conscious of the fact that your interest in the subject stemmed
from a desire to better understand the de facto relationship
presently existing between the Bureau and the Treasury. In this
memorandum I am offering you my own conclusions and recommendations
on the subject.

        I have intentionally avoided expressing any conclusions
or recommendations on the subject of reorganizing the Bureau
internally except to the extent that this was essential for
improving the relationship between the Bureau and the Treasury.
It does seem clear to me, however, that consideration should be
given to whether some internal reorganization of the Bureau is
not highly desirable. While the attached historical memorandum
does throw some interesting light on this subject, I am of the
opinion that any internal reorganization should be considered
only after positive steps have been taken to assure an improvement
of the Bureau-Treasury relations. Once this is done, plans for
an internal reorganization can be considered not only in terms
of improving the Bureau but also in terms of further strengthening
the Bureau-Treasury relations. Moreover no such action should be
considered until a thorough study of the Bureau's actual operations
has been made by someone having your confidence and full support.

                        <u>Conclusions</u>

        In my opinion:

        (1) The Secretary of the Treasury today has - and always
has had - clear <u>legal</u> authority to control the Bureau of Internal
Revenue. Not only does the Secretary of the Treasury have clear
legal authority over the Bureau, he also has clear <u>legal</u>
<u>responsibility</u> for the policies and operations of the Bureau.

07 2334

FILED

DEC 2 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

- 2 -

Moreover, in the eyes of the public, whatever the Bureau does - or fails to do - is directly identified with the Secretary of the Treasury. In a very real sense the public regards him as the man who puts his hands into their pockets and collects the taxes.

(2) The lack of de facto control over the administration and policies of the Bureau arises primarily from the fact that, although the Secretary of the Treasury has legal authority over, and responsibility for, the Bureau, the officers in charge of the Bureau - whether political or civil service appointees - have owed their primary loyalties elsewhere. Specifically, the political appointees have owed their appointments, their tenure and their loyalties to those responsible for their appointments - and not to the Secretary of the Treasury. The civil service officers of the Bureau know that Secretaries of the Treasury come and go, but the Bureau and its career men go on forever.

(3) While the political and career officials in the Bureau tend to regard the Secretary of the Treasury - and the Treasury Department - as necessary nuisances which must be tolerated but scarcely respected, yet these two types of officials do recognize that as a practical matter they must work together to achieve their separate aims. The ordinary political appointee thrown into the highly technical field of tax administration soon discovers that the "safe" way to avoid embarrassing mistakes on his part is to let the experts have their way. The career officials, on the other hand, find in these political officials powerful allies in support of their own positions and ambitions - to say nothing of counteracting "interference" by the Treasury. Thus, you discover the not infrequent anomaly of the Commissioner of Internal Revenue, for instance, ardently supporting a career man for a political post in the Bureau. Confronted with this situation, observing that in normal times the Bureau will cause little trouble if it is left alone, lacking specialized knowledge and experience in the tax field themselves, having other interests, and wary of stirring up a hornet's nest, most Secretaries of the Treasury have been inclined to leave the Bureau strictly alone.

(4) This condition of actual indifference to the Secretary of the Treasury ( and the Treasury generally) and the alliance between the political and career officials in the Bureau is probably much deeper than the personalities of the particular men who happen to hold these posts at any specific time. The existence of these same forces for the better part of a century have developed an ingrained way of thinking on the part of Bureau personnel generally, so that today we are confronted not only with the facts but also a tradition that will have to be uprooted if any permanent readjustment is contemplated.

(5) If this analysis is reasonably correct, the readjustment of the fundamental relationship between the Bureau and the Secretary of the Treasury must be conceived of as evolutionary rather than revolutionary. It will require tact and skill coupled



- 3 -

with plenty of dogged determination and persistence to make a
fundamental change.  On the other hand, prompt improvement can
be achieved - at least during your tenure in office - if in your
opinion this goal warrants the time and effort required in its
accomplishment.

(6)  As indicated above, it is difficult - if not impossible -
to separate the relationship between the Bureau and the Secretary
of the Treasury from the relationship between the Bureau and the
Treasury Department.  As is true in other fields - whether it be
the eyes of the public, the Congress, or other government agencies -
the Treasury Department and the Secretary of the Treasury are as
one in the eyes of the Bureau.  Both are "outsiders" and both hold
certain reins of authority.  The crucial points of contact between
the Bureau, on the one hand, and the Secretary and the Department
on the other, are primarily at the high policy level (such as
major personnel actions, legislation, regulations and general
policy decisions).  At these high policy points of contact the
men in the Department representing the Secretary do tend to reflect
his views and _vice versa_ so that this identity in concept is most
natural.  This point is particularly significant to our considera-
tion because it suggests that any move strengthening the position
of _either_ the Secretary or the Department vis a vis the Bureau
will most likely strengthen the position of the _other_.  Thus in
weighing techniques for improving the situation we are free to
interchange the Department and the Secretary at any point where
convenience or expediency suggest it is appropriate.

<u>Recommendations</u>

In offering these recommendations for improving the _de facto_
control of the Secretary over the Bureau of Internal Revenue and
in achieving a greater degree of coordination in their policies
and operations, I have assumed that fundamentally the short range
treatment of the problem varies only in degree and not in kind from
the long range approach to it.  Accordingly I have not separated
long range recommendations from those of short range.  Rather I
have dealt with them under the same heading, pointing out where
necessary whether the proposals are of transitory or permanent
significance.

I

<u>The Bureau Must be Made to Realize that the</u>
<u>Secretary of the Treasury is the Boss.</u>

All recommendations for readjusting the relations between the
Bureau and the Secretary - whether temporary or permanent in nature
can be telescoped into one proposition:  The Bureau must be made to
realize that the Secretary of the Treasury is the boss and that the
Secretary intends to be the boss.  Whether the readjustment proves
temporary or permanent depends upon whether the Bureau is convinced
that it is only the <u>present</u> Secretary of the Treasury who will have
to be treated as boss or whether a fundamental change has occurred
which will make <u>any</u> Secretary of the Treasury the Bureau's boss
in fact as well <u>as</u> theory.  Once the political and career officials
become convinced that the Secretary is the boss and intends to so
act, the Bureau will begin to function as an agent of the Secretary
of the Treasury rather than as an independent contractor.



- 4 -

But expressing this general recommendation hardly offers a concrete program for realizing its goal. The recommendations below will outline specific measures to implement and supplement this primary recommendation.

II

### The Secretary of the Treasury Must Have the Power to Appoint and Remove the Top Bureau Officials.

As indicated in the part of this memorandum dealing with conclusions, the primary weakness in the de facto authority of the Secretary over the Bureau is that both political and career officials owe their positions and tenure to others than the Secretary. Until it is driven home to them that the Secretary has the power to hire and fire - and is willing to use it - their loyalties will remain elsewhere.

Ideally, this situation can be best remedied on a permanent basis by giving the Secretary of the Treasury the statutory power of appointment, carrying with it the implied power of removal. While there might be a good deal of political opposition to this proposal, still a powerful case in its favor can be established. Moreover Congress and the Administration are bound to be reorganization minded at the inception of the reconversion period and the proposal might have the benefit of this momentum. This might be particularly the case if this proposal were lumped with other proposals, such as increasing the number of Assistant Secretaries.

While different arguments would probably be required in selling this proposal to the Congress, from the point of view of achieving results, it would certainly drive home to the Bureau who was the boss and the Bureau would know that no matter who was Secretary of the Treasury, he would be the boss.

If this proposal is deemed impractical or too likely to provoke delay where immediate action is necessary, then the Commissioner and the top Bureau officials should be informed specifically and unequivocally that the President is giving the Secretary of the Treasury an absolutely free hand over their appointment and tenure. This will give the Secretary de facto authority, at least temporarily. The weakness in this measure is quite obvious. In the first place the Bureau officials will be prone to regard it as temporary and subject to change with a new Administration, a new Secretary of the Treasury, or a change in political tides. They may be subservient but hardly reconstructed in mental outlook for they will be tempted to bide their time, meanwhile preserving their other loyalties against the day when conditions return to "normal".

While it may be argued that the de facto power of appointment is adequate and the case of Assistant Secretaries be offered as proof, there are certain difficulties with the analogy. In the



- 5 -

first place, in the case of Assistant Secretaries there is no
tradition of autonomy to overcome as in the Bureau's case; in
fact there is at least a considerable degree of tradition to the
contrary.  In the second place, some of us can recall a few vivid
instances where Assistant Secretaries were not the choice of the
Secretary and where the power of the Secretary over his assistants
was more theory than fact.

Finally, it should be pointed out that one of the deficien-
cies of a de facto appointing power is that the Secretary does not
fight just one battle but is exposed to a whole series of battles,
some of which may occur at times when his position may be at least
temporarily weakened or embarrassed.  Each time there is a major
appointment to make, however, the Secretary's candidate must run
the gamut of the President, the Party and the Congress - and the
Bureau will know it too.

All of the foregoing is true regardless of whether the
title of the head of the Bureau of Internal Revenue remains that
of "Commissioner" or is changed to "Assistant Secretary of the
Treasury in charge of the Bureau of Internal Revenue".  While
a change in titles might be helpful in dramatizing the fact that
the Secretary was now the boss, still the fundamental question
of loyalty would remain, regardless of title.  In this connection
it should be pointed out, however, that the actual job of adminis-
tering the Bureau must be performed by a man in the Bureau and
not a man located in an office in the main Treasury.  He will have
all he can do if he is on the spot and in a position to see things
operating at first hand.  He cannot do that and serve as one of
the Secretary's personal staff here in the Treasury.  Moreover,
there are cogent reasons for believing that the task of integrating
the administration of the Bureau and the policy formulating
functions here in the Treasury should be performed by an Assistant
Secretary on your personal staff.  If this is the case, it might
seem a little odd for the operating head of the Bureau with the
title of "Assistant Secretary" to be reporting through another
Assistant Secretary.

In any event it is suggested that the Bureau's relations
with the Treasury would be improved effectively and dramatically
by the appointment of "your man" to be its head, regardless of
his title.  This seems almost vital if you are to get the head of
the Bureau to enter into this task with the spirit and drive
essential to its achievement.  Besides, it will dramatize the
fact that you intend to be the boss and the other Bureau officials
and the staff will get the point.

III

Qualifications for the Head of the Bureau

It would hardly require a separate heading for this subject
to recommend the appointment of a "good man", but I should like



- 6 -

to suggest some of the special qualifications that would assist even a "good man".

A.  The head of the Bureau should be a man having the Secretary's confidence and whom the Secretary will be prepared to support even when the "throat cutting" is at its worst.  This means a man who sees eye to eye with the Secretary on the Secretary's objectives and on the means of achieving these objectives.

B.  He must be a man with sufficient personality and interest to actually dominate the Bureau and who will feel personally responsible for the Bureau's operations. It goes without saying, of course, that he must devote his full time to running the Bureau.

C.  He should be an experienced government man who can be plenty tough and yet wear gloves.  It is the old story of "sending a thief to catch a thief".  The man named must have the training and ability to equip him in taking the measure of the Bureau experts.  Otherwise, he will find himself in the position of most political appointees taking the post; he must either be able to play their game and win or he will be forced to enter into a one-sided alliance with them to protect himself.  But in suggesting that he be a government man, I emphasize that this does not mean he should be a Bureau man.  He should not be a Bureau man because then the chances are he would be one of the club.  Rather he must be outside the Bureau Club and proselyte its members into the Treasury Club.  He does not need to be a tax expert if he knows where to get loyal men who are experts to assist him and to warn him of the pitfalls.  He must be tough enough to take on the bureaucrats if need be; at the same time temperamentally inclined to win his battles without showing all his cards.

D.  He should be a good judge of other men.  No one man can hope to do the job.  He must be able to pick other good men to serve as his lieutenants and be able to inspire them with his philosophy and approach.  He must be able to win over part of the top staff, at least, to make them his men and ready to support him technically where necessary. In any bureau like Internal Revenue there are always a number of top caliber men who are themselves sick of the petty intrigue and bureaucracy.  These men, if they can be separated from the chronic malcontents, will be ripe for a new deal and the opportunity to push forward.  They will become the loyal supporters of those giving them this opportunity.  The man selected as head of the Bureau also should be able to attract new blood from the Treasury proper and other government agencies since not only may this be necessary but in any case it is desirable in the course of reshaping the Bureau's attitude toward the Treasury.



- 7 -

IV

## Integration of Bureau and Treasury

The Bureau should be more closely integrated with the tax policy side of the Treasury as well as with the Treasury generally. If relations between the Treasury and the Bureau are bad, there is an excellent chance that both have been at fault on this score. Specifically, while the Bureau must come to realize that the Secretary of the Treasury is the boss, the relationship between the Treasury and the Bureau cannot be that of master and servant. It must be that of partners whose separate success or failure depends upon joint cooperation.

Both the Treasury and the Secretary must earnestly seek to gain the confidence of the Bureau. In the past the Bureau has operated on the basis of being isolated from the Treasury and thus compelled to fight its own battles both with Congress and within the Treasury proper. Almost never has it been able to view the Treasury as a protector of its interests and sympathetically concerned with its problems. To a substantial extent this feeling has developed from the fact that the Treasury official supervising the Bureau has been either a weak man himself and afraid to stick up for the Bureau; or had little interest or sympathy with the Bureau and its problems; or was too preoccupied with other Treasury problems and could not take the time to look out for the Bureau. Correcting this situation should contribute to improving the Bureau's morale and establishing an espirit de corps with the Treasury.

The Bureau must be given greater encouragement to participate in the formulation of policy at a high level, including legislation. I know that a procedure already exists which is designed to achieve this end and I have no doubt but what it is reasonably effective. On the other hand, it probably can stand a good deal of improvement if we proceed in our reconsideration from the premise that people who see eye to eye are in charge of both the Bureau and the Treasury. Instead of a procedure equipped to absorb sniping and unsympathetic analysis, we should focus on one for partners.

Finally, the transfer of personnel between the Bureau and the Treasury should be greatly encouraged. Tax men in the Bureau should be carefully considered for any appointments in the tax field in the Treasury and vice versa. This is most desirable from the point of view of each group getting to know and better understand the problems of the other. Each gets more of the feeling that it is a part of a larger whole rather than two separate bodies with little in common except that they operate in the same general field. In addition, career men in the Bureau should be able to look forward to the possibility of extending their career in the main Treasury and men on the legislative side of the Treasury should be given the opportunity to observe first hand how their programs work in practice. This freedom of movement back and forth will do much to erase the existing barriers and drive home to both that they work for the Secretary of the Treasury.



C O N F I D E N T I A L

AUG 2 5 1945

To          Secretary Vinson

From        Messrs. Luxford and Brenner

Subject:    Administrative History of the
            Bureau of Internal Revenue.

This memorandum has been prepared after a study of the
existing histories of the Bureau of Internal Revenue, the
legislative provisions relating to administration of the Bu-
reau, the hearings, reports, and debates in connection with
the revenue laws which made important changes in the admini-
stration of the Bureau, and the hearings and reports of the
more important Congressional investigations of the Bureau.
Unfortunately there is no recent study of the revenue admini-
stration sufficiently thorough to be useful.

Considerable time has been spent in the examination of
legislative histories, which did not prove very fruitful because
the important administrative provisions are generally incorpora-
ted in revenue bills and are of minor significance as compared
to the actual tax provisions. The material that does exist in
the legislative histories is scattered throughout the debates,
and frequently the administrative provisions were not the sub-
ject of extended discussion.1/

This study does not include material which might be obtained
from an examination of the proceedings in connection with appro-
priations made by Congress for the work of the Bureau, nor does
it include a check of the contemporary newspapers and periodicals
for collateral background on the changes in administrative methods.

We have not felt free to examine files of the Bureau of In-
ternal Revenue or check other sources there which would probably
be valuable in providing information on this subject. Nor could
we have examined the material which has been studied during the
limited time in which this memorandum has been prepared if we
had also made use of the Bureau's sources.

---

1/ The most valuable sources we have examined are:
   The Internal Revenue System in the United States, Frederick
   C. Howe. (1896)
   The Bureau of Internal Revenue, Service Monographs of the
   United States Government, No. 25(1923)
   Monograph of the Attorney General's Committee on Administra-
   tive Procedure, Part 8 (Senate Document No. 10, 77th Congress,
   1941).
   Hearings of the Select Senate Committee on Investigation of
   the Bureau of Internal Revenue, March 14-April 9, 1924 and
   November 20, 1924-June 1, 1925.
   Report of the Select Senate Committee on Investigation of
   the Bureau of Internal Revenue, January 12, February 2, and
   February 28, 1926 (Report No. 27, 69th Congress).



- 2 -

I. <u>Early History</u>.

There was no permanent system of internal taxation prior to the Civil War, and there was no permanent administrative agency for the collection of internal taxes until that time. During the earlier years, however, there were several periods during which internal taxes were collected, and the administrative system ultimately established as a permanent part of the Government is based largely upon the experience of these early attempts to collect internal taxes.

A. <u>Post-Revolution Period</u>

The background of the first period of internal taxation has an important bearing on the type of administrative machinery that has been developed in the field of internal revenue. When the Federal Government was established under the Constitution, the difficulties caused by excise taxes levied by Parliament were still fresh in the minds of the public and of Congress. It was apparent to Hamilton, however, that customs duties alone would not provide sufficient funds for the financing of the Government. War expenditures had created a substantial public debt and revenue measures were needed if it was to be reduced.

Hamilton introduced measures for the imposition of excise taxes. According to Howe, The Internal Revenue System in the United States (1896), one of Hamilton's first reports advocated a moderate tax on liquor, but Congress rejected the proposal because of its centralizing tendencies which would result from the creation of a large body of Federal tax collectors. Howe (p. 17) then describes the opposition to excise taxes in the following paragraph:

"This aversion to internal taxes was partly traditional, partly the result of the absence of legal restraint in those isolated regions where the opposition was most intense. In the South, moreover, whiskey was looked upon almost as a necessity, and a tax upon its manufacture and sale no more defensible than one imposed upon any other product of the farm. In Pennsylvania, also, the feeling was most bitter; and the legislature of that State instructed its representatives in Congress to oppose the passage of such a measure by every means in their power, while a memorial from Westmoreland County (Pa.) insisted, among other things, that to convert grain into spirits was as clear a natural right as to convert grain into flour. An excise 'was the horror of all free states,' said one vigorous speaker in the House; it was 'hostile to the liberties of the people;' it would 'convulse the government; let loose a swarm of harpies, who, under the denomination of revenue officers, will range the country, prying into every man's house and affairs, and, like the Macedonian phalanx, bear down all before them'."

- 3 -

Beginning in March 1791, however, a series of internal taxes was enacted on such items as liquor, sugar, tobacco and legal instruments. This period of internal taxation lasted until 1802, when Congress enacted a law which abolished both the taxes and the administrative machinery which had been set up for their collection. During this entire time the collections from customs far exceeded the collections from internal taxes, and when the fiscal position of the Government had recovered from the difficulties arising out of the revolution, the internal taxes were discontinued.

To administer the internal taxes the country was divided into fourteen revenue districts, each state being a separate district. Each district had one supervisor, appointed by the President and confirmed by the Senate, whose salary was fixed by the President. Aggregate salaries could not exceed seven per cent of the internal taxes collected on liquor, or more than $45,000. There was also a provision for the division of revenue districts into inspection districts and the appointment of inspectors by the President with the consent of the Senate. The effect of these internal taxes was primarily political. It led to the "Whiskey Insurrection" in Pennsylvania during 1794, which clearly demonstrated that the central government was endowed with sufficient power to enforce its enactments. From a fiscal point of view, however, the taxes were of little significance.

Fear of centralizing tendencies and the jealousy with regard to states' rights undoubtedly led to the administrative provisions calling for the division of the country into districts with local supervisors and local inspectors. Even the fact that local citizens enforced the taxes was not a sufficient palliative to prevent the "Whiskey Insurrection".

In 1798 Congress for the first time levied a direct tax on real property. In connection with this tax the law provided for the creation of divisions, each consisting of several counties within a state, and a commissioner for each division was appointed by the President with the consent of the Senate. All of the commissioners in a particular state were to act as a board to divide the state into assessment districts, appoint assessors and make regulations. The other officials who were created in connection with the direct tax were surveyors of the revenue. These men, however, were not appointed by the commissioners who were responsible for the direct tax, but were appointed by the supervisors who had the responsibility for the collection of other internal taxes.

In 1792 Congress created the office of "Commissioner of the Revenue" to replace the Assistant to the Secretary of the Treasury, who had been in charge of the collection of taxes. In 1800 Congress also created the office of the Superintendent of Stamps, who was in charge of the paper used for the purpose of collecting stamp taxes. The laws do not specify how either of these officials were appointed.

- 4 -

Hamilton had been the proponent of internal revenue measures and had worked hard to establish a system of excise taxes. When Jefferson took office in 1801, however, he took steps promptly to abolish the system. Before becoming President, Jefferson had attacked the excise taxes as likely to conduce dismemberment of the Union, and his party was pledged to the repeal of the taxes. Several reasons were given for the repeal. It was contended that the taxes which had been levied were oppressive, that the idea of an excise tax was hostile to the nature of a free people, and that the administration of internal taxes tended to multiply offices and increase patronage.

All the offices referred to above were abolished when the internal taxes were repealed by the Act of April 6, 1802 (2 Stat. 148). At the time, 400 officials were employed to administer the internal taxes, and the cost of maintaining this force was twenty per cent of the taxes collected.

B. War of 1812.

From 1802 to 1812 customs duties, the receipts from the sales of public lands, and the overdue payments of the direct taxes were not only sufficient to meet the current needs of the Government but were also large enough to permit steady reduction of the public debt. In 1813, 1814, and 1815 Congress enacted a number of internal taxes for the purpose of financing the interest on the public debt, which had risen considerably as a result of the war. The excise taxes were all abolished in 1817. Congress also levied a direct tax of $3,000,000 in 1813, and in 1815 provided for an annual direct tax of $6,000,000. The larger direct tax was never collected but was reduced to $3,000,000 for the year of 1816 and abolished thereafter.

To administer the new taxes Congress recreated the Office of the Commissioner of the Revenue, and divided the states into collection districts with a collector and a principal assessor in each district. The Commissioner, the collectors and the assessors were all appointed by the President and confirmed by the Senate. It was the duty of the collectors to collect both the direct and excise taxes, and their functions were quite similar to those which they have at present. The Commissioner of the Revenue was placed in charge of the collection of all taxes, and the Secretary of the Treasury was authorized to transfer to him the collection of customs duties.

In 1817 Congress abolished all of the offices created for the purpose of collecting the excise and direct taxes, but the collectors were to remain in office until the outstanding taxes had been collected. In 1830 the Office of the Solicitor of the Treasury was created, and that officer, who was appointed by the President with the consent of the Senate, was charged with all of the residual duties of the Commissioner or acting Commissioner of the Revenue, in relation to collection of outstanding direct and internal duties.



- 5 -

From 1814 to 1818 when these taxes were collected, the receipts from customs still exceeded the receipts from internal taxes, but not by nearly so large an amount as during the prior period of internal taxation.

II. The Civil War Laws.

The first Civil War Revenue Act was enacted on August 5, 1861 (12 Stat. 292). It levied a direct tax of $20,000,000 apportioned among the States, an income tax, and increased the customs duties. The Act authorized the President to divide the States and Territories into collection districts, each district having a collector and an assessor appointed by the President with the consent of the Senate. In addition, the Act provided for a Commissioner of Taxes to supervise the collection of the direct tax and the income tax to be nominated by the Secretary of the Treasury and appointed by the President. The Act also permitted the States to assess and collect their quotas of the direct tax, and this was the course which was followed by the States.

It was the Act of July 1, 1862 (12 Stat. 432) that actually established the internal revenue system which exists today. This legislation taxed so many things that a definite administrative system for their collection was essential. Congressman Morrill explained the bill to the House and, with respect to the administrative provisions, he said: "We have, therefore, looked to such examples as we found upon our statutes, and have endeavored to arrange a system by which all descriptions of duties could be assessed and collected through the same officers." (58 Cong. Globe 1194).

The old machinery which had been used for the collection of taxes during and immediately after the war of 1812 had expired. Instead of reviving it, Congress created the office of Commissioner of Internal Revenue, to be appointed by the President and confirmed by the Senate. The Commissioner, under the direction of the Secretary of the Treasury, was charged with the same general duties which he has today. During the House debate it had been proposed that the Commissioner act under the direction of the President but this proposition was defeated when it was pointed out that all revenue matters should be under the Treasury Department. (58 Cong. Globe 1218).

The President was authorized to divide the country into collection districts not exceeding the number of representatives in each state except California. The President created the full number of districts authorized by law (185) and for each district an assessor and a collector were appointed.

The principal officials created by the Act of 1862 were the assessors and the assistant assessors. Assessors were appointed by the President with the consent of the Senate, and they appointed their own assistants. Their functions included finding the



- 6 -

taxable property, assessing the taxes and hearing all appeals. The office of assessor remained the focal point of tax administration during the war and for several years thereafter until it was abolished in 1872. Assessors and their assistants were paid by the day.

Collectors, who were appointed by the President with the consent of the Senate, at that time were only fiscal agents and their principal duty was to collect the taxes in accordance with the lists furnished them by the assessors. Collectors were paid commissions on the money they collected and the amount of commissions any individual could receive was limited to $10,000 except in the larger districts. The commissions had to cover not only the collectors compensation but also that of the deputies they were authorized to appoint. Deputies were paid by the collectors and no additional funds were made available for this purpose.

The collectors had authority to appoint inspectors, who were the chief enforcement officers of the period. These men confined their activities to the enforcement of the taxes on liquor. Occasionally other inspectors were appointed in some districts in connection with the tobacco, petroleum and coal oil taxes. The authority to appoint inspectors was contained in a later act passed in 1862. (Act of July 1, 1862, 12 Stat. 447). In accordance with its terms, inspectors did not receive any payment from the Government but were paid fees by the manufacturers whose goods they inspected. This led to many abuses and according to "The Bureau of Internal Revenue", by Schmeckebier and Eble (1923), the fee system "was one of the weakest features of the whole Internal Revenue System, and there is no doubt that this method of compensation was one of the principal avenues of temptation to dishonest distillers, who were extra generous with 'fees' and thereby obtained the necessary protection which in later years led to the worst frauds in the history of the Nation."

The next revenue measure was enacted March 3, 1863 (12 Stat. 726). Under this legislation assessors were given an annual salary and an allowance for office rent, which replaced their per diem compensation. In addition, they were allowed commissions on collections made in their districts.

The Act of 1863 also created the position of Deputy Commissioner of Internal Revenue, to be appointed by the President and confirmed by the Senate, and it authorized the Secretary of the Treasury to appoint three revenue agents. This was the first statutory reference to revenue agents who were to be appointed for the purpose of enforcing the revenue laws.

The Revenue Act of June 30, 1864 (13 Stat. 223) made a few changes in the administrative provisions relating to the collection

- 7 -

of internal revenue. It changed the method of compensation of collectors to an annual salary plus commissions, and it changed the method of paying inspectors from the fee system to a per diem compensation plus a travel allowance. This latter provision was undoubtedly intended to do away with the abuses arising from the fee system, but Congress allowed the improvement to remain in effect only two years. The only other administrative change brought about by this legislation was the increase in the number of revenue agents to five.

The Revenue Act of March 3, 1865 (13 Stat. 469) limited the commissions of collectors and increased the number of revenue agents from five to ten. It also authorized the Secretary of the Treasury to appoint a Commission of three persons to study the whole problem of taxation, including "the manner and efficiency of the present and past methods of collecting the internal revenue". The Commission's report will be dealt with under III below.

Shortly after the Civil War, several changes were made in the administrative provisions which had been worked out during the war. In 1866, the fee system of paying inspectors was restored.(14 Stat. 155), and the abuses which had characterized this system were revived. The same act increased the number of deputy commissioners from one to three, but the deputies were reduced to two in 1874 (18 Stat.8) and back to one in 1876 (19 Stat. 151).

On March 6, 1872 a law was passed which changed the system of having deputy collectors paid by the collectors. From that time on their salaries were fixed by the Secretary of the Treasury, on the recommendation of the Commissioner of Internal Revenue, and were paid by the Government. The appointment of internal revenue agents was changed by the same act which provided that they were to be appointed by the Commissioner of Internal Revenue, who was also authorized to fix their salaries (17 Stat. 241). The Act of December 24, 1872 (17 Stat. 401) abolished the offices of assessors and assistant assessors. As of July 1, 1873, these offices were terminated and their functions were transferred to the offices of the collectors.

III.  The Revenue Commission of 1865.

The Revenue Commission appointed by the Secretary of the Treasury in accordance with the Act of March 3, 1865, made 13 special reports and a general report. In the general report it devoted some space to criticizing the manner of administration of the internal revenue laws.

The principal defects it found in the Bureau of Internal Revenue were:

- 8 -

(1) The lack of power and discretion in the officials
of the Bureau;

(2) The absence of positions with high salaries and
permanent tenure which would attract and keep com-
petent personnel;

(3) The splitting of penalties and forfeitures with in-
formers;

(4) The appointment, retention and promotion of officers
on the basis of other circumstances than qualifications
of good behavior.

The Commission reviewed the functions of the Secretary of
the Treasury and concluded that the office was, next to the Presi-
dent, the most important in the Government. They expressed some
concern over the fact that many duties of minor importance were
imposed upon him in addition to the major ones, and accordingly,
in suggesting a plan of reorganization in the administration of
revenue collection, they proposed that an "Under-Secretary of
the Treasury in Charge of the Revenue" be appointed, and that
the general supervision and direction of revenue collections be
assigned to him.

The Commission also proposed the appointment of a commis-
sioner of the customs, a commissioner of the excise, a solicitor
of the customs, and a solicitor of the excise. These 4 men,
together with the Under Secretary, should constitute the Board
of Commissioners of the Revenue, which should determine rules
and regulations relating to collections, the expenditures to be
incurred in collecting revenues, management of all revenue liti-
gation, and the distribution of all awards for good service and
valuable information.

Another recommendation of the Commission was that no subor-
dinate officer in the Bureau be appointed until his qualifications
had been examined and approved by the Board of Commissioners.
They also suggested that the Secretary and the Under Secretary
participate on the floor of the House in all debates on revenue
questions. Finally, they proposed that each leading source of
revenue be recognized as a division of the Bureau and be placed
in charge of an officer with a permanent position and a good
salary.

The response of Congress to the report of the Revenue Com-
mission was contained in the Act of July 13, 1866 (14 Stat. 98).
Before that time the only officers recognized by law were the
commissioner, the deputy commissioner, and a cashier, other
clerical assistance being drawn from employees of the Secretary
of the Treasury. The new legislation provided a definite per-
sonnel for the Bureau. It authorized under the direction of the
Secretary the employment of two deputy commissioners, in addition
to the existing one, a solicitor, seven heads of divisions, and
244 clerks, messengers and laborers for the Washington office.



- 9 -

The sweeping reforms recommended by the Commission were not followed, however. The farthest that Congress went in this direction was to authorize the Secretary of the Treasury to appoint a Special Commissioner of the Revenue in his department to hold office for 4 years and make reports on every aspect of the internal revenue policies.

The attitude of Congress toward the report of the Commission was clearly stated by Congressman Morrill:

"The law authorizing the Secretary of the Treasury to assign to the Bureau of Internal Revenue a sufficient force to carry it on will expire by its own limitation on the 1st of July next, and it therefore becomes necessary to make some arrangement for the permanent organization of the bureau. It will be seen that the bill makes provision for this object. The operations of this bureau are now on so large a scale as to require the services of able, clearheaded men, trained to business, and of unquestioned integrity. Such men in our country are highly prized, and command the highest salaries paid in financial and commercial employments, and unless we fix salaries at an adequate or competing point we shall only command the services of second-rate men. The bane of the Treasury Department is that so soon as officers receive the stamp of its confidence they receive a loud call and the offer of more pay to go elsewhere. The best officers are, therefore often mere birds of passage, here today but may be gone tomorrow. The Bureau of Internal Revenue, it is quite apparent, is deficient in executive force. It is impossible that the Commissioner, however faithful and industrious, and I know of no man more so, should be able to consider all the complicated cases daily arising for investigation in the administration of his office, and we have conceded not only the propriety but the absolute necessity of reinforcing the office by two additional deputies and one solicitor.

"Notwithstanding all the disadvantages we have labored under in putting new and untried laws suddenly into operation, it is gratifying to find that the expense of collecting the revenue has been far less than was anticipated--including everything except printing done by the Public Printer--amounting, in 1865, to no more than two and seventy-five one hundredths, or two and three fourths per cent. This contrasts most favorably with the cost of collection in Great Britain, where, after years of experience, the cost varies from four and one quarter to five and three fourths per cent.



- 10 -

"The services of the gentlemen employed on the revenue commission, I have no doubt, are properly appreciated by Congress, as they will be by the country, and the Committee of Ways and Means were unanimously, I believe, of the opinion that this kind of service should not be entirely discontinued. Believing that at least one similar officer can be profitably employed permanently, they have added a section to the bill for this purpose, and I have no doubt it will prove wise economy to adopt and continue it so long as we may be compelled to raise anything like our present revenues from taxation." (71 Cong. Globe 2438).

IV.   Post Civil War to Post World War.

The Revenue Commission's report was not the only recognition of flaws in the administration of internal revenue. Writing in 1896, Howe (The Internal Revenue System in the United States) concluded that during the Civil War:

"* * *inefficiency and maladministration characterized the service, dissipating the confidence of the public and deleteriously affecting the revenues.

"Two causes were in the main responsible for this result: one, the inadequacy of the remuneration offered; but by far the most potent cause was the absence of a merit system for the determination of appointments. Probably no branch of our national administration has suffered so much from the spoils system as has the internal revenue service; for in no department of the government are efficiency and honesty so essential in the employee". (p. 195)

The Act of July 20, 1868 (15 Stat. 126) authorized the Secretary of the Treasury, on the recommendation of the Commissioner, to appoint 25 supervisors of internal revenue. The supervisors were to be enforcement officers, and, among other things, were to be empowered to transfer inspectors, storekeepers, and gaugers from one district to another and to suspend these officers from duty. In 1872 (17 Stat. 241) the number of supervisors was reduced to 10 and the power of appointment was transferred from the Secretary to the President with the consent of the Senate. In 1876 (19 Stat. 152) the offices of supervisors were abolished and the powers of transfer and suspension were vested in the Commissioner, with all other powers transferred to the collectors.

The 1868 legislation also authorized the commissioner to employ 25 detectives for duty under the direction of the supervisors or for other special duties. In 1872 (17 Stat. 241) the title of these officials was changed from detective to agent.

The jobs of gaugers and storekeepers were created by the



- 11 -

1868 legislation." Gaugers were to be appointed by the Secretary, on the recommendation of the assessors in the districts in which they were to work. They checked on the production of liquor within their districts and were paid by the collectors out of fees paid by the distillers whose production they supervised. Storekeepers were appointed by the Secretary and were paid a daily wage. By the Act of March 6, 1872 (17 Stat. 241) gaugers were provided salaries paid by the Government rather than by the firms for which the gauging was done.

As revenues declined after the Civil War, steps were taken to reduce the size of the administrative machinery. The number of dep ty commissioners was reduced to two in 1874 and to one in 1876. The number of districts was reduced in 1876 and again in 1877. In 1883 President Arthur by Executive Order further reduced the number of collection districts to 82, but later in the year he increased the number to 83 and then to 84.

In 1879 (20 Stat. 329) the number of revenue agents was increased to 85. At the same time, provision was made for the payment by the Government of the salaries of deputy collectors who had formerly been paid by the collectors. The collectors' salaries were also changed by fixing a minimum of $2,000 if annual collections were below $25,000, and a maximum salary of $4,500 if the annual collections exceeded $1,000,000. This method of paying collectors remained in force until 1919.

From the end of the Civil War until 1875 the most serious problem which faced the Bureau of Internal Revenue was that of the whiskey frauds. From 1864 to 1868 the rate on distilled liquors was so high that a premium was placed on fraud and evasion. In addition, revenue inspectors received their compensation through fees paid by the distillers, which opened the way to bribery and fraud. After a Congressional investigation it was recommended that the liquor tax be reduced from $2.00 a gallon to 50¢, and this was done in 1868. As a result, the revenue increased enormously.

From 1871 to 1875 additional frauds occurred through a conspiracy known as the "Whiskey Ring". The principal feature of this conspiracy was the large scale corruption of government officials.

Howe (supra p. 198) describes the attempts to improve the collection of liquor taxes as follows:

"The perfection of the details of the service received but scant attention during the war; but with the growing familiarity of officials with its defects from the disclosures of the press, as well as the invaluable investigation of the Revenue Commission, the importance of administrative efficiency became apparent. A careful revision of so much of the law as related to the manufacture and assessment of distilled spirits was made at the



- 12 -

instance of the Revenue Commission in the years immediately subsequent to the war, the leading feature of which was the subjection of each distillery to the direct surveillance of a government inspector, whose duty it was to oversee the process of manufacture and sale, and the assessment of the duty. While the change was conducive of greater fidelity on the part of weighers, gaugers and other officials, and placed an additional check upon them, the powerful inducements which could be offered by the dishonest distillers frequently neutralized the effect of the measure; and there was no provision for constant rotation of the inspectors from one still or district to another, as was suggested by the Commission, a provision which would have greatly enhanced the efficiency of the law. But the effect of this, as well as all other remedial efforts on the part of Congress, was checked by the dishonesty, complicacy, and inefficiency of officials, traceable in part at least to the system of appointment and retention in office for political services."

Collections by contract were attempted from 1872 to 1874. The Secretary of the Treasury was authorized to enter into such contracts by an apparently innocent provision in an appropriation act passed in 1872 (17 Stat. 69). A few months after this act was passed a contract was made with John D. Sanborn for the collection of taxes from 39 distillers and purchasers of whiskey. Shortly thereafter, another contract was made for Sanborn to collect taxes on estates and incomes of 760 persons. A third contract covering a list of about 2,000 names, including 350 foreign residents, was also executed. A fourth contract was made for Sanborn to collect taxes from 592 railroad companies. The supervisors and collectors of internal revenue were directed by the Secretary to assist Sanborn in his work. The Commissioner protested but was unable to do anything about the contracts.

All the contracts provided that Sanborn would receive 50 per cent of the gross amount collected, and he collected $427,000. In 1874 there was a House investigation of the whole procedure and it was found that no responsible official in the Treasury Department knew much about the matter. None of them was willing to accept responsibility, but none of them was found to have been influenced by corrupt motives. The committee also found that many of the taxes collected by Sanborn would have been collected in due course by the Bureau in the ordinary discharge of its duty. As a result of the committee's recommendation, the law authorizing collection by contract was immediately repealed.

In 1887 an Executive Order reduced the number of collection districts from 85 to 63.

The Act of August 2, 1886, which placed a tax on oleomargarine, authorized the Secretary of the Treasury to appoint an analytical chemist and microscopist, and also authorized the Commissioner to employ additional chemists and microscopists when necessary.



- 13 -

The McKinley Tariff Act of 1890 (26 Stat. 567) provided for a bounty on sugar obtained from products grown in the United States and provided that the bounty should be determined by the Bureau of Internal Revenue. The Commissioner protested against such a function being placed in the Bureau but Congress paid no attention and the Bureau administered the law until it was repealed in 1894. This required the employment of 12 sugar inspectors and many deputy collectors of internal revenue for special duty as sugar weighers.

The Wilson Tariff Act of 1894 (28 Stat. 508) revived the income tax and led to the establishment of the Income Tax Division in the Bureau of Internal Revenue. This Division functioned only a few months before the Supreme Court held the income tax unconstitutional.

When Howe wrote his book in 1896 (supra, p. 203) he described the administration as follows:

"In concluding this sketch of the years of experimentation by means of which the present perfected machinery for the garnering of the resources of the nation into the Federal Treasury has been brought about, it may not be inadvisable to describe in some detail the workings of the internal revenue department in the collection of the several taxes at present imposed. The ground plan of the system has not changed fundamentally from the outlines defined by Hamilton over one hundred years ago. As in the department of customs, the chief ministerial officer is the Commissioner, whose duties remain substantially as outlined in the Act of 1862 * * *. In recent years, with the gradual reduction of the system, there has been a tendency to centralize and simplify the collection of the taxes, as is seen in the abolition of the offices of district assessors, as well as in the reduction of the collection districts, of which there are at the present time but sixty-three. It is now the duty of the commissioner to make all inquiries, determinations, and assessments of all taxes and penalties, and to certify a list of such assessments to the collector of the proper district, who is authorized to collect and account for the same to the commissioner. The latter officials are appointed by the President, by and with the consent of the Senate, and must be residents of the districts in which they serve. Every collector before entering upon the duties of his office, is required to execute a bond, with not less than five sureties, conditioned upon the faithful performance of his duties. He is then empowered to appoint as many deputies as he may deem necessary, for whose actions he is, in a like manner, held responsible.

"In addition to the official force directly employed in the collection of the taxes, there are appointed by the commissioner a certain number of special agents, who are deployed from the central office for the purpose of checking any attempted evasion or suspected complicity on the part of other officials; while the Secretary of the Treasury is



- 14 -

authorized to appoint, wherever deemed necessary, a
certain number of gaugers and storekeepers * * *".

In 1909 increasing government expenditures led to the
enactment of a tax of 1 per cent on the net income of corpora-
tions in excess of $5,000. A Corporation Tax Division was or-
ganized in the Bureau to supervise the collection of this tax.

In 1913, after the Constitution had been amended, Congress
enacted a new income tax law (38 Stat. 166). The tax was im-
posed on individuals and corporation and the 1909 tax on cor-
porations was repealed. Following the enactment of this law,
the Personal Income Tax Division was created in the Bureau, and
the Corporation Income Tax Division continued to collect the tax
on corporations.

In 1913 the Overman Act (38 Stat. 208) authorized the appoint-
ment of bonded deputy collectors by the collectors without regard
to the civil service rules. This legislation was enacted as part
of the Urgent Deficiency Appropriation Act which came up soon after
the Democratic Administration took office in 1913. A series of
executive orders had been issued by Presidents Cleveland, Roose-
velt and Taft, concerning the status of deputy collectors. Cleve-
land put them under civil service, Roosevelt took them out and
Taft covered them into civil service again. The result of this
series of orders was that the positions of deputy collectors were
filled by Republicans who were protected by the civil service
rules. The Overman amendment to the Urgent Deficiency Appropria-
tion bill was designed to relieve the situation.

There is some doubt whether the amendment was necessary. In
the course of the debate, Senator Overman quoted an opinion of
the Attorney General, dated January 3, 1913, in which that of-
ficial held that the term of office of a deputy collector expires
automatically upon the appointment of a successor to his collec-
tor (50 Congressional Record, 5388).

The proponents in the House contended that the civil service
had been used by the Republican Party to create an enormous
political machine. They alleged that the deputy collectors had
been selected for political service and that the amendment was
not aimed at destroying the civil service, but was intended to
make an efficient service possible.

The opposition in the House contended that the deputy col-
lectors could be removed from office if they were inefficient,
and hence, it was unnecessary to remove the protection of civil
service from these jobs. It was contended further that the pro-
blem could well be solved by requiring the deputy collectors who
had been covered under civil service without examination, to
take an examination and permit them to hold their jobs only if
they passed it.

The same arguments were used in the Senate and in addition
it was asserted that the logic of the amendment would mean the



- 15 -

complete abolition of the civil service system. Senator Hughes, a Democrat from New Jersey, even went so far as to argue that the Overman amendment was contrary to the Democratic platform.

In 1941 when the Attorney General's committee on administrative procedure issued its report on administrative procedure in government agencies, it found that each collector nominated his own staff, subject to the approval of the Commissioner and the Secretary. The monograph points out that even stenographers had deputy collector's status and were required to post nominal bonds. At the end of the fiscal year 1939 there were about 8,500 permanent employees in the collector's office, but only a few of them were civil service employees (Administrative Procedure in Government Agencies, part 9, page 1, Senate Document No. 10, 77th Congress).

In 1914 the Bureau was required to enforce the regulatory provisions of the narcotics laws. The Harrison Act of December 17 (38 Stat. 785) regulated the use of narcotics and provided for the payment of a fee of $1.00 by every person dealing in narcotics, and the Commissioner was required to enforce it.

The World War brought about several changes in the administration of internal taxes, most of which arose out of the constantly increasing revenues of the Government. The first World War Act was the Revenue Act of October 22, 1914 (38 Stat. 745), but this was a temporary measure and had little effect on the administrative provisions. The Revenue Act of September 8, 1916, however, levied an estate tax, a capital stock tax, and a munition manufacturers tax, and these new taxes required new administrative machinery. An Estate Tax Division was organized in the Bureau, which employed a field force of investigators to examine returns and enforce the tax. The munition manufacturers tax was collected only two years but the capital stock tax is still in effect.

During 1917 a number of tax measures were being considered by Congress and the time consumed in their consideration placed a heavy strain on the Bureau. Many of the proposals would have modified the entire internal revenue system and would have necessitated reorganization of the administrative machinery. Consequently, the Commissioner maintained close contact with Congress and received confidential advance information on the proposals in order that he might keep the collection districts informed and prepared to administer new laws. During this period the duties placed upon the Bureau were both tax collecting and regulatory. It was selected as the agency to enforce the prohibition laws and other prohibitory measures.

The first revenue measure enacted after the declaration of war was the Act of October 3, 1917 (40 Stat. 300). This Act amended many previous laws and was very difficult to administer as a result. It levied an excess profits tax, and in order to interpret this part properly, the Secretary of the Treasury selected a group of excess profits tax advisors from business and professional men. In addition, the Bureau was reorganized



- 16 -

with the creation of new offices and divisions. All of the
collectors were placed under the direction of a supervisor of
collectors, and the 31 revenue agents were placed under the di-
rection of a chief revenue agent. These two officials were
made equivalent in rank to deputy commissioners.

During 1918 Congress debated a large tax bill, but it was
not enacted at the time the war ended, and finally a smaller bill
was approved on February 24, 1919 (40 Stat. 1057). Among other
things the new law placed a tax on the products of child labor
and a Child Labor Tax Division was organized to enforce it. This
Division was abolished when the act was declared unconstitutional
in 1922. The 1919 act also created a Supervisory Tax Board of
6 members appointed by the Commissioner with the approval of the
Secretary. The Board functioned for about 6 months and was fol-
lowed by a Committee on Appeals and Review, which was an inde-
pendent unit of the Bureau responsible only to the Commissioner.
The Committee's function was to hear and consider cases appealed
by taxpayers and to answer the questions asked by the income tax
unit.

The 1919 act also provided for the employment of 5 deputy
commissioners and adjusted the salaries of collectors, including
a provision that no collector should receive more than $6,000
a year. From 1919 to 1921 there were a number of shifts in the
functions of the various units and divisions having jurisdiction
over miscellaneous excise taxes. The ultimate development was
that a Sales Tax Unit supervised the collection of taxes which
were regarded as purely sales taxes, and the Miscellaneous Unit
supervised other excise taxes, such as stamp taxes, taxes on trans-
fers of stock and special taxes on businesses and occupations.

Prior to 1920 the revenue agents and inspectors outside of
Washington served all the units of the Bureau and investigated
cases involving all kinds of internal tax matters. They were
responsible to the chief revenue agent, who in turn was respon-
sible directly to the Commissioner. By 1920 the enforcement of
the income tax had become such a difficult problem that the Field
Auditing Division was created. The men assigned to this division
were charged with the investigation of income and excess profits
taxes, but were not required to do any other work. The Revenue
Act of November 23, 1921 provided for the appointment of a Tax
Simplification Board consisting of 3 public members appointed by
the President and 3 officers of the Bureau designated by the Secre-
tary. Its duties were to investigate the procedures used by the
Bureau and to make recommendations that would simplify them.

During the prohibition era the Bureau had great responsibilities
in connection with the enforcement of the liquor laws. This work
has been largely obviated by the repeal of the prohibition amend-
ment to the Constitution, and accordingly an extensive discussion
is unwarranted.

REPRODUCED...
...NARA Date 10/5/84

- 17 -

## V. Senate Investigation of 1924-1926.

On February 21, 1924 Senator Couzens introduced a resolution calling for the appointment of a Special Senate Committee to investigate the Bureau of Internal Revenue, and make recommendations for corrective legislation. The terms of the resolution authorized the Committee to hold hearings but did not permit the employment of experts. As first presented, the resolution contained several "whereas" clauses indicating that there had been unnecessary delay in decisions of income tax cases, that the delay had been characterized by inefficiency on the part of the Bureau and implied that there had been fraudulent and corrupt practices in the administration of the revenue laws. The Finance Committee reported the resolution without the preamble, but Senator Robinson stated that the resolution itself was broad enough to enable the committee to make any investigation that circumstances indicated to be necessary.

Senator Couzens stated in the debate that his reason for introducing the resolution was the public criticism which had been leveled at the Bureau. There were complaints about arbitrary and unreasonable assessments, delays in final determinations, and many other injustices.

The resolution was adopted March 12, 1924 and on March 14, the Special Committee held hearings which lasted until April 9. On April 10 Secretary Mellon sent a letter to the President in which he stated that he approved the purposes of the resolution but that Senator Couzens had conducted the hearings in such a way that he was convinced that their sole purpose was to vent some personal grievance against himself. He alleged that the Committee attempted only to investigate companies in which he was interested and that they had failed to show any favoritism but had abandoned all constructive purposes. Mellon's letter stated further that the Committee had adopted a resolution authorizing Francis J. Heney to conduct the investigation on the understanding that neither the Committee nor the Government would pay him any compensation, but he would be paid by Senator Couzens. Mellon charged that the investigation injured the efficiency of the Bureau and the taxpayer suffered because the morale of the 60,000 employees of the Department was impaired. He stated "If the imposition of private resources be permitted to interfere with the executive administration of government, the machinery of government will cease to function." The letter concluded with this statement: "When, through unnecessary interference, the proper exercise of this duty is rendered impossible, I must advise you that neither I nor any other man of character can longer take responsibility for the Treasury. Government by investigation is not government."

On the 11th of April President Coolidge sent a message to the Senate attaching a copy of Secretary Mellon's letter. In his message the President said that he would always lay before the Senate any information that was not of a confidential nature, but that the attack being made on the Treasury went beyond any legitimate requirements. Coolidge alleged that the appointment of an agent and attorney to act in behalf of the United States but to be paid from some source other than Treasury, violated an act of 1917, and that this unwarranted intrusion must be resisted by the Executive. He stated, "Under a procedure of this kind the Constitutional guarantee against unwarranted search and seizure breaks down * * *". The conclusion

- 18 -

of the letter was, "If it is to continue, if the government is to be thrown into disorder by it, the responsibility for it must rest on those who are undertaking it. It is time that we return to a government under and in accordance with the usual forms of the law of the land. The state of the Union requires the immediate adoption of such a course."

A very spirited debate followed the receipt of the President's message and political charges of all kinds were made. Preparations were being made for the political conventions to nominate Presidential candidates, and the Senators of both parties tried to turn this dispute to their political advantage.

In the course of the debate Senator McKellar quoted a letter which had been received a few days before by one of the members of the Committee from Secretary Mellon. In it Mellon stated that he felt the Committee should make an immediate investigation in order to satisfy itself and the public whether or not the companies in which he was interested had received any favor from the Government. A few days later he sent the letter described above to the President. Senator Robinson attacked the validity of the statements made by Mellon on the ground that it was impossible to interfere with the efficiency of the Bureau or demoralize the 60,000 employees of the Treasury by merely asking for the tax returns of the companies in which Mellon was interested. No demand had been made that the records be furnished but Mellon had turned them over to the Committee voluntarily. He also pointed out that there could be no violation in this instance of a Constitutional guarantee against unwarranted search and seizure because that section protected private citizens and was not a guarantee to public officials against publicity of their records.

Senator Borah pointed out that when an investigating committee demanded certain files from the Attorney General, and he refused to furnish them because they were confidential, the President requested the immediate resignation of the Attorney General. On the other hand, when the Secretary of the Treasury manifested impatience and resentment toward an investigation of tax returns in which he was interested, the President assumed an entirely different attitude and sent a message to the Senate seeking to call a halt to the investigation.

The question of prohibition enforcement was also dragged into the argument, as it had been charged that the Bureau was not making a sufficient effort to enforce the law. The principal issue was whether Secretary Mellon had any connection with a forged liquor permit on the basis of which a saloon keeper in Pittsburg had obtained a large quantity of whiskey from a bonded warehouse.

Some of the senators attempted to defend Senator Couzens' action in agreeing to pay Mr. Heney's salary himself but ultimately the Senate amended the earlier resolution so as to permit the Committee to hire experts.



- 19 -

Additional hearings under the new resolution were held from November 20, 1924 until June 1, 1925. On January 12, 1926 the Committee filed a partial report and on February 2 filed the second part of its report. The minority views were published on February 26.

The hearings were extremely voluminous, but consist primarily of the examination and discussion of particular cases which had been before the Bureau. There were, however, a number of references to the adequacy of the administrative machinery.

The Committee heard the testimony of Frank E. Frazier, a former employee of the Bureau, on the question of decentralizing the work of the Bureau. Frazier pointed out that there were two field organizations in the Bureau. One was the collection service, under the supervision of 65 collectors, which had 7,000 people and was charged with the collection of revenue and the auditing of individual income tax returns below $15,000. Most of its employees were not covered by the civil service rules. The second field organization was the force of 3,000 people known as internal revenue agents and inspectors, who were under the direction of 34 internal revenue agents in charge. The people in the agents' offices were all civil service employees, but did not do much auditing except in those cases referred to them by Washington. Frazier pointed out that 7,000,000 returns were audited in the field and the work in Washington was considerably in arrears. He stated that it was his opinion that all auditing ought to be done in the field.

Mr. Nash, the Assistant Commissioner of Internal Revenue, stated that further decentralization had not taken place because there was not a proper organization for the auditing of all returns in the field. His reasons for this statement were that the men in the field were not all civil service employees, were not technically qualified to handle difficult returns, and were not paid high enough salaries.

Mr. Hartson, Solicitor of the Bureau, testified that decentralization promotes a lack of uniformity in the rulings. He stated that it is desirable to get taxpayers' cases settled, but it is more important to the same taxpayer to be treated the same way that other taxpayers in other jurisdictions are treated.

Mr. Frazier concluded by proposing that the Overman Act be repealed, all the field forces, except the prohibition forces, be consolidated, and that the auditing of practically all income tax returns be done in the field. He predicted that this would speed up the work of the Bureau, and that its appropriations could be reduced by several million dollars at an early date.

At a later point Mr. Nash testified to the same effect as Mr. Frazier that there were two field organizations, one under the collectors, which was not civil service, and one under the agents, which was civil service. He said that he would like to see all of the field work under one administrative head, but that he did not believe the problem could be solved by combining the collectors' offices and the agents' offices because so many of the collector's



- 20 -

employees were political appointees. Nash testified that the men
in the agents' offices did a higher type of work and received on
the average, higher salaries than the deputy collectors.

Senator King, who was a member of the Committee, stated that
he felt it would be better to have one organization and have it
responsible to Washington, rather than to local collectors. He
wanted to know whether Secretary Mellon would sponsor such a move
and whether it would be approved by the Treasury Department. Mr. Nash
stated that it had been studied very carefully by the Treasury, but
that any such proposal would require a drastic change in the law
in order to keep the efficient people who did not have civil service
status but who should stay in the internal revenue service. Senator
King expressed his view as being that the duties of the collectors
should be transferred to the revenue agents.

## VI.  Senate Committee Report of 1926.

The investigation of the Special Senate Committee dealt primarily
with the administration of the income and estate taxes. In addition,
there were investigations of the administration of the prohibition
laws and of the reasons for yearly variations in taxable income. In
its first report the Committee took up the investigation of the income
tax administration and stated that a subsequent report would be filed
on this same subject. Apparently the second report has never been
filed.

The two principal abuses which the Committee found in the admin-
istration of the income tax were allowances for discovery depletion
and allowances for amortization of war facilities. In connection
with depletion allowances the Committee found that Bureau officials
superior to the engineers, were setting aside sound determinations
of value and substituting excessive ones on the basis of analytic
appraisals. This practice was forbidden by the regulations, but the
regulations were being consistently ignored and the Committee
recommended an amendment to the law. The Committee also found that
the head of the Engineering Division was unfit to hold his position
and that there was a growing tendency to make a production record
regardless of principle and to give persistent and influential tax-
payers anything they demanded in order to reach a settlement. The
abuses found in connection with the amortization of war facilities
were numerous and consisted of complicated methods of allowing
greater amortization than was permitted by the revenue laws. On
this point the Committee report states that taxes on about $140,000,000
of amortized values could be saved if Congress took prompt action.

The Committee also found that it was the Commissioner's consistent
policy to exceed his authority to compromise taxes and in many cases
he gave unsecured creditors and stockholders of insolvent corporations
precedence over claims for taxes. The Committee concluded that the
fraud penalty was never enforced by the Commissioner.

REPRODUCED

NARA Date

- 21 -

The administrative reasons behind these abuses were discussed in detail by the Committee. The report states that the "practically unlimited discretionary power vested in the Commissioner of Internal Revenue" was really being exercised by the heads of the divisions of the Bureau. There were no adequate rules or restrictions governing the division heads and their work could not be reviewed unless a taxpayer was dissatisfied with their determinations or a refund in excess of $50,000 was involved. Even subordinates within the divisions were unable to protest, because it was the policy of the income tax unit to discourage complaints and protests by employees, and no direct communication with the Solicitor or the Commissioner was permitted.

One of the principal defects discussed by the Committee was the failure to publicize principles and practices to be followed in the determination of tax liability. They found that this resulted in gross discrimination because employees of the Income Tax Unit had no uniform principals to follow; that taxpayers often failed to claim allowances because they did not know that similar allowances had been granted to others; that because precedents were not published, taxpayers were forced to employ former employees of the Income Tax Unit to advise them in tax cases, which placed an artificial premium on the value of the services of such persons and enabled them to charge excessive fees; that the demand for the services of ex-employees of the Bureau caused an enormous turnover in the personnel of the Bureau; and that because of the unsettled state of the law, many claims were filed which should be settled by precedents.

The Committee concluded that the publication of rulings would be the strongest possible deterrent against the making of unsound rulings, but that instead of following such a course, it was the policy of the Bureau to fix taxes by bargain so that the most persistent trader got the lowest tax. Although the Committee recognized that there were objections to throwing open the records of the Income Tax Unit to the public, it suggested the necessity of giving an opportunity for some outside scrutiny to protect the public against discrimination.

In connection with the investigation of alleged delays in the closing of tax cases, the Committee found that many delays took place and were the result of bargaining with the taxpayers and the granting of many extensions of time to furnish information required to determine the validity of deductions.

On February 6, 1926, more than three weeks after the filing of the majority report, two of the five members of the Committee filed a report containing the minority views. In it they severely criticized the majority for their handling of the investigation and the report, and they also attempted to refute all of the criticisms made in the majority report.

The comments on the Committee procedure were that most of the cases discussed in the report had not been the subject of hearings but had been examined after the close of the hearings from photostats made from internal revenue files. The report was prepared by counsel and the Bureau was given an inadequate opportunity to comment on it.



- 22 -

The Committee never met to discuss the report and it was published hastily, giving an erroneous impression to the public of the state of work in the Bureau.

With respect to the comments of the majority on administrative procedure in the Bureau, the minority made several arguments. First, they stated that the Committee had never examined the Bureau procedures at first hand as they had been invited to do by the Bureau officials. Second, they contended that the practice of delegating authority to division heads was justified, because it would be impossible for all the activities of the Bureau to be under the direct personal supervision of the Commissioner. The minority believed that the review procedures were adequate and that every step possible had been taken to protect the interests of the Government. The minority also contended that an enormous number of rulings and regulations had been published and that the bulletins in which rulings appeared had, for the preceding two years, contained a statement on the cover that "no unpublished ruling or decision will be cited or relied upon by any officer or employee of the Bureau of Internal Revenue as a precedent in the disposition of other cases." Finally, the minority attempted to show that the Bureau had accomplished a great deal against very serious obstacles.

The number and amount of taxes had been increased enormously between 1916 and the end of the investigation, which had caused the Bureau to expand its personnel in an attempt to handle the volume of work. In addition, new types of taxes were imposed and a great many new duties were imposed on the Bureau. The minority felt that the Bureau had overcome the greatest difficulties and had succeeded in becoming practically current in its work. They felt that the investigation had been limited to individual cases and had not gone into over-all accomplishments of the Bureau. The concluding paragraph of the minority report is as follows:

"The accomplishments of the bureau in collecting more than $30,000,000,000 in revenue and in auditing and closing 58,000,000 cases has been subjected for the last year and three months to this type of critical investigating by the investigating committee and its staff, composed of some 50 lawyers, engineers, accountants, and clerks. It has resulted in a criticism of various regulations which had received the approval of two administrations and many competent and able authorities on taxation, besides disclosing a difference of judgment in some specific cases. The investigation has disclosed no hint of any irregularity or fraud. That the bureau can so successfully withstand such a searching and critical investigation is a great tribute both to its present and past officials and employees. The bureau is entitled to the respect, admiration, and praise of the Congress and of the country for the honest and efficient way in which it has performed its work."

REPRODUCED...
...NARA DATE...

- 23 -

## VII. Recent Developments in Administration.

When the office of the supervisor of collectors was abolished some time after 1920, a new procedure was established for the examination of collectors' offices. The men who had been employed by the supervisor of collectors under civil service became supervisors of accounts and collections. They were placed under the direction of a Deputy Commissioner and organized into an Accounts and Collections Unit created in 1922. They have been used to supervise the personnel of collection districts, to train new personnel, and to speed up collection drives in districts where receipts lag. The purpose of their audit of the collectors' books is to maintain agreement between the collectors' books and the amounts charged against them at the Bureau in Washington. They also report on the general efficiency of the employees, and before the bulk of collectors' employees were covered under civil service, they reviewed efficiency ratings and had considerable control over the personnel of the collectors' offices.

Without benefit of legislation the Bureau took steps in 1927 to improve the work of the collectors' offices, particularly where inadequacies resulted from the fact that the collectors were political appointees. Collectors were persuaded in most instances to appoint their chief deputies or chief clerks as "Assistant to the Collector". At the time this was done there was no requirement that the Assistant to the Collector be a civil service officer, but in many cases the men appointed were under the civil service. According to the Internal Revenue Manual (1936) the Assistant to the Collector is under the general direction of and responsible to the collector. It is his duty to plan, organize, coordinate, supervise, and be directly responsible for the operations of the office organization. He assumes the duties of the collector in the collector's absence. The chief weakness of this office is that the collector is free to choose any member of his staff and to change assistants at will.

In 1926 Congress authorized the President with the consent of the Senate to appoint a Special Deputy Commissioner of Internal Revenue. This official has such duties as are prescribed by the Commissioner or authorized by law. (44 Stat. 126).

The Act of May 29, 1928 (45 Stat. 882) provided that the salaries of collectors of internal revenue could be readjusted and increased under regulations prescribed by the Commissioner with the approval of the Secretary. It also limited the amount received by any collector to $7,500 per year.

On March 2, 1929 legislation was enacted (45 Stat. 1496) changing the salaries of storekeeper-gaugers from a per diem basis to annual salaries based on their then existing per diem rates.



- 24 -

In 1934 an act was passed (48 Stat. 758) which reorganized the legal branch of the Bureau of Internal Revenue. Prior to the enactment of this law there was a Solicitor of the Treasury who had powers in a limited field not assigned to other legal officers of the Department, a General Counsel for the Bureau of Internal Revenue, an Assistant General Counsel for the Bureau, and an Assistant Solicitor of the Treasury.

The report of the House Committee on Ways and Means stated that "there is no responsible legal officer in the Treasury with power to coordinate the legal work of these separate groups of lawyers and to prevent waste and duplication of effort among them" (report No. 704, 73rd Congress, page 40).

The new law created the office of General Counsel, who is appointed by the President with the advice and consent of the Senate. In addition, the President is authorized to appoint, with the consent of the Senate, an Assistant General Counsel for the Bureau of Internal Revenue. Five other Assistant General Counsels were authorized to assist the General Counsel in the performance of his duties, but these appointments are made by the Secretary of the Treasury and only the Assistant General Counsel for the Bureau is appointed by the President and confirmed by the Senate.

The General Counsel is vested with the powers, duties, and functions of the General Counsel for the Bureau of Internal Revenue, the Assistant General Counsel for the Bureau of Internal Revenue, the Solicitor of the Treasury, and the Assistant Solicitor of the Treasury, all of which offices were abolished.

The Revenue Act of 1934 in which these provisions relating to the legal staff of the Treasury were incorporated, had been introduced for the purpose of increasing the revenue by preventing tax avoidance. Numerous amendments were made in the rate structure and in the detailed technical provisions of the tax laws. In the course of the debate Congressman McFadden made a speech concerning the information which had been accumulated concerning former Secretary Mellon's administration of the Bureau. In addition to criticizing the confidential rulings which were used extensively during Mellon's administration and the compromises which were entered into at that time, Congressman McFadden severely criticized the treatment which had been accorded employees of the Bureau. He alleged that employees were liberally rewarded at the Government's expense if they assisted Mellon to enrich himself, or the companies in which he was interested, through the avoidance of taxes. He alleged further that those who did not serve Mellon's purposes could not advance and those who dared to question his activities were "demoted, dismissed, dishonored and disgraced". He also contended that civil service employees of the Bureau were never granted the hearings to which they were entitled under the law if their status was affected by the action of Mellon or his associates.

REPRODUCED AT THE
NATIONAL ARCHIVES

- 25 -

In 1938 two new divisions concerned with taxation problems were created by administrative action. These were the Division of Tax Research and the office of the Tax Legislative Counsel. Although neither group was supposed to be a part of the Bureau or responsible to the Commissioner, their salaires and expenses were paid out of the annual appropriations for the Bureau. The Treasury Department Appropriation Act, 1944 (57 Stat. 250) is the first legislative reference to these divisions. Separate appropriations have been provided for them since June 30, 1943.

In 1938 Secretary Morgenthau decided to decentralize the settlement machinery of the Bureau of Internal Revenue. The purpose of decentralization was to creat a single unified settlement and trial agency with office facilities which were near the taxpayer's residence or place of business. The program is described in an article by Milton E. Carter, an official of the Bureau, in 17 Taxes 403 (1939) and there is a more detailed discussion in Part 9 of the monograph of the Attorney General's Committee on Administrative Procedure.

The Technical Staff of the Bureau of Internal Revenue was created for the purpose of carrying out the decentralization policy. That Staff exercises all the authority of the Secretary of the Treasury and the Commissioner of Internal Revenue in the review of protested tax determinations made by Internal Revenue agents in charge, and in the settlement of contested cases and their defense before the Court of Tax Appeals. The Technical Staff is charged with the disposition by settlement or trial of the many protested cases which arise each year. In 1939 it had ten field divisions and 38 permanent local offices. They grant hearings to taxpayers who request them after having failed to reach agreement with the investigating internal revenue agent. If the taxpayer declines to accept the determination of the Technical Staff the case is returned to the internal revenue agent in charge, who issues a notice of deficiency. Appeals by taxpayers to the Court of Tax Appeals again bring the case back to the Technical Staff which considers them with a view to settlement by agreement.

The Technical Staff operates under the general supervision of the Commissioner and has representatives of the Chief Counsel attached to each field office. The local member of the Chief Counsel's office must concur in settlements negotiated after appeals have been made to the Court of Tax Appeals, and they also try the cases which are not settled at this point.

The Monograph of the Attorney General's Committee criticizes some details of the decentralization program but gives it general approval and considerable praise for the speed with which it was organized and put into operation.

- 26 -

During the Senate's consideration of the Revenue Act of 1942, an incident occurred which illustrates in a striking manner the relationship of the Secretary of the Treasury and the Commissioner of Internal Revenue. This incident led to the enactment of a statute (Internal Revenue Code, section 5012) which made a very important change in the relationship of the Treasury and Congress on tax matters.

The Revenue Bill supported by the Secretary provided for withholding personal income taxes at the source. The Secretary testified before the House Committee that it was the best available expedient to achieve a more convenient method for the payment of income taxes. Notwithstanding the Secretary's testimony, and without notifying the Secretary of his intention to do so, the Commissioner appeared before the same Committee and testified in very emphatic terms that the provision was administratively unfeasible. The Commissioner gave similar testimony in even more emphatic terms before a Subcommittee of the Senate Committee on Finance, again without obtaining the Secretary's consent.

As a result of this conflicting testimony the Senate Committee proposed an amendment to the bill authorizing the Joint Committee on Internal Revenue Taxation or its chief of staff to obtain any information directly from the Bureau (including the Assistant General Counsel for the Bureau) or directly from any other department or agency. In defending this provision during the debate, Senator Clark of Missouri said:

"The views of the general headquarters contingent, so to speak, and the 'brain trust' of the Treasury Department, were expressed at great length to the subcommittee, and it was casually said that the Bureau of Internal Revenue was being represented at that time by a young man whom I did not know. I went out and called up the Commissioner of Internal Revenue who had the actual administration of the measure in hand, and asked him to come up and appear before the committee. He told me he could not do it without the permission of the Secretary of the Treasury. I wrote the Secretary of the Treasury and gave the committee views in direct divergence, just as far as they possibly could be, from the views which had been expressed on his behalf by the Treasury officials themselves, and as the result of the information he gave the committee, the committee saw fit to make a very radical change in the proposal, in fact to make a complete divergence." (Cong. Rec., DI, October 9, 1942, p. 8271).

Senator Barkley tried to amend the proposal by requiring the Joint Committee or its chief of staff to secure information through the heads of the departments and agencies but his amendment was defeated by a vote of 74 to 10.

The Act of June 9, 1943 (57 Stat. 150) authorized the President with the consent of the Senate to appoint two Assistant Commissioners in the Bureau of Internal Revenue. This act also abolished the office of Assistant to the Commissioner, which had been created in 1919. The Assistant Commissioners perform such duties as may be prescribed by the Commissioner or required by law.



- 27 -

### VIII. Existing Laws Relating to the Administration of the Bureau.

There has never been any statutory creation of the Bureau of Internal Revenue, although the Bureau is mentioned in several statutes, including statutes relating to the social security taxes (Internal Revenue Code, sections 1420, 1530, and 1605), the provisions relating to the narcotics tax (Internal Revenue Code, sections 2550 and 2603), and those relating to the power of the Joint Committee on Internal Revenue Taxation to obtain information (Internal Revenue Code, section 5012).

#### A. Statutory Relationship of the Secretary and the Commissioner.

The Commissioner of Internal Revenue is appointed by the President by and with the advice and consent of the Senate. The office is created in the Department of the Treasury, and the Commissioner is entitled to a salary of $10,000 per year (Internal Revenue Code, section 3900). The next section of the Internal Revenue Code sets forth the powers and duties of the Commissioner. It begins with the phrase "The Commissioner, under the direction of the Secretary---." It is obvious, therefore, that the position of the Commissioner of Internal Revenue is not endowed by legislation with any peculiar attributes which are not attached to a number of other officials of the Department who are responsible to the Secretary of the Treasury, although they are appointed by the President and confirmed by the Senate.

Section 3901 continues with the provision that the Commissioner, under the direction of the Secretary, shall superintend generally the assessment and collection of all taxes providing internal revenue, and he is also to prepare and distribute the instructions, regulations, drafts, forms, blanks, stamps and other matters pertaining to the assessment and collection of internal taxes.

The internal tax laws impose a number of functions and duties upon the Commissioner with respect to the various taxes. In nearly all instances, however, the authority granted him may be exercised only with the approval of the Secretary of the Treasury. There are literally hundreds of references in the Internal Revenue Code to the authority of the Commissioner being exercised only with the approval of the Secretary. This is true of practically all of the functions which involve the exercise of a considerable amount of discretion. An examination has been made of the Internal Revenue Code for the purpose of determining the functions of the Commissioner which he exercises without the specific approval of the Secretary. Several such instances have been found, but they are generally of minor importance, and it should be noted that even in these cases the Commissioner is

REPRODUCED AT
BY NARA DATE

- 28 -

probably subject to the direction of the Secretary pursuant to
the terms of section 3901 of the Internal Revenue Code.2/ With
respect to narcotics and liquor taxes, the Secretary is authorized
to transfer duties and functions freely irrespective of the sta-
tutes relating to the Commissioner of Internal Revenue.  (Inter-
nal Revenue Code, sections 2606 and 3170).

It is apparent from an examination of the statutes that
Congress has been careful to preserve the power of the Secretary
to supervise and direct the activities of the Commissioner.  Any
difficulties that have arisen in this connection must, therefore,
have been the outgrowth of administrative practices and the laws
relating to the appointment and service of other officers of the
Bureau.

B.  Relationship of the Collectors to the Commissioner
and the Secretary.

The collectors of internal revenue are appointed by the
President with the consent of the Senate, but the statutes relating
to their appointment and duties do not indicate to whom they are
responsible.  Very little has been found which indicates how the
existing relationships developed.  It seems clear, however, that
the practice is to make the collectors responsible to the Com-
missioner.  The Internal Revenue Manual (1936) is issued for the
information and guidance of collectors and their employees.  It
is signed by the Commissioner of Internal Revenue and approved
by the Acting Secretary of the Treasury.  In its description of
the functions and responsibilities of the collector, it states
(section 2) "the collector of internal revenue is under the
general administrative direction of, and is responsible to, the
Commissioner of Internal Revenue for the administration of the
internal revenue service in his district; * * *".  It is apparent,

2/ The Commissioner is authorized to approve certain types of ac-
counts maintained by taxpayers (sec. 41); to allocate income and
deductions between corporations having identical ownership (sec.
45); to require bonds when credit is allowed for foreign taxes
(sec. 131); to close the taxable year, make assessments and abate
them when taxes are in jeopardy or taxpayer is about to leave the
United States (secs. 146, 272, 3660); to obtain specified types
of information from corporations (sec. 148); to require informa-
tion concerning deductions and credits allowed to non-resident
aliens (sec. 213); to extend time for payment of taxes on unjust
enrichment, require bonds and settle claims involving the same
tax (secs. 702 and 705); to adjust abnormalities affecting income
subject to excess profits taxes (sec. 722); to extend time for pay-
ment and require bonds in connection with the estate tax and de-
ficiencies (secs. 822 and 871); to prescribe stamps and the method
of affixing and cancelling them (secs. 1809, 1815 and 1816); to
prescribe the form of inventories and books under the tobacco
taxes (secs. 2017, 2018, 2036, 2037, 2055 and 2056); to issue



- 29 -

therefore, that the Secretary, the Commissioner and the Collectors operate on the basis of direct responsibility of the collectors to the Commissioner.

Whatever power the Secretary may exercise over the actions of the collectors stems from the Secretary's general authority with respect to the Commissioner. As noted in an earlier part of this memorandum, the Commissioner acts "under the direction of the Secretary". In addition the Secretary has authority to suspend collectors but only in cases of fraud, gross neglect of duty, or abuse of power. (Internal Revenue Code, section 3942 and Reorganization Plan No. II, sec. 404).

C.  Existing Laws Relating to Subordinate Positions
    in the Bureau.

In addition to the Commissioner the statutes in effect today provide for the appointment by the President, with the consent of the Senate, of two Assistant Commissioners. The President also has authority, with the consent of the Senate, to appoint a Special Deputy Commissioner. There are five other deputy commissioners employed in the Bureau pursuant to section 3915 of the Internal Revenue Code. The statutes also provide for the appointment by the Secretary of an analytical chemist and a microscopist and the legal staff described above.

Sections 3940 and 3941 of the Internal Revenue Code authorize the President with the consent of the Senate to appoint a collector for each of the 65 internal revenue districts. The President is also authorized to consolidate collection districts. The salaries and allowances for expenses of collectors are determined by the Secretary upon the recommendation of the Commissioner. This control of salaries provides the Secretary of the Treasury with considerable power over the appointment and continuance in office of collectors. In addition to the initial determination of salaries, the Secretary has the right to approve or disapprove regulations prescribed by the Commissioner, readjusting and increasing the salaries of collectors.

---

2/continued.
regulations on bulk sales of tobacco free of tax (sec. 2101); to issue regulations requiring cigar and cigarette labels to show taxes paid (sec. 2111); to issue regulations on the destruction of forfeited tobacco (sec. 2190); to determine margarine substances subject to tax and deleterious to health (sec. 2311); to require persons to file returns, furnish information and keep records (sec. 3603); and to sanction tax suits (sec. 3740).



- 30 -

Each collector is authorized by section 3990 of the Internal Revenue Code to appoint as many deputies as he thinks proper and to revoke their appointments. These powers were transferred to the Secretary of the Treasury by section 404 of Reorganization Plan No. II, May 3, 1939. Deputy collectors are compensated by such allowances as the Secretary provides upon the recommendation of the Commissioner. If a collector is sick or absent, the senior deputy performs his functions, and if there is a vacancy he discharges the collector's functions until a successor is appointed. All deputies continue to act until a new collector is appointed to fill a vacancy.

The Commissioner has authority under section 4000 of the Internal Revenue Code to appoint internal revenue agents and to assign them to duty under the direction of any officer of the Bureau or such special duties as he deems necessary. The appointment power was transferred to the Secretary in 1939 by Reorganization Plan No. II.

Bonded storekeeper-gaugers are appointed by the Secretary under section 4010 of the Internal Revenue Code. They are paid annual salaries and traveling expenses. One or more must be assigned by the Commissioner to every internal revenue bonded warehouse. Whenever storekeeper-gaugers are not employed upon their regular duties, they may be assigned to such duties as the Commissioner shall designate.

### D. Civil Service Status of Employees.

None of the officials appointed by the President with the advice and consent of the Senate are civil service employees. These include the Commissioner, the two Assistant Commissioners, the Special Deputy Commissioner, the Assistant General Counsel for the Bureau of Internal Revenue and all collectors of internal revenue.

Under the terms of the Overman Act of 1918 deputy collectors of internal revenue were not covered by the civil service laws, and by 1939 practically all of the positions in the offices of the collectors were classified as deputy collectors. Accordingly, there were very few civil service employees on the collectors' staffs. The employees of the internal revenue agents on the other hand are almost entirely civil service employees. In 1934 the Civil Service Commission contended that clerks and other employees in the offices of collectors should not be deputy collectors appointed outside the civil service. The Commissioner argued that the practice of the collectors was authorized by the Overman Act. On September 13, 1934 Mr. Oliphant, then General Counsel of the Treasury, wrote an opinion in which he concluded that it was not the intention of Congress that clerical help in collectors' offices be appointed deputy collectors, and thus be exempted from civil service requirements. It is not known what action resulted from this opinion of the General Counsel.



- 31 -

In 1940 Congress authorized the President to issue executive orders covering into the classified civil service any offices or positions in the Executive Branch of the Government with certain specified exceptions. There were no exceptions affecting the Bureau of Internal Revenue, except that the executive orders could not affect officials appointed by the President with the advice and consent of the Senate.

On April 23, 1941 the President issued Executive Order 8743, which covered into the classified civil service all Government employees not so covered, with certain stated exceptions. Positions excepted from the classified civil service under Schedules A and B of the Civil Service Rules were not covered by the Executive Order. These schedules make only one reference to employees of the Bureau of Internal Revenue, which is as follows:

"\* \* \* special employees for temporary detective work in the field service of the Bureau of Internal Revenue under the appropriation for detecting and bringing to trial and punishment persons violating the internal revenue laws. Appointments under this paragraph shall be limited to persons whose services are required because of individual knowledge of violations of the law, and such appointments shall be continued only so long as the personal knowledge possessed by the appointee of such violation makes his services necessary.\* \* \*"

Accordingly, all positions in the Bureau of Internal Revenue, including deputy collectors, are now covered into the classified civil service with the exception of those officials appointed by the President with the consent of the Senate.

*Arnold D. Lufford*
*Richard J. Dunne*

50/1450/57/16/06
Box 174

**EXHIBIT P**
Letters to Chief Counsels William Smith and Chief Counsel Preet Bharara of the
U.S. Committee on the Judiciary, and to Senator Richard Burr and Senator Elizabeth Dole
(6 pages)

Certified Mail: <u>7007 0220 0000 2023 1471</u>

Rodney K. Justin
c/o 620 Virginia Drive
Woodleaf, North Carolina [27054]

December 20, 2007

William Smith, Majority Chief Counsel
Preet Bharara, Minority Chief Counsel
US Committee on the Judiciary
Subcommittee Admin.Oversight/Courts
224 Dirksen Senate Office Building
Washington, D.C. 20510

Dear Chief Counsels Smith and Bharara:

I, Rodney K. Justin, am seeking assistance regarding the United States Government's perpetual invasion into my family's life. For several years, I have been corresponding with the Internal Revenue Service regarding my alleged tax liability, including, but not limited to the filing of my 1040 tax forms for the years 1997 through 2005. I filed an administrative claim on approximately April 6, 2007. However, I received a letter dated July 10, 2007 from Charles E. Hunter, Special Agent in Charge, Department of the Treasury, Internal Revenue Service Criminal Investigation, stating: ***"This office has under consideration a recommendation that criminal proceedings be instituted against you for evasion of assessment of taxes for tax years 2001, 2002, 2003, and 2004 in violation of I.R.C. § 7201,"*** and a recommendation that I be prosecuted was submitted in September 2007 to the Department of [J]ustice.

Since then we have filed lawsuits against the United States, Internal Revenue Service (IRS) and others, seeking declaratory and injunctive relief on various grounds. One key issue we have raised is that Congress clearly *prohibits the prosecution* of [t]axpayers for alleged violation of the internal revenue laws (civilly and criminally) at Title 26 U.S.C. § 6213(a), which states in part that "*. . . **no . . . proceeding in court . . . shall be . . . prosecuted until such notice (of deficiency) has been mailed to the taxpayer** . . .*" yet, the IRS has failed to comply with this mandatory act of Congress, as we have never been issued a notice of deficiency. Thus, we are of the conviction that we should not be prosecuted for this and other reasons.

We are aware that the federal Courts routinely abuse process to their discretion (especially when the United States is a plaintiff or defendant), and we do not wish to be victims of that abuse. Hence, we have no confidence in the judicial system and are seeking your assistance for oversight of the judiciary so that we might have an equal opportunity to judicially resolve the issues of facts and law raised instead of continually being denied access to the courts. If you could take a few moments from your busy schedule to review this case, it would be greatly appreciated – my life, liberty and property depend on it. Thank you for your kind indulgence and consideration regarding this most serious matter.

**FILED**

07 2334

DEC 2 2 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Truly Yours,

_____/S/_____

Rodney K. Justin

**Enclosure:**

Verified Complaint with Exhibits

**Mailed to:**

The Honorable Richard Burr
United States Senate
217 Russell Senate Office Bldg
Washington, D.C. 20510
Certified Mail: 7007 0220 0000 2023 1587

The Honorable Elizabeth Dole
United States Senate
555 Dirksen Senate Office Bldg
Washington, D.C. 20510
Certified Mail: 7007 0220 0000 2023 1594

Certified Mail: <u>7007 0220 0000 2023 1587</u>

Rodney K. Justin
c/o 620 Virginia Drive
Woodleaf, North Carolina [27054]

December 20, 2007

The Honorable Richard Burr
United States Senate
217 Russell Senate Office Bldg
Washington, D.C. 20510

Dear Senator Burr:

I, Rodney K. Justin, am seeking assistance regarding the United States Government's perpetual invasion into my family's life. For several years, I have been corresponding with the Internal Revenue Service regarding my alleged tax liability, including, but not limited to the filing of my 1040 tax forms for the years 1997 through 2005. I filed an administrative claim on approximately April 6, 2007. However, I received a letter dated July 10, 2007 from Charles E. Hunter, Special Agent in Charge, Department of the Treasury, Internal Revenue Service Criminal Investigation, stating: ***"This office has under consideration a recommendation that criminal proceedings be instituted against you for evasion of assessment of taxes for tax years 2001, 2002, 2003, and 2004 in violation of I.R.C. § 7201,"*** and a recommendation that I be prosecuted was submitted in September 2007 to the Department of [J]ustice.

Since then we have filed lawsuits against the United States, Internal Revenue Service (IRS) and others, seeking declaratory and injunctive relief on various grounds. One key issue we have raised is that Congress clearly *prohibits the prosecution* of [t]axpayers for alleged violation of the internal revenue laws (civilly and criminally) at Title 26 U.S.C. § 6213(a), which states in part that "*. . . **<u>no . . . proceeding in court . . . shall be . . . prosecuted until such notice (of deficiency) has been mailed to the taxpayer</u>** . . .*" yet, the IRS has failed to comply with this mandatory act of Congress, as we have never been issued a notice of deficiency. Thus, we are of the conviction that we should not be prosecuted for this and other reasons.

We are aware that the federal Courts routinely abuse process to their discretion (especially when the United States is a plaintiff or defendant), and we do not wish to be victims of that abuse. Hence, we have no confidence in the judicial system and are seeking your assistance for oversight of the judiciary so that we might have an equal opportunity to judicially resolve the issues of facts and law raised instead of continually being denied access to the courts. If you could take a few moments from your busy schedule to review this case, it would be greatly appreciated – my life, liberty and property depend on it. Thank you for your kind indulgence and consideration regarding this most serious matter.

Truly Yours,

/s/
_____

Rodney K. Justin

**Enclosure:**

Verified Complaint with Exhibits

**Mailed to:**

William Smith, Majority Chief Counsel
Preet Bharara, Minority Chief Counsel
US Committee on the Judiciary
Subcommittee Admin.Oversight/Courts
224 Dirksen Senate Office Building
Washington, D.C. 20510
Certified Mail: 7007 0220 0000 2023 1471

The Honorable Elizabeth Dole
United States Senate
555 Dirksen Senate Office Bldg
Washington, D.C. 20510
Certified Mail: 7007 0220 0000 2023 1594

Certified Mail: 7007 0220 0000 2023 1594

Rodney K. Justin
c/o 620 Virginia Drive
Woodleaf, North Carolina [27054]


December 20, 2007


The Honorable Elizabeth Dole
United States Senate
555 Dirksen Senate Office Bldg
Washington, D.C. 20510

Dear Senator Dole:

I, Rodney K. Justin, am seeking assistance regarding the United States Government's perpetual invasion into my family's life. For several years, I have been corresponding with the Internal Revenue Service regarding my alleged tax liability, including, but not limited to the filing of my 1040 tax forms for the years 1997 through 2005. I filed an administrative claim on approximately April 6, 2007. However, I received a letter dated July 10, 2007 from Charles E. Hunter, Special Agent in Charge, Department of the Treasury, Internal Revenue Service Criminal Investigation, stating: *"This office has under consideration a recommendation that criminal proceedings be instituted against you for evasion of assessment of taxes for tax years 2001, 2002, 2003, and 2004 in violation of I.R.C. § 7201,"* and a recommendation that I be prosecuted was submitted in September 2007 to the Department of [J]ustice.

Since then we have filed lawsuits against the United States, Internal Revenue Service (IRS) and others, seeking declaratory and injunctive relief on various grounds. One key issue we have raised is that Congress clearly *prohibits the prosecution* of [t]axpayers for alleged violation of the internal revenue laws (civilly and criminally) at Title 26 U.S.C. § 6213(a), which states in part that *". . . no . . . proceeding in court . . . shall be . . . prosecuted until such notice (of deficiency) has been mailed to the taxpayer . . ."* yet, the IRS has failed to comply with this mandatory act of Congress, as we have never been issued a notice of deficiency. Thus, we are of the conviction that we should not be prosecuted for this and other reasons.

We are aware that the federal Courts routinely abuse process to their discretion (especially when the United States is a plaintiff or defendant), and we do not wish to be victims of that abuse. Hence, we have no confidence in the judicial system and are seeking your assistance for oversight of the judiciary so that we might have an equal opportunity to judicially resolve the issues of facts and law raised instead of continually being denied access to the courts. If you could take a few moments from your busy schedule to review this case, it would be greatly appreciated – my life, liberty and property depend on it. Thank you for your kind indulgence and consideration regarding this most serious matter.

Truly Yours,

/S/
_____
Rodney K. Justin


**Enclosure:**

Verified Complaint with Exhibits


**Mailed to:**

William Smith, Majority Chief Counsel
Preet Bharara, Minority Chief Counsel
US Committee on the Judiciary
Subcommittee Admin.Oversight/Courts
224 Dirksen Senate Office Building
Washington, D.C. 20510
Certified Mail: <u>7007 0220 0000 2023 1471</u>

The Honorable Richard Burr
United States Senate
217 Russell Senate Office Bldg
Washington, D.C. 20510
Certified Mail: <u>7007 0220 0000 2023 1587</u>